EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Obispo de la Iglesia Católica de Puerto Rico -Diócesis de Arecibo, Daniel Fernández Torres y su Vicario General Luis Colón Rivera<br><br>Peticionarios<br><br>v.<br><br>Secretario de Justicia del Estado Libre Asociado de Puerto Rico, Hon. César Miranda<br><br>Recurrido | 2014 TSPR 86<br><br>191 DPR ____ |

Número del Caso: CT-2014-4

Fecha: 14 de julio de 2014

Abogados de la Parte Peticionaria:

      Lcdo. Frank Torres-Viada
      Lcdo. Manuel Martínez Umpierre
      Lcdo. José A. Andreu Fuentes

Oficina de la Procuradora General:

      Lcda. Margarita Mercado Echegaray
      Procuradora General

      Lcda. Tanaira Padilla Rodríguez
      Subprocuradora General

      Lcdo. Zarel Soto Acabá
      Procurador General Auxiliar

Materia: Sentencia declaratoria, interdicto preliminar y permanente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Obispo de la Iglesia Católica de Puerto Rico -Diócesis de Arecibo, Daniel Fernández Torres y su Vicario General Luis Colón Rivera

            Peticionarios                    CT-2014-0004

                    v.

Secretario de Justicia del Estado Libre Asociado de Puerto Rico, Hon. César Miranda
            Recurrido

SENTENCIA

En San Juan, Puerto Rico, a 14 de julio de 2014.

Luego de analizar con detenimiento el expediente de este caso y los alegatos de las partes, revocamos el dictamen del Tribunal de Primera Instancia. Se devuelve el caso a ese foro para que realice un examen en cámara de los documentos solicitados y dilucide cuáles de aquellas presuntas víctimas al momento de la denuncia tenían dieciocho años de edad o más y cuáles eran menores. En cuanto a las que eran menores, el Tribunal de Primera Instancia debe ordenar la divulgación de la información a la fiscalía, bajo los estándares más estrictos de confidencialidad.

En el caso de las que al momento de la denuncia tenían dieciocho años de edad o más, el foro debe analizar primero, como asunto de umbral, cuáles expedientes, si alguno, contienen comunicaciones privilegiadas al amparo de la Regla 511 de Evidencia, 32 LPRA Ap. VI. Aquellas comunicaciones que se hayan manifestado durante el sacramento de la confesión deben excluirse por estar protegidas por el privilegio.

De concluir que no aplica el privilegio, el tribunal deberá resolver si conforme a la cláusula de libertad de culto, el Estado demostró que no existen medidas menos onerosas para obtener la información que obra en los expedientes de la Diócesis de Arecibo. Si concluye que existen alternativas menos onerosas, el Tribunal de Primera Instancia deberá emitir un injunction para dejar sin efecto los subpoenas que emitió la Fiscalía de Arecibo por violar la cláusula de libertad de culto. Art. II, Sec. 3 de la Constitución de Puerto Rico, LPRA Tomo I.

Por el contrario, si determina que no existen alternativas menos onerosas, y que en su consecuencia no se viola la cláusula de libertad de culto, el foro primario deberá hacer valer el derecho constitucional a la intimidad que tienen las presuntas víctimas. Para ello, el tribunal deberá ordenar al Obispo de Arecibo que notifique en un plazo corto a las personas adultas involucradas que existe un requerimiento del Estado a la información íntima que ellas brindaron confidencialmente a la Iglesia Católica. El Obispo de Arecibo deberá certificar al tribunal, bajo juramento, que notificó a esas personas a la última dirección conocida. Se entregará la información al Ministerio Público a menos que la persona notificada lo objete luego de ser notificada debidamente. Debe advertirse a la persona de esta consecuencia y darle un plazo razonable para que conteste. Si una o más de las personas notificadas no acceden a que se revele la información, el Tribunal de Primera Instancia deberá emitir un injunction que deje sin efecto los subpoenas que emitió la Fiscalía de Arecibo en cuanto a la información íntima de las personas que objetaron la entrega, por violar el derecho constitucional a la intimidad que tienen esas posibles víctimas de abuso sexual. Art. II, Sec. 8 de la Constitución de Puerto Rico, LPRA Tomo I.

En ambas instancias -sean las posibles víctimas mayores o menores de edad- no se entregará al Estado ningún documento o porción de este referente a "cómo la Iglesia Católica y/o las personas que atendieron estos asuntos resolvieron los mismos". Apéndice, pág. 65.

Notifíquese inmediatamente por correo electrónico o fax y por la vía ordinaria.

Publíquese de inmediato.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión de Conformidad a la que se unieron los Jueces Asociados señores Kolthoff Caraballo, Rivera García y Feliberti Cintrón. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión Disidente a la que se unieron la Jueza Presidenta señora Fiol Matta y la Jueza

Asociada Oronoz Rodríguez. El Juez Asociado señor Estrella Martínez emitió una Opinión Disidente.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Obispo de la Iglesia Católica de Puerto Rico -Diócesis de Arecibo, Daniel Fernández Torres y su Vicario General Luis Colón Rivera

        Peticionarios

v.

Secretario de Justicia del Estado Libre Asociado de Puerto Rico, Hon. César Miranda

        Recurrido

CT-2014-0004

Opinión de conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES a la que se unieron los Jueces Asociados señores KOLTHOFF CARABALLO, RIVERA GARCÍA y FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 14 de julio de 2014.

La adjudicación correcta de este caso requiere que analicemos varios aspectos de nuestro derecho evidenciario y de nuestro derecho constitucional. En primer lugar, debemos analizar si la información que contienen los expedientes en controversia está protegida por el privilegio religioso creyente de la Regla 511 de Evidencia, 32 LPRA Ap. VI. Asimismo, es necesario que estudiemos con detenimiento varias cláusulas constitucionales que han sido invocadas. En particular, es nuestro deber examinar: (1) la cláusula que garantiza la libertad de culto; (2) la cláusula que prohíbe el

establecimiento de una religión (conocida como "cláusula de establecimiento") y; (3) la cláusula que garantiza el derecho a la intimidad. Art. II, Secs. 3 y 8 de la Constitución de Puerto Rico, LPRA Tomo I.

En este caso estamos llamados a hacer un fino balance entre el poder del Estado para investigar la comisión de delitos, el derecho a la intimidad de las presuntas víctimas de abuso sexual, el derecho a la libertad religiosa, y la separación de Iglesia y Estado.

Luego de analizar la controversia con detenimiento, estamos conformes con la Sentencia de este Foro. Opinamos que este Foro no puede determinar si la información que obra en los documentos producidos en las investigaciones de la Diócesis de Arecibo son comunicaciones privilegiadas al amparo del privilegio religioso-creyente de la Regla 511 de Evidencia, supra. Asimismo, es nuestro criterio que la Diócesis de Arecibo no tiene que entregar los expedientes de las presuntas víctimas que tenían dieciocho años de edad o más al momento de denunciar a menos que se demuestre que el Estado no tiene alternativas menos onerosas para obtener esa información. Si se concluyera que el Estado no tiene alternativas menos onerosas, el foro primario deberá, como ordena la Sentencia de este Tribunal, permitir la divulgación de los expedientes a menos que las presuntas víctimas que tenían dieciocho años de edad o más no consientan a ello. En cuanto a las presuntas víctimas menores de dieciocho años, procede la

entrega de la información personal en poder de la Iglesia Católica.

Debe quedar claro que en este caso no se plantea que el Obispo de Arecibo o la Iglesia Católica estén de algún modo encubriendo las actuaciones de sacerdotes pederastas o se nieguen a cooperar en su encausamiento. Por el contrario, de lo que se trata es de un planteamiento dirigido a vindicar derechos constitucionales importantes, reconociendo a su vez el interés del Estado a investigar la comisión de actos delictivos y el indudable interés público de proteger la integridad física y emocional de los menores de edad. Como señaló el Tribunal de Primera Instancia en su sentencia, el abuso de menores es un mal que ha hecho daño a las presuntas víctimas y a la propia Iglesia Católica y hay que combatirlo.

I

El Departamento de Justicia, por conducto del Fiscal de Distrito de Arecibo, emitió varios *subpoenas* contra el Obispo Católico de la Diócesis de Arecibo, el monseñor Daniel Fernández Torres y su Vicario General, el Rev. Luis Colón García. La información solicitada se relacionaba a unas investigaciones internas que realizó la Diócesis tras recibir varias querellas en las que se denunciaba conducta sexual impropia por parte de sacerdotes. La investigación se realizó conforme al procedimiento uniforme que estableció la Conferencia Episcopal Puertorriqueña,

organismo que reúne a todos los obispos católicos de la Isla.

El Obispo de Arecibo encomendó la investigación al Vicario General, quien entrevistó y tomó declaraciones a las presuntas víctimas, querellantes y otros testigos en ausencia de terceros y garantizándoles que la Diócesis mantendría lo comunicado en confidencialidad. Ese proceso produjo varios expedientes que recogieron los documentos preparados durante la investigación. Junto al Vicario General, participaron de la investigación el Obispo, notarios, consultores y profesionales que aportaron pericia, por lo que solamente algunos de los que intervinieron eran sacerdotes o clérigos de la Iglesia Católica. Apéndice, pág. 59. Los hallazgos de la investigación se refirieron a la Congregación para la Doctrina de la Fe, organismo de la Iglesia Católica. El proceso culminó en la expulsión de seis sacerdotes de la Diócesis.

El 30 de enero de 2014 se emitieron los primeros dos *subpoenas*, uno dirigido al Obispo y otro al Vicario General. Ambos documentos solicitaban que comparecieran o suministraran los nombres, direcciones y toda la información relacionada a los querellantes (tanto menores como adultos) que hubiesen alegado ser víctimas de delitos sexuales cometidos por sacerdotes adscritos a la Diócesis durante los últimos diez años. También solicitaron información sobre cómo la Diócesis y las personas

responsables atendieron y resolvieron las querellas internamente en la Iglesia Católica. Para cumplir con los requerimientos, la Diócesis presentó una lista que contenía los nombres de los sacerdotes contra quienes se presentaron las querellas.

El Fiscal de Distrito de Arecibo emitió dos *subpoenas* adicionales contra el Obispo. En el primero, se le requirió al Obispo de Arecibo suministrar la misma información solicitada mediante el primer *subpoena* que le remitieron. En el segundo requerimiento, el Obispo fue citado a comparecer para entregar información sobre la investigación relacionada a los alegados delitos sexuales cometidos para el año 2009 por el exsacerdote Edwin Mercado Viera. En esos dos requerimientos se citó al Obispo para que compareciera a la Fiscalía de Arecibo el 12 de febrero de 2014 y entregara la información requerida.

El mismo 12 de febrero de 2014, el Obispo de Arecibo y el Vicario General presentaron una demanda ante el Tribunal de Primera Instancia con el propósito de impugnar los *subpoenas* emitidos por el Departamento de Justicia. En esencia, solicitaron una sentencia declaratoria y la concesión de un interdicto preliminar y permanente en el que se declarara la inconstitucionalidad de los *subpoenas* emitidos y, a su vez, impidiera la entrega de los expedientes y documentos requeridos.

El Obispo de Arecibo y su Vicario General basaron su reclamo en los fundamentos siguientes: (1) la libertad de culto; (2) la separación de Iglesia y Estado; (3) el derecho a la intimidad y expectativa de privacidad de la Diócesis en relación a sus documentos y procesos internos de investigación; (4) el derecho de intimidad de las presuntas víctimas denunciantes con respecto a las declaraciones de eventos que expresaron ante la Diócesis y el proceso de sanación emocional y espiritual por el cual atravesaron y, además; (5) el privilegio religioso-creyente que establece la Regla 511 de Evidencia, 32 LPRA Ap. VI.

Cónsono con lo anterior, indicaron que los requerimientos sufren de amplitud excesiva y colocan a la Diócesis en riesgo de sufrir un daño irreparable, pues la información solicitada es confidencial y entregarla laceraría su libertad de culto, la cual incluye la facultad de manejar sus asuntos internos y disciplinarios. Además, expresaron que cumplir con los *subpoenas* interferiría con la facultad de la Diócesis para disciplinar a aquellos clérigos que incurran en prácticas impropias y en la forma de ayudar a los feligreses que son presuntas víctimas de ese tipo de conducta.

El Estado compareció al pleito y solicitó la desestimación de la demanda por no exponer una reclamación que justifique la concesión de un remedio. Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V. Además, sostuvo que el

Secretario de Justicia tiene facultad en ley para investigar y procesar todos los casos de naturaleza penal en la jurisdicción de Puerto Rico, por lo que la negativa del Obispo y su Vicario a entregar la información requerida constituye una limitación indebida al poder investigativo del Estado. En cuanto al planteamiento de confidencialidad, el Estado sostuvo que el Departamento de Justicia cuenta con procedimientos adecuados para salvaguardar la confidencialidad de los documentos y de las presuntas víctimas.

El 19 de febrero de 2014, DJMG (interventor) presentó ante el foro primario una demanda de intervención. Indicó que en la actualidad tiene 23 años de edad, que entre los 12 y 15 años fue abusado sexualmente por un sacerdote de la Diócesis y hace tres años presentó una querella ante la Iglesia Católica por los hechos ocurridos. Señaló que presentó la querella movido por la estricta confidencialidad que cobija el proceso eclesiástico y el dogma de la Iglesia Católica. El interventor informó que obtuvo ayuda sicológica y que quedó satisfecho con los esfuerzos que realizó la Diócesis de Arecibo. Añadió que no le interesa que lo denunciado ante la institución religiosa sea investigado y procesado por las autoridades civiles.

Ante ese escenario, el interventor solicitó que se anularan los *subpoenas* emitidos y se prohibiera la divulgación de su identidad y circunstancias personales,

así como las comunicaciones confidenciales que él emitió a la Diócesis. Cimentó sus reclamos en los fundamentos siguientes: (1) el derecho a la intimidad; (2) la inviolabilidad de la dignidad humana; (3) la libertad de culto y; (4) el privilegio religioso-creyente.

Luego de varios trámites procesales, el 7 de abril de 2014, el Tribunal de Primera Instancia emitió una sentencia mediante la cual declaró la constitucionalidad de los *subpoenas* en cuestión. Concluyó que procedía la entrega de todos los documentos requeridos por el Departamento de Justicia, excepto las comunicaciones privilegiadas que se emitieron durante el sacramento de la confesión, conforme la Regla 511 de Evidencia, <u>supra</u>. Además, ordenó al Obispo y al Vicario General entregar, en un término de quince días, los documentos solicitados.

En desacuerdo, el Obispo de Arecibo, el Vicario General y el interventor apelaron el dictamen del foro primario ante el Tribunal de Apelaciones. También presentaron una moción en auxilio de jurisdicción en la que solicitaron la paralización de los efectos de la sentencia hasta que se resolviera el recurso de apelación presentado. El foro apelativo intermedio denegó la paralización solicitada.

Mientras el proceso apelativo transcurría en el Tribunal de Apelaciones, el Obispo de Arecibo, el Vicario General y el interventor presentaron ante este Foro una petición de certificación intrajurisdiccional y una moción

en auxilio de jurisdicción en las que repitieron los mismos argumentos esgrimidos ante los foros recurridos. El 7 de mayo de 2014, acogimos la petición de certificación y ordenamos la paralización de los efectos de la sentencia. Concedimos a las partes un término simultáneo de quince días para presentar sus alegatos y un segundo término simultáneo de cinco días a partir de la entrega de los alegatos, para replicar.

El Obispo de Arecibo, el Vicario General y el interventor sostienen que el foro primario erró al resolver que las comunicaciones confidenciales realizadas durante la investigación interna que realizó la Diócesis no son comunicaciones privilegiadas al amparo de la Regla 511 de Evidencia, supra. Asimismo, aducen que el Tribunal de Primera Instancia desacertó al adjudicar la controversia ante su consideración sin examinar en cámara la información y documentos sobre los que reclaman la protección constitucional y el privilegio estatutario.

También expresan que validar la constitucionalidad de los *subpoenas* emitidos implica ignorar los reclamos de intimidad que adujeron los demandantes en nombre propio, y en representación de las presuntas víctimas y la Diócesis. Además, indican que exigirles que entreguen la información requerida implica una violación a la libertad de culto protegida constitucionalmente.

Por otro lado, el Estado sostiene que es improcedente la tesis de los demandantes y del interventor en cuanto a

los derechos constitucionales invocados. En particular, aduce que acoger esa tesis implicaría que cualquier persona se podría escudar en las reglas internas de su religión para neutralizar el poder investigativo del Estado. Además, expresa que la información y documentación requerida no está cobijada por el privilegio religioso-creyente.

Con el beneficio de la comparecencia de ambas partes, resolvemos el caso ante nuestra consideración.

II

Conforme con la doctrina de autolimitación judicial, atendemos primero la controversia de derecho probatorio. Si concluyéramos que el privilegio religioso-creyente dispone de la controversia entre las partes, evitaríamos pasar juicio innecesariamente sobre una cuestión constitucional. AMPR et als. v. Sist. Retiro Maestros IV, Op. de 11 de abril de 2014, 2014 TSPR 58, 2014 JTS 67, 189 DPR __ (2014); Brau et al. v. E.L.A., Op. de 21 de febrero de 2014, 2014 TSPR 26, 2014 JTS 35, 190 DPR __ (2014); Rosario v. Toyota, 166 DPR 1, 9 (2006); P.P.D. v. Admor. General de Elecciones, 111 DPR 199, 243 (1981); Pacheco v. Srio. Instrucción Pública, 108 DPR 592, 601 (1979); E.L.A. v. Aguayo, 80 DPR 554, 596 (1958).

**A.** Aunque el propósito principal de las Reglas de Evidencia es la búsqueda de la verdad, Regla 102 de Evidencia, 32 LPRA Ap. VI, nuestro ordenamiento admite a

través de los privilegios evidenciarios la exclusión de evidencia pertinente para adelantar intereses sociales que pueden ser ajenos a la búsqueda de la verdad. Pagán et al. v. First Hospital, Op. de 19 de septiembre de 2013, 2013 TSPR 102, 2013 JTS 105, 189 DPR __ (2013); E.L. Chiesa Aponte, Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales, República Dominicana, Publicaciones JTS, 2005, págs. 185-186.

Los privilegios evidenciarios buscan adelantar valores e intereses sociales que por consideraciones de política pública se estiman superiores a la búsqueda de la verdad. Chiesa Aponte, íd., pág. 169. El fundamento tradicional para ello es el utilitarismo. De esa forma, "se estima que el sacrificio de evidencia con claro valor probatorio se justifica para adelantar un alto interés público... Mientras más alto sea el interés público que se quiere adelantar con el privilegio, mayor será su alcance y menor las excepciones al privilegio". E.L. Chiesa Aponte, Reglas de Evidencia de Puerto Rico 2009, Publicaciones JTS, 2009, pág. 149. Véase, además, Pueblo v. Fernández Rodríguez, 183 DPR 770, 784 (2011).

Como los privilegios evidenciarios son contrarios a la búsqueda de la verdad, la Regla 518 de Evidencia, 32 LPRA Ap. VI, establece que deben ser interpretados de forma restrictiva, salvo los que sean de rango constitucional. El propósito de esa interpretación restrictiva es evitar que se obstaculice el trámite de los

procesos judiciales. Rodríguez v. Scotiabank de PR, 113 DPR 210, 214 (1982).

Quien invoca el privilegio tiene el peso de demostrar su existencia mediante preponderancia de la prueba. Pagán et al. v. First Hospital, supra; 1 McCormick on Evidence, Ed. Thompson-West, St. Paul, sec. 73.1, 2006, pág. 342. En particular, debe probar los requisitos del privilegio que invoca. Íd.

Nuestras Reglas de Evidencia brindan un trato privilegiado a la comunicación que ocurre entre un creyente y un religioso. En ese sentido, la Regla 511 de Evidencia, supra, dispone:

**Regla 511. Relación religiosa o religioso y creyente**

(a) Según usadas en esta regla, las siguientes expresiones tendrán el significado que a continuación se indica:

(1) Religiosa o religioso.—Sacerdote, pastora, pastor, ministra, ministro, rabino, practicante de una religión, funcionaria o funcionario similar de una iglesia, secta o denominación religiosa o de cualquier organización religiosa.

(2) Creyente.—Persona que le hace una comunicación penitencial o confidencial a una religiosa o un religioso.

(3) Comunicación penitencial o confidencial.— Aquélla hecha por una persona creyente, en confidencia, sin la presencia de una tercera persona, a una que es religiosa y quien, en el curso de la disciplina o la práctica de su iglesia, secta, denominación u organización religiosa, está autorizada o acostumbrada a oír tales comunicaciones y que bajo tal disciplina tiene el deber de mantenerlas en secreto.

(b) Una religiosa o un religioso, o una persona creyente, sea o no parte en el pleito, tiene el privilegio de rehusar revelar una comunicación penitencial o confidencial o impedir que otra persona la divulgue.

Los poseedores del privilegio son las dos personas que participan en la comunicación confidencial, el creyente y el religioso. Íd. Surge del Informe del Secretariado de la Conferencia Judicial y Notarial de este Tribunal que la extensión del privilegio a la persona religiosa se fundamenta en que no se le puede compeler a que transgreda las normas de su organización religiosa que la obligan a mantener la comunicación en secreto. Secretariado de la Conferencia Judicial y Notarial del Tribunal Supremo, Informe de las Reglas de Derecho Probatorio, 2007, págs. 280-281.

Para ser considerado religioso conforme a la Regla 511 de Evidencia, supra, es necesario que la persona sea un funcionario afiliado a una secta organizada y reconocida. No se incluyen los ministros autodenominados. E.L. Chiesa Aponte, Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales, op cit., pág. 281. Por su parte, el término creyente es definido como el sujeto que realiza la comunicación confidencial al religioso. Regla 511 de Evidencia, supra.

No toda comunicación que ocurre entre un religioso y un creyente está protegida por el privilegio. Informe de las Reglas de Derecho Probatorio, supra, pág. 281. De acuerdo a la Regla 511(a)(3) de Evidencia, supra, una comunicación confidencial o penitencial es aquella que emite un creyente, sin la presencia de terceras personas, a un religioso que en la práctica de su iglesia, secta,

denominación u organización religiosa, está autorizada o acostumbrada a oír esas comunicaciones y tiene el deber de mantenerlas en secreto. La actual Regla 511 de Evidencia, íd., no requiere que la comunicación confidencial se realice dentro del sacramento católico de la confesión para que sea tratada como privilegiada. Informe de las Reglas de Derecho Probatorio, supra, págs. 280-281. Véase, además, E.J. Imwinkelried, The New Wigmore: A Treatise on Evidence: Evidenciary Privileges, Aspen Publishers, 2d. Ed., 2010, Sec. 6.9.1.

Ahora bien, la Regla 511 de Evidencia, supra, requiere para preservar el privilegio **que la comunicación confidencial no se divulgue a terceros.** Ese requisito también se encuentra presente en la Sec. 1032 del Código de Evidencia de California[1], West's Ann. Cal. Evid. Code sec. 1032, que sirvió de modelo para la actual Regla 511 de Evidencia, supra, y era parte del texto de la derogada Regla 28 de Evidencia de 1979, 32 LPRA Ap. IV. Informe de las Reglas de Derecho Probatorio, supra, pág. 280.

---

[1] La Sec. 1032 del Código de Evidencia de California establece:

> *As used in this article, penitential communications means a communication made in confidence, in the presence of no third person so far as the penitent is aware, to a member of the clergy who, in the course of the discipline or practice of the clergy member´s church, denomination, or organization, is authorized or accustomed to hear those communications and, under the discipline or tenets of his or her church, denomination, or organization, has a duty to keep those communications secret.*

Durante el proceso de redacción de las actuales Reglas de Evidencia, el Comité Asesor Permanente evaluó la posibilidad de extender el privilegio religioso-creyente a comunicaciones confidenciales que se divulguen a terceros cuando ello sea necesario para llevar a cabo el propósito de la comunicación. Íd. De hecho, los Proyectos de Reglas de Evidencia de esta jurisdicción de 1986 y 1992 contemplaban la posibilidad de invocar el privilegio en situaciones en que se divulgaba la comunicación a terceras personas, siempre que fuera necesario para adelantar el propósito de la comunicación. Véanse, Informe del Proyecto de Reglas de Evidencia de Junio de 1992, págs. 72-73; Comité de Reglas de Evidencia del Secretariado de la Conferencia Judicial, Primer examen de las Reglas de Evidencia de 1979: comentarios y recomendaciones, pág. 172. El Comité de Reglas de 1986 y el Proyecto de Reglas de 1992 definían una comunicación confidencial como aquella hecha a un sacerdote, en su carácter profesional como consejero espiritual, "en la confianza de que la misma no será divulgada a terceras personas, **salvo aquellas que sea necesario para llevar a cabo el propósito de la comunicación**". Íd. (Énfasis suplido.) El lenguaje amplio de esos proyectos provenía, en esencia, de la Regla 506 federal propuesta.[2] Véanse, Informe del Proyecto de

---

[2] La propuesta Regla 506 de Evidencia federal lee de la siguiente forma:

   (a) Definitions. As used in this rule:

(continúa...)

<u>Reglas de Evidencia de Junio de 1992</u>, pág. 73; <u>Primer</u>
<u>examen de las Reglas de Evidencia de 1979: comentarios y</u>
<u>recomendaciones</u>, pág. 175.

Sin embargo, el Comité Asesor Permanente rechazó
extender el alcance de la antigua Regla 28 de Evidencia,
<u>supra</u>, por lo que no se acogió en las Reglas de Evidencia
de 2009 el lenguaje del Comité de Reglas de 1986 ni el
Proyecto de Reglas de 1992. <u>Informe de las Reglas de</u>
<u>Derecho Probatorio</u>, <u>supra</u>, pág. 280. De esa forma, debemos
afirmar que la actual Regla 511 de Evidencia, <u>supra</u>,
limita el ámbito del privilegio a las comunicaciones que

---

*(1) A "clergyman" is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.*

*(2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.*

*(b) General rule of privilege. A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as a spiritual advisor.*

*(c) Who may claim the privilege. The privilege may be claimed by the person, by his guardian or conservator, or by his personal representative if he is deceased. The clergyman may claim the privilege on behalf of the person. His authority so to do is presumed in the absence of evidence to the contrary.* Véase L. Whittaker, <u>The Priest-</u><u>Penitent Privilege: Its Constitutionality and</u> <u>Doctrine</u>, 13 Regent U. L. Rev. 145, 148 (2001).

el religioso debe mantener en secreto y en su consecuencia, **no puede revelar a terceras personas**.

**B.** Para determinar si en este caso se configura el privilegio religioso-creyente, es necesario estudiar el proceso que llevó a cabo la Iglesia Católica de Puerto Rico, conforme al procedimiento establecido por la Conferencia Episcopal Puertorriqueña para dilucidar las querellas contra sacerdotes.

Los demandantes lograron probar que las comunicaciones en controversia ocurrieron entre un creyente y un religioso. Regla 511(a)(1) y (a)(2) de Evidencia, supra. También se probó que el religioso estaba autorizado a recibir ese tipo de comunicación según la doctrina católica. Ahora bien, el expediente de este caso no nos permite concluir si las declaraciones en controversia se mantuvieron en secreto, según requiere la Regla 511 de Evidencia, supra.

Claramente, la Regla 511(a)(3) de Evidencia, íd., requiere que el religioso no divulgue la comunicación a nadie. En este caso no se presentó prueba, más allá de lo ya señalado, de cómo la Iglesia Católica tramitó los expedientes en controversia. Así las cosas, no podemos resolver si los documentos producidos en esas investigaciones son comunicaciones privilegiadas al amparo del privilegio religioso-creyente de la Regla 511 de Evidencia, supra. Lo único que podemos determinar es que las comunicaciones que se hayan manifestado durante el

sacramento de la confesión deben excluirse por estar protegidas por el privilegio. Estamos conformes con la Sentencia de este Foro que concluye que el Tribunal de Primera Instancia deberá dilucidar este asunto luego de examinar los documentos en cámara. Como esto no dispone del caso, pasamos a discutir los planteamientos constitucionales que hacen el Obispo de Arecibo y el interventor.

## III

**A.**   El Art. II, Sec. 3, de la Constitución de Puerto Rico, LPRA, Tomo 1, dispone que "[n]o se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio del culto religioso. Habrá completa separación de la iglesia y el estado". Esta sección responde a la cláusula de libertad de culto y a la cláusula de establecimiento que consagra la Primera Enmienda de la Constitución de los Estados Unidos. Mercado, Quilichini v. UCPR, 143 DPR 610, 633-634 (1997); Asoc. Academias y Col. Cristianos v. E.L.A., 135 DPR 150 (1994). El texto de la Primera Enmienda lee como sigue:

> El Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna, o que prohíba el libre ejercicio de la misma o que coarte la libertad de palabra o de prensa; o el derecho del pueblo a reunirse pacíficamente y a solicitar del Gobierno la reparación de agravios. Enmda. 1, Const. EE.UU., LPRA, Tomo 1.[3]

---

[3] El texto original en inglés es el siguiente:

> *Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom*

(continúa...)

El lenguaje sobre la separación entre iglesia y estado que se incluyó en el Art. II, Sec. 3, supra, de la Constitución de Puerto Rico no está contemplado en el texto de la Primera Enmienda. La cláusula sobre separación requiere que se reconozca una especie de jurisdicción a la iglesia, distinta y separada a la del estado, para que las actuaciones de ambas no interfieran entre sí. Mercado, Quilichini v. UCPR, supra, pág. 634.

Existe una tensión entre la cláusula de libertad de culto y la cláusula de establecimiento de la Primera Enmienda que ha impulsado a la jurisprudencia a crear un balance para armonizar su coexistencia. Íd.; Abington School Dist. v. Schempp, 374 US 203 (1963). Esa discusión se da también en el contexto del Art. II, Sec. 3 de la Constitución local. El choque se evidencia ya que, por un lado se requiere al Estado no prohibir o inmiscuirse en las prácticas religiosas y, por otro lado, se le prohíbe el establecimiento de una religión. En Mercado, Quilichini v. UCPR, supra, pág. 637, expresamos lo siguiente al respecto:

> Ello es así ya que es posible que el Gobierno, con el fin de evitar el establecimiento de una religión, adopte medidas legislativas que tiendan a impedir su práctica. Asimismo, es concebible que un tribunal, al permitir cierto tipo de conducta por parte de algunos creyentes de una religión, en particular al amparo de la libertad de culto, tienda a promover el establecimiento de tal religión, lo cual puede

_of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances._

chocar con la primera parte de las disposiciones constitucionales que hoy evaluamos.

**B.** Mediante la cláusula de libre ejercicio o de libertad de culto se garantiza la práctica de creencias religiosas, impidiendo todo tipo de intervención gubernamental que dificulte esas prácticas. Mercado, Quilichini v. UCPR, supra, pág. 636; Asoc. Academias y Col. Cristianos v. E.L.A., supra. Esa garantía constitucional se circunscribe a prácticas religiosas que protejan la paz, la moral y el orden público. Mercado, Quilichini v. UCPR, supra; Sucn. de Victoria v. Iglesia Pentecostal, 102 DPR 20, 22 (1974). No se trata de una garantía absoluta que sirva de velo para no cumplir con las leyes que promulgue el Estado.

En los casos en que una parte presente un reclamo bajo la cláusula de libre ejercicio, deberá demostrarse que la actuación estatal tiene un efecto adverso sobre su práctica religiosa. "La parte que cuestiona una actuación gubernamental bajo la cláusula de libertad de culto tiene inicialmente la obligación de demostrar que el Estado le ha impuesto un gravamen sustancial al ejercicio de la religión". Díaz v. Colegio Nuestra Sra. del Pilar, 123 DPR 765, 779 (1989). Véase, Tony & Susan Alamo Foundation v. Sec'y of Labor, 471 U.S. 290, 303 (1985). Los tratadistas han apoyado este precepto para activar la cláusula constitucional:

> *Members of a religious organization… who claim an inability to conform their conduct to regulatory statutes, because of religious beliefs, must show that the government*

*regulations impose some burden on their ability to carry out their faith.* R. Rotunda, J. Nowak, Treatise on Constitutional Law: Substance and Procedure, 5ta Ed., Thomson Reuters, 2013, Vol. 6, págs. 261-262.

Al interpretar el Art. II, Sec. 3 de la Constitución de Puerto Rico hemos seguido el análisis que se hace tradicionalmente al amparo de la Primera Enmienda de la Constitución federal. Así pues, si se demuestra que la acción estatal tiene un efecto adverso sobre la práctica religiosa, se hace necesario aplicar el siguiente análisis. Díaz v. Colegio Nuestra Sra. del Pilar, supra. Primero, deberá determinarse si la actuación estatal es neutral y de aplicabilidad general. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 US 520, 547 (1993); Mercado, Quilichini v. UCPR, supra. El análisis de neutralidad descansa en establecer si el objetivo de la actuación estatal es suprimir la práctica religiosa. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, supra, pág. 542 ("*if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral.*")

Además de analizar si es neutral, el tribunal deberá determinar si la actuación estatal es de aplicabilidad general. El Tribunal Supremo federal ha expresado lo siguiente al respecto:

> *The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause.* Church of the Lukumi Babalu

Aye, Inc. v. City of Hialeah, supra, pág. 543.

Una actuación no es general cuando va dirigida únicamente a la iglesia o entidad religiosa y a sus asuntos internos. Mercado, Quilichini v. UCPR, supra, pág. 646. Es decir, cuando la intervención recaiga sobre un asunto interno de la iglesia que solamente afecte a esta última, no se considerará un asunto de aplicabilidad general. Íd.

Segundo, si la actuación gubernamental no es neutral o no es de aplicabilidad general, entonces el tribunal aplicará un escrutinio estricto. "*A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny.*" Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra, pág. 546. En ese supuesto, para prevalecer ante un reclamo bajo la cláusula de libertad de culto el Estado deberá demostrar: (1) que tiene un interés apremiante que justifica sus acciones aun cuando estas tengan el efecto incidental de imponer una carga sobre una práctica religiosa en particular; (2) que su acción persigue ese interés; y (3) que no existen alternativas que impongan una carga menos onerosa a la religión. Mercado, Quilichini v. UCPR, supra, pág. 637; Asoc. Academias y Col. Cristianos v. E.L.A., supra. Véase, además, Burwell v. Hobby Lobby Stores, Inc., Op. de 30 de junio de 2014, No. 13-354, 13-356, 573 US __ (2014), para un análisis similar bajo la *Religious Freedom Restoration Act of 1993*

(RFRA), 42 USC sec. 2000bb <u>et seq</u>. No obstante, cuando las actuaciones del Estado sean neutrales y generalizadas no habrá un conflicto de índole constitucional.

Por otra parte, somos conscientes de que no puede existir una ausencia absoluta de contacto entre la iglesia y el Estado, pues la complejidad de los asuntos del diario vivir inevitablemente provocan una especie de interrelación. <u>Town of Greece v. Galoway</u>, Op. de 5 de mayo de 2014, No. 12-696, 572 US __ (2014); <u>Walz v. Tax Commission of City of New York</u>, 397 US 664 (1970). Por eso, hemos adoptado los siguientes criterios que estableció el Tribunal Supremo de Estados Unidos para determinar cuándo el Estado prevalecerá frente a un reclamo bajo la cláusula de establecimiento: (1) que la actuación estatal persiga un propósito secular; (2) que no promueva o prohíba la religión; y (3) que no constituya una intromisión excesiva en asuntos religiosos. <u>Asoc. Academias y Col. Cristianos v. E.L.A.</u>, <u>supra</u>; <u>Meek v. Pittenger</u>, 421 US 349, 358 (1975); <u>Committee for Public Education v. Regan</u>, 444 US 646, 653 (1980); <u>Lemon v. Kurtzman</u>, 403 US 602, 612-613 (1971). Por este último caso ese escrutinio se conoce comúnmente como el "*Lemon test*".

IV

Los hechos en este caso no dan margen a la aplicación de los estándares esbozados bajo la cláusula de establecimiento, pues no está presente una actuación del Estado que favorezca o promueva la práctica de una

religión. Mercado, Quilichini v. UCPR, supra, pág. 635. Ahora bien, entendemos que la cláusula de libre ejercicio si es aplicable a la controversia que nos ocupa.

Lo primero que el Secretario de Justicia solicita por medio de los *subpoenas* es los nombres, direcciones y toda la información relacionada a los menores y adultos que alegan haber sido víctimas de delitos sexuales por parte de sacerdotes católicos en los últimos diez años. La Conferencia Episcopal de Puerto Rico creó un procedimiento conforme con las normas propias de los dogmas y creencias del derecho canónico de la Iglesia Católica. Sentencia TPI, pág. 26. El procedimiento establecido por la Conferencia Episcopal Puertorriqueña para manejar los casos de conducta sexual impropia de los miembros del clero garantiza confidencialidad y privacidad a las presuntas víctimas denunciantes que tenían dieciocho años o más y a los testigos. Íd. Esa confidencialidad se adoptó como incentivo para que las presuntas víctimas denuncien a sus ofensores sin temor a caer en el ostracismo público. Una vez se recibe la denuncia, se inicia un proceso de investigación. Íd., pág. 22. El procedimiento de la Iglesia Católica establece que se deben informar a las autoridades civiles aquellas situaciones que pudieran constituir maltrato de menores o abuso sexual. Íd., pág. 23-24. Ahora bien, si la presunta víctima es, al momento de la denuncia, mayor de dieciocho años, la autoridad eclesiástica no tiene, de acuerdo a las normas internas,

la obligación de notificar a la autoridad civil. Íd., pág. 23. Es decir, como la víctima tiene capacidad para consentir, se respeta el reclamo de confidencialidad que esta haga.

La entrega de información que revele la identidad de las presuntas víctimas de abuso sexual que eran adultas al momento de la denuncia tiene dos efectos adversos sobre la Iglesia Católica. Primero, contradice la norma de gobierno de la Iglesia que garantiza a las presuntas víctimas que el proceso de investigación sería confidencial y privado. Así pues, la acción estatal impone una carga sustancial al ejercicio de la religión al obligar a la Iglesia a actuar en contra de las normas que pautó para gobernar sus asuntos internos.[4] En segundo lugar, disuade a los creyentes, y posibles futuras víctimas de abuso sexual, de acudir a la Iglesia y denunciar conducta impropia de los miembros del clero por temor a tener que revelar detalles íntimos o a caer en el ridículo y la mofa pública.

Lo contrario ocurre cuando la información solicitada es sobre las presuntas víctimas que eran menores de edad al momento de la denuncia. En ese caso no existe problema ni conflicto alguno, pues las propias normas internas de

---

[4] La Sentencia del Tribunal de Primera Instancia, Apéndice, pág. 66, otorga demasiado valor al hecho de que el Arzobispo de San Juan, Mon. Roberto González Nieves, entregó unos expedientes al Departamento de Justicia. Sin embargo, no existe ni un ápice de evidencia en el expediente que nos ilustre sobre el contenido de la información entregada. Por ejemplo, desconocemos si los documentos entregados contenían información sensitiva de denunciantes menores de edad o de personas adultas.

la Iglesia establecen que se tienen que denunciar ante las autoridades civiles las situaciones en las que la víctima es menor de edad. Eso concuerda con el Art. 21 de la Ley Núm. 246-2011, 8 LPRA sec. 1131, que establece que

> [t]oda persona estará obligada a informar inmediatamente aquellos casos donde exista o se sospeche que existe una situación de maltrato, maltrato institucional, negligencia y/o negligencia institucional hacia un menor o que existe el riesgo de que un menor sea víctima de dicha situación.

En ese aspecto, el interés del Estado y las normas de la Iglesia Católica son compatibles. La Iglesia Católica no puede alegar que en cuanto a la divulgación de la identidad de los menores de edad existe una carga o interferencia con sus normas internas.

Podemos concluir que por no existir un choque de intereses entre la Iglesia y el Estado en cuanto a la información de las presuntas víctimas que eran menores de edad, no se violó la cláusula de libertad de culto respecto a esa información. Por no haber un conflicto constitucional, procede que la Iglesia entregue la información solicitada en los *subpoenas* referentes a las presuntas víctimas que eran menores de edad al momento en que denunciaron sus quejas a la Iglesia. En cuanto a las presuntas víctimas adultas, el choque de intereses entre estos dos entes amerita aplicar el análisis desarrollado jurisprudencialmente.

Establecido que la actuación del Estado tiene un efecto adverso en la práctica religiosa de la Iglesia

(exceptuando el requerimiento de información sobre las presuntas víctimas que eran menores de edad), procede determinar si la actuación del Estado en cuanto a la información de las presuntas víctimas adultas es neutral y de aplicabilidad general.

En esta ocasión, el objetivo de la actuación estatal es obtener información que le ayude en la investigación criminal de alegados delitos de naturaleza sexual cometidos por clérigos de la Iglesia Católica. Es por esa razón que los *subpoenas* se dirigen a la Iglesia. Los *subpoenas* se utilizan comúnmente por parte del Estado para obtener información durante la etapa investigativa de un caso. El propósito que se persigue con los *subpoenas* no es prohibir o de alguna forma suprimir conducta motivada por creencias religiosas. Por eso, consideramos que la actuación por parte del Estado es neutral.

Ahora bien, los *subpoenas* van dirigidos exclusivamente a obtener información producto de un procedimiento interno de la Iglesia. De manera selectiva, con su conducta el Estado impone una carga dirigida única y específicamente a la Iglesia Católica. En <u>Mercado, Quilichini v. UCPR</u>, <u>supra</u>, pág. 646, dijimos que "[la] intervención no constituye una actuación estatal de aplicabilidad generalizada y neutral, es decir, 'que reca[iga] uniformemente sobre todo un género de actividades ...'. [La] intervención **recaería sobre un asunto *interno* de... la Iglesia Católica que solamente a ésta afectaría**".

(citas omitidas) (Énfasis nuestro). Asimismo, en Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra, págs. 545-546, el Tribunal Supremo federal determinó que unas ordenanzas perseguían el interés del Estado únicamente contra conducta motivada por creencias religiosas, por lo que no cumplían con el estándar de aplicabilidad general. En este caso, la información requerida por el Estado mediante subpoenas no afecta a grupos o conducta no religiosa, sino que su efecto recae solamente **sobre la Iglesia Católica y su gobierno interno**. Por lo tanto, la actuación estatal no satisface el principio de aplicabilidad general.

Como mencionamos, cuando la actuación del Estado cumple tanto con el principio de neutralidad como con el de aplicabilidad general no puede determinarse que se violó la cláusula de libre ejercicio. Mercado, Quilichini v. UCPR, supra, pág. 637; Church of Lukumi Babalu Aye, Inc. v. Hialeah, supra, pág. 546. En esos casos, el Estado no tendrá que satisfacer el escrutinio escrito.

En la controversia que se nos presenta, el requerimiento del Estado a la Iglesia cumplió con el estándar de neutralidad, pero no así con el de aplicabilidad general ya que iba dirigido a obtener información sobre procesos internos de la Iglesia Católica. Procede entonces aplicar el escrutinio estricto. Primero hay que determinar si existe un interés apremiante del Estado que justifique interferir de esa manera con asuntos religiosos. Íd.

Sin lugar a dudas, realizar una investigación criminal en casos de delitos de naturaleza sexual persigue un interés social de gran magnitud. En Puerto Rico v. Ortiz Rodríguez, 147 DPR 433, 440 (1999), afirmamos que "[e]n momentos de violencia, alto uso de drogas, criminalidad y su consabido desasosiego en nuestro diario vivir, el fiel cumplimiento de la ley tiene un interés apremiante". Hemos dicho, además, que "los delitos ... no sólo... lesionan particulares intereses privados, sino que por el contrario se afectan fundamentales postulados sociales y comunitarios...". Pueblo v. Ramírez Valentín, 109 DPR 13, 17 (1979). Véanse, además: Pueblo v. Díaz, Bonano, 176 DPR 601 (2009); Pueblo v. Muñoz, Colón y Ocasio, 131 DPR 965 (1992); Pueblo v. Pérez Pérez, 115 DPR 827 (1984). Este interés se torna aún mayor ante la presencia de menores. El Estado tiene, más que un interés apremiante, un deber apremiante bajo el concepto de *parens patriae* de proteger a los menores que son víctimas del maltrato y la negligencia. Véanse Depto. de la Familia v. Soto, 147 DPR 618 (1999); Pérez, Ex parte v. Depto. de la Familia, 147 DPR 556 (1999).

Tanto el foro primario como el Estado dedican varias páginas a discutir jurisprudencia de otras jurisdicciones que, alegadamente, disponen de esta controversia. No obstante, los casos citados son distinguibles de la controversia que nos atañe. Véanse: Roman Catholic Archbishop of Los Angeles v. Superior Court, 131 Cal. App.

4th 417 (2005), Society of Jesus of New England v. Commonwealth, 808 N.E. 2d 272 (Mass. 2004) y Hutchison v. Luddy, 606 A. 2d 905 (Pa. 1992) (no toma en consideración si existía un procedimiento establecido por la Conferencia de Obispos de Estados Unidos que tuviera normas propias de los dogmas y creencias del derecho canónico de la Iglesia Católica.); State v. Wenthe, 839 N.W.2d 83 (Minn. 2013) (lo que estaba en controversia era la constitucionalidad de un delito tipificado en el ordenamiento legal del estado de Minnesota, Minn. Stat. Sec. 609.344.); People v. Campobello, 348 Ill. App. 3d 619 (2004) (el requerimiento se limitaba al expediente personal del sacerdote y no abarcaba información sensitiva de las víctimas.); Commonwealth v. Stewart, 690 A.2d 195 (Pa. 1997) (no existía un procedimiento establecido por la Conferencia de Obispos de Estados Unidos que tuviera normas propias de los dogmas y creencias del derecho canónico de la Iglesia Católica y se demostró que no existían medidas menos onerosas para obtener la información requerida.)

En este caso no se presentó evidencia que nos permita concluir si la identidad de las presuntas víctimas puede obtenerse por otros medios menos onerosos sin intervenir con la libertad de culto y los procedimientos internos de la Iglesia Católica. Lo único que sabemos es que el Estado posee la lista de todos los sacerdotes expulsados. Desconocemos si la prueba para procesarlos, como lo es el nombre y la información de las presuntas víctimas adultas,

puede obtenerse por otros medios, como sería acudir a las parroquias donde trabajaron los sacerdotes para realizar allí entrevistas a diferentes personas, como parte de una investigación de campo rigurosa.

Como no estamos en posición de concluir si la actuación del Estado constituye la alternativa menos onerosa, procede, como ordena la Sentencia de este Foro, devolver el caso al Tribunal de Primera Instancia para que dilucide este asunto. Si el foro primario concluyera que existen medidas menos onerosas, deberá emitir un *injunction* para dejar sin efecto los *subpoenas* que emitió la Fiscalía de Arecibo en cuanto a toda la información de las presuntas víctimas que eran mayores de dieciocho años al momento de hacer la denuncia a la Iglesia. En cambio, si el tribunal concluyera lo contrario, deberá aplicar el análisis del derecho a la intimidad sobre la información solicitada, según se discute más adelante en esta Opinión.

V

Por otro lado, lo segundo que solicitó el Secretario de Justicia fue información sobre "cómo la Iglesia Católica y/o las personas que atendieron estos asuntos resolvieron los mismos". Apéndice, págs. 304-306. Este requerimiento excesivamente amplio interfiere con los asuntos internos de la Iglesia y viola la libertad religiosa. "Las organizaciones religiosas, tienen un interés en mantener su autonomía en la organización de sus asuntos internos". Mercado, Quilichini v. UCPR, supra,

pág. 639 (citando a <u>Corporation of Presiding Bishop v. Amos</u>, 483 US 327, 341-342 (1987) (Opinión Concurrente del Juez Asociado señor Brennan). De lo que se trata es de que estas organizaciones religiosas puedan libremente "seleccionar sus líderes, definir sus propias doctrinas, **resolver las disputas internas y administrar sus instituciones**...". (Énfasis suplido.) <u>Mercado, Quilichini v. UCPR</u>, <u>supra</u>, pág. 640. La institución religiosa merece libertad e independencia del control secular para poder tomar decisiones sin interferencia alguna por parte del Estado tanto en materia de su gobierno interno como también en materia de fe y doctrina. <u>Presbyterian Church v. Hull Church</u>, 393 US 440, 448 (1969).

El proceso que llevó a cabo la Iglesia Católica para atender y resolver las alegaciones de las presuntas víctimas de delitos sexuales es un asunto de su gobierno interno. Al atender estos asuntos, la Iglesia Católica Romana tomó decisiones relacionadas con la continuación, terminación y expulsión de varios sacerdotes. Esa función, por definición, va a la esencia misma del gobierno interno de la Iglesia. Requerir ese tipo de información no responde a un interés apremiante del Estado. No es función del Estado pasar un juicio valorativo sobre esos procesos. Esa información no es necesaria para que el Estado pueda continuar con su investigación criminal y de ninguna manera adelantaría el interés del Estado. No existe vínculo alguno entre evaluar asuntos del gobierno interno

de la Iglesia y adelantar una investigación criminal. El Estado debe abstenerse de intervenir innecesariamente con las decisiones que toma una iglesia en cuanto a cómo manejar sus cuestiones internas.

Por esa razón, no procede, tal como concluye la Sentencia de este Tribunal, que el Obispo de Arecibo entregue la información sobre cómo y quiénes atendieron los problemas de conducta impropia de algunos miembros del clero.

Por otro lado, cabe destacar que el procedimiento para tramitar las querellas de abuso sexual que hemos estudiado no es ilegal de su faz. "Nuestro Derecho Penal no reconoce como conducta punible la omisión de dar cuenta a las autoridades públicas de un delito cuando se adviene en conocimiento de su comisión. Por consiguiente, en vista de que en Puerto Rico no existe un deber específico de obrar, no es posible incurrir en encubrimiento por conducta omisiva, o sea, por guardar silencio sobre una conducta delictiva conocida". Pueblo v. León Cortijo, 146 DPR 394, 402 (1998) (Opinión de conformidad del Juez Presidente señor Andréu García). De acuerdo al derecho penal, "para incurrir en el delito de encubrimiento debe mediar la intención específica de ayudar al autor de un delito a eludir la acción de la justicia." Íd., pág. 403. Eso no es lo que sucede en este caso.

Vindicar el derecho constitucional a la libertad de culto o el derecho a la intimidad de personas adultas no

puede considerarse, bajo ningún concepto, que constituye el delito de encubrimiento que tipifica nuestro ordenamiento jurídico en el Art. 280 del Código Penal, 33 LPRA sec. 5373.

VI

**A.** El derecho a la intimidad está expresamente consagrado en la Sec. 8 del Art. II de nuestra Constitución, LPRA, Tomo 1, ed. 1999, pág. 317, el cual dispone que "[t]oda persona tiene derecho a [la] protección de [la] ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Reiteradamente hemos expresado que este derecho, componente del derecho a la personalidad, goza de la más alta protección bajo nuestra Constitución y representa un ámbito exento capaz de impedir o limitar la intervención de terceros —sean particulares o poderes públicos— contra la voluntad del titular. López Tristani v. Maldonado, 168 DPR 838, 850 (2006).

Los derechos a la dignidad, integridad personal e intimidad son derechos constitucionales fundamentales que gozan de la más alta jerarquía y constituyen una crucial dimensión en los derechos humanos. Su protección es necesaria para que se pueda lograr una adecuada paz social o colectiva. Arroyo v. Rattan Specialties, Inc., 117 DPR 35 (1986). Por eso, los constituyentes expresaron que "[l]a lesión a la intimidad es... el más penoso ataque a los derechos fundamentales de la persona". 4 Diario de

*Sesiones de la Convención Constituyente* 2567. Véase, además, <u>Acarón v. D.R.N.A.</u>, 186 DPR 564, 577 (2012). El carácter privilegiado y la primacía de este derecho en nuestro ordenamiento nos han motivado a hacerlo valer frente a entes privados y prescindir así del requisito de acción estatal. Véase <u>Arroyo v. Rattan Specialties, Inc.</u>, <u>supra</u>.

Este derecho constitucional impone al Estado y a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos. <u>Colón v. Romero Barceló</u>, 112 DPR 573 (1982). En general, están protegidos dos intereses fundamentales: 1) **el interés individual de evitar la divulgación de asuntos personales** y 2) el interés de poder tomar decisiones importantes de manera independiente. <u>Arroyo v. Rattan Specialties, Inc.</u>, <u>supra</u>, pág. 75. <u>López v. ELA</u>, 165 DPR 280 (2005). En el presente caso nos corresponde indagar sobre el primero de estos intereses, es decir, el de evitar la divulgación de asuntos personales.

Ahora bien, a pesar de que el derecho constitucional a la intimidad es de la más alta jerarquía en nuestro ordenamiento jurídico, no se concibe como un derecho absoluto que "vence a todo otro valor en conflicto bajo todo supuesto concebible". <u>ELA v. P.R. Tel. Co.</u>, 114 DPR 394, 401 (1983). Así pues, ante una alegación de violación a la intimidad, "[l]a cuestión central [por resolver] es si la persona tiene derecho a abrigar, donde sea, dentro

de las circunstancias del caso específico, la expectativa de que su intimidad se respete". Íd., pág. 402. Para hacer esa determinación, es necesario que concurran dos elementos: (1) el subjetivo, mediante el cual el reclamante, según las circunstancias del caso, alberga una expectativa real de que su intimidad se respete, y (2) el criterio objetivo, es decir, si la sociedad considera razonable tener tal expectativa. Pueblo v. Santiago Feliciano, 139 DPR 361, 384 (1995). En aquellos casos en los que se demuestre que existe un derecho de intimidad y el Estado pretenda interferir con él, tiene que limitar esta interferencia al mínimo, de modo que no se convierta en una intromisión injustificada en ámbitos privados protegidos. López v. ELA, supra, pág. 296.

Este Tribunal ha sido particularmente celoso en proteger el derecho a la intimidad cuando el Estado solicita a ciertas entidades información sensitiva de terceras personas. Por ejemplo, en el contexto de un requerimiento de documentos, resolvimos en RDT Const. Corp. v. Contralor I, 141 DPR 424, 442 (1996), que las personas tienen una expectativa de intimidad sobre la información de sus cuentas bancarias que está en manos de un banco. Resaltamos entonces que "[a] través de las cuentas bancarias de una corporación se puede obtener información confidencial sobre sus finanzas y su salud financiera, los salarios y beneficios marginales que ofrece a su personal, los asesores que utiliza y los

gastos ordinarios y extraordinarios en que incurre". Íd. Destacamos así que las personas "suministran a los bancos una gran cantidad de datos bajo la premisa de que serán utilizados únicamente para propósitos bancarios u otros fines legítimos". RDT Const. Corp. v. Contralor I, supra, pág. 442; RDT Const. Corp. v. Contralor II, 141 DPR 861 (1996). Véanse, además, Weber Carrillo v. ELA et al., Op. de 24 de marzo de 2014, 2014 TSPR 46, 2014 JTS 55, 190 DPR __ (2014); Rullán v. Fas Alzamora, 166 DPR 742 (2006) (donde aplicamos esta protección a las copias de las planillas de contribución sobre ingresos); Pueblo v. Loubriel, Suazo, 158 DPR 371, 379 (2003).

**B.** El Tribunal Supremo de Estados Unidos ha reconocido, asimismo, que los individuos tienen derecho a exigir que no se divulgue su información íntima. Véanse: Nixon v. Administrator of General Services, 433 US 425 (1977); Whalen v. Roe, 429 US 589 (1977). Basados en esos casos, otros tribunales han resuelto que existe un derecho fundamental a evitar la divulgación de información confidencial e íntima relacionada a los abusos sexuales. Bloch v. Ribar, 156 F.3d 673, 686 (6to Cir. 1998) ("*the right to prevent the dissemination of confidential and intimate details of a rape implicates a fundamental right*"). Véase, además: Eastwood v. Dep't of Corrections, 846 F.2d 627, 631 (10mo Cir. 1988) ("*This constitutionally protected right [to privacy] is implicated when an individual is forced to disclose information regarding*

*personal sexual matters.*"); <u>Mangels v. Pena</u>, 789 F.2d 836, 839 (10mo Cir. 1986) ("*Information is constitutionally protected when a legitimate expectation exists that it will remain confidential*").

Ese derecho de las víctimas de abuso sexual tiene su fundamento en los problemas que crea la divulgación de cierta información sensitiva. Así, se han resaltado los sufrimientos y la humillación a los que son sometidos las víctimas de abuso sexual:

> *[A] historic social stigma has attached to victims of sexual violence. In particular, a tradition of "blaming the victim" of sexual violence sets these victims apart from those of other violent crimes. Releasing the intimate details of rape will therefore not only dissect a particularly painful sexual experience, but often will subject a victim to criticism and scrutiny concerning her sexuality and personal choices regarding sex.* <u>Bloch v. Ribar</u>, <u>supra</u>, pág. 685.

Véase, además, Peter B. Edelman, <u>Free Press v. Privacy: Haunted by the Ghost of Justice Black</u>, 68 Tex. L. Rev. 1195, 1208 n.69 (1990) ("*Rape is an act of physical violence which by its very nature is an affront to privacy. It represents forcible exposure of aspects of oneself that are protected by conventions of limited access. These conventions are normally adhered to out of regard for well-being and respect for personal privacy*").

En Puerto Rico, hemos resaltado en múltiples ocasiones el derecho de intimidad que protege a las víctimas de abuso sexual en ciertas circunstancias. Véanse, por ejemplo, <u>Pueblo v. Sharma</u>, 167 DPR 2 (2006);

Pena v. Pena, 164 DPR 949, 963 (2005) ("el tribunal debe sopesar los intereses de quien peticiona, frente al derecho a la intimidad de esos menores"); Pueblo v. Arocho Soto, 137 DPR 762, 768 (1994) ("se ha requerido que el acusado demuestre un interés en la evaluación de la víctima lo suficientemente importante como para justificar una invasión al derecho a la intimidad de la víctima en cuestión"), Castro Ortiz v. Mun. de Carolina, 134 DPR 796 (1993).

En Elba A.B.M. v. U.P.R., 125 DPR 294, 322-323 (1990), explicamos diáfanamente el problema que tienen las víctimas de abuso sexual frente al resto de la comunidad:

> [L]a víctima de violación sufre otros efectos además de los que se ocasionan como resultado del ataque físico y sexual. 'Frecuentemente se produce un 'segundo ataque' contra la víctima; éste lo ocasionan los juicios y actitudes de las personas a su alrededor que aunque probablemente involuntarios, provocan un impacto igualmente devastador. El 'segundo ataque' no es un simple reflejo de la conducta o las actitudes de un individuo o grupo en relación a una víctima en específico. Más bien es reflejo de un contexto social más amplio en relación con la violación; es la unión de las actitudes históricas y contemporáneas que existen en cuanto a la figura del hombre y la mujer, de sus relaciones, y lo que se espera por parte de ellos como conducta apropiada'. (Citas omitidas.)

Claro está, el derecho a la intimidad de las víctimas de abuso sexual no es absoluto. Usualmente, ese derecho choca con el interés del Estado en investigar y procesar el crimen. Bloch v. Ribar, supra ("*in this case implicates both a private and a public interest... in prosecution*). En esos casos habrá que hacer un balance de los intereses

encontrados. Íd. pág. 685. Véase, además, Whalen v. Roe, supra. Este análisis de balance de intereses no es ajeno a nuestro acervo jurídico. Véanse, por ejemplo, Lozada Tirado et al. v. Testigos Jehová, 177 DPR 893 (2010); Arroyo v. Rattan Specialties, Inc., supra; E.L.A. v. P.R. Tel. Co., 114 DPR 394 (1983); Sucn. de Victoria v. Iglesia Pentecostal, 102 DPR 20 (1974).

**C.** Los peticionarios, así como el interventor, reconocen que a las víctimas que al momento de la denuncia eran menores de edad, no se les ofreció una garantía de confidencialidad y que no tienen una expectativa razonable de intimidad. Por eso, es innecesario profundizar en ese aspecto. Además, alegan ante nos que el derecho de intimidad protege los nombres de las presuntas víctimas de abuso sexual que al momento de la denuncia tenían dieciocho años o más. Enmarcan ese reclamo en el contenido de la información y la manera confidencial bajo la que se divulgó. Luego de analizar todos los puntos de vista, concluimos que tienen razón.

Lo primero que hay que dilucidar es si, según las circunstancias del caso, las presuntas víctimas adultas albergan una expectativa real de que su intimidad se respete. Entendemos que sí. El procedimiento que adoptó la Conferencia Episcopal Puertorriqueña tenía como regla general la confidencialidad y la privacidad cuando las presuntas víctimas denunciantes fuesen mayores de edad. Para incentivarles a declarar sobre asuntos íntimos, como

lo son incidentes de conducta sexual, expresamente se les garantizó que no se divulgaría su información. Apéndice, pág. 60. Estas personas abrigan hoy la expectativa subjetiva de que no se dé a conocer su información íntima. Íd. No olvidemos que se trata de información relacionada con la integridad sexual de seres humanos.

Ahora bien, ¿la sociedad considera razonable tener esa expectativa? Concluimos que sí. Las víctimas de abuso sexual, como expusimos, están sujetas al escarnio público y la divulgación de esa información las somete usualmente al estigma que conlleva haber sido abusado sexualmente. Muchos podrían culpar a las víctimas por los hechos y levantar sospechas sobre sus vidas íntimas. Esas víctimas pudieran llegar a perder el respeto de sus pares. En otras palabras, podrían ser revictimizadas. Por eso, venimos llamados a proteger la información de las víctimas adultas que, como en este caso, está en manos de terceros. **Si anteriormente hemos brindado protección a información económica y financiera que está en manos de terceros, ¿cómo no darla a unas víctimas de abuso sexual que confiaron en un proceso confidencial y revelaron detalles de lo más íntimo de su vida?** No tiene sentido proteger información que se brindó a ciertas entidades para fines comerciales y, por otro lado, permitir la divulgación de información incluso más íntima, como es aquella de conducta sexual, que un tercero legítimamente prometió expresamente no develar.

Por ejemplo, en este caso, el interventor, un joven adulto de 23 años, expuso que los hechos en los que se vio involucrado "constituyeron una experiencia desagradable, que no interesa volver a recordar ni revivir, y de cuya experiencia se ha podido sobreponer". Apéndice, pág. 388. Imaginamos la humillación que volverá a vivir este joven si la Iglesia Católica revela que fue una de las víctimas de abuso sexual. Luego de haber superado el proceso, lo obligaríamos a revivir cada uno de esos momentos dolorosos, con todo lo que ello implica.

En conclusión, las presuntas víctimas en este caso que tenían dieciocho años o más al momento de hacer la denuncia poseen una expectativa de intimidad sobre la información relacionada al abuso sexual a su persona que revelaron a un tercero. Esa expectativa de intimidad impide, tal como concluye la Sentencia de este Foro, la divulgación de esa información si la presunta víctima objeta.

Como expusimos anteriormente, el Estado tiene un interés apremiante en investigar y procesar los crímenes de abuso sexual que cometieron ciertos sacerdotes católicos. Pueblo v. Ramírez Valentín, 109 DPR 13 (1979). Sin embargo, en el balance de intereses que venimos llamados a hacer entre el poder investigativo del Estado y el derecho a la intimidad, **la balanza en este caso específico se inclina a favor del derecho a la intimidad, y en su consecuencia, a la no divulgación de la**

**información íntima de feligreses adultos que está en poder de la Iglesia Católica con un acuerdo de confidencialidad.** Tenemos constancia en el récord judicial de que al menos una de las víctimas de abuso sexual (el interventor) se ha opuesto tenazmente a que su información se divulgue. Las presuntas víctimas son hoy personas adultas que decidieron rehacer su vida y dejar atrás el calvario del abuso sexual. Estas personas nunca han acudido a las autoridades del Estado para reparar su agravio y más importante aún: la información la posee un tercero que la obtuvo bajo un proceso que era expresamente privado y confidencial.

En este caso no podemos aplicar de forma automática los remedios dispuestos en RDT Const. Corp. v. Contralor I, supra, y su progenie. En esos casos, el Estado sabía a quién pertenecía la información protegida por el derecho a la intimidad. Por el contrario, aquí es la propia identidad del poseedor del derecho lo que se busca proteger. No podemos brindar el mismo trato a dos situaciones fácticas distintas.

Dicho de otro modo, (1) la naturaleza sexual de la información sensitiva que brindaron las presuntas víctimas a la Iglesia y (2) la garantía de confidencialidad que la Iglesia brindó a las presuntas víctimas nos hace inclinar la balanza a favor de la no divulgación. El análisis podría ser distinto si estas dos circunstancias no estuviesen presentes. Es decir, **no** estamos resolviendo que todas las personas que han sufrido abuso sexual tienen un

derecho de intimidad bajo cualquier circunstancia concebible sobre el incidente del que fue víctima.

Por otra parte, el Estado alega que la negativa de la Iglesia a revelar los nombres de las presuntas víctimas de abuso sexual equivaldría a reconocerles a estas un derecho al veto del procesamiento de un delincuente. Eso no es correcto. El argumento del Estado tiene una falla lógica.

Es cierto que "[e]n nuestra jurisdicción, y conforme a lo dispuesto por nuestro ordenamiento jurídico, la facultad y responsabilidad de investigar los hechos delictivos y la decisión de a qué persona acusar y procesar criminalmente y por qué delito, recae en la persona del Secretario del Departamento de Justicia de Puerto Rico y de los fiscales bajo su supervisión". Pueblo v. Castellón Calderón, 151 DPR 15, 24 (2000). Sin embargo, este caso no trata sobre si las víctimas pueden decidir acusar o no a los sacerdotes expulsados. El Estado siempre conserva esa facultad para ejercerla en cualquier momento. Lo que no puede hacer el Estado es obtener forzadamente la información íntima de las presuntas víctimas que está en posesión de un tercero.

Además, el Estado alega que la información que entregue la Iglesia Católica será, de acuerdo a ciertas normas legales, mantenida en secreto. Para ello cita el Art. 13 de la Ley Orgánica del Departamento de Justicia, según enmendado por el Plan de Reorganización de 2011, 3 LPRA sec. 292j, que establece:

La información obtenida como resultado de la investigación realizada es confidencial y debe mantenerse en un expediente investigativo, el cual no puede ser objeto de inspección, examen, ni divulgación mientras se conduce la investigación. **La información así recopilada puede ser divulgada una vez concluida la investigación, conforme las normas que adopte el Secretario mediante reglamento,** excepto en aquellos casos en que surjan las siguientes situaciones:

(a) Una ley o reglamento declare la confidencialidad de la información.
(b) Se revele información que pueda lesionar derechos fundamentales de terceros.
(c) La comunicación esté protegida por alguno de los privilegios evidenciarios que pueden invocar los ciudadanos.
(d) Se trate de la identidad de un confidente.
(e) Sea información oficial conforme a las Reglas de Evidencia, Ap. VI del Título 32.
(f) Se revelen técnicas o procedimientos de investiga[ción].

Esa garantía, dados los intereses involucrados y las particularidades del caso, resulta insuficiente. Nótese que la misma ley dispone que la información recopilada por el Estado podrá ser divulgada una vez concluya la investigación. De hecho, el Reglamento adoptado para eso resulta más insuficiente aún si consideramos que en Puerto Rico existe un derecho constitucional a la información que posee el Estado. Véanse, por ejemplo, Nieves v. Junta, 160 DPR 97, 111 (2003) ("el derecho a la información pública es fundamental"); Soto v. Srio. de Justicia, 112 DPR 477 (1982). Véanse, además, Florida Star, The v. B.J.F., 491 US 524 (1989); Cox Broadcasting Corp. v. Cohn, 420 US 469 (1975).

De cualquier modo, el derecho a la intimidad de las víctimas opera en primer lugar contra el Estado. Weber

Carrillo v. ELA et al., supra. Por eso, aun si el Departamento de Justicia no divulgara la información a terceros, persiste el problema de la violación de la expectativa de intimidad de las víctimas frente al requerimiento del Estado. Íd.

VII

Por todo lo anterior, estamos conformes con la Sentencia de este Tribunal en la que se revoca al foro primario. Procede devolver el caso a ese foro para que realice un examen en cámara de los documentos solicitados y dilucide cuáles de aquellas presuntas víctimas al momento de la denuncia tenían dieciocho años de edad o más y cuáles eran menores. En cuanto a los que eran menores, el Tribunal de Primera Instancia debe ordenar la divulgación de la información a la fiscalía, bajo los estándares más estrictos de confidencialidad.

De acuerdo a lo discutido anteriormente, en el caso de los que al momento de la denuncia tenían dieciocho años de edad o más, el foro debe analizar primero, como asunto de umbral, cuáles expedientes, si alguno, contienen comunicaciones privilegiadas al amparo de la Regla 511 de Evidencia, supra. Aquellas comunicaciones que se hayan manifestado durante el sacramento de la confesión deben excluirse por estar protegidas por el privilegio.

De concluir que no aplica el privilegio, el tribunal deberá resolver si conforme a la cláusula de libertad de culto, el Estado demostró que no existen medidas menos

onerosas para obtener la información que obra en los expedientes de la Diócesis de Arecibo. Si concluye que existen alternativas menos onerosas, el Tribunal de Primera Instancia deberá emitir un *injunction* para dejar sin efecto los *subpoenas* que emitió la Fiscalía de Arecibo por violar la cláusula de libertad de culto. Art. II, Sec. 3 de la Constitución de Puerto Rico, <u>supra</u>.

Por el contrario, si determina que no existen alternativas menos onerosas, y que en su consecuencia no se viola la cláusula de libertad de culto, el foro primario deberá hacer valer el derecho constitucional a la intimidad que tienen las presuntas víctimas. Para ello, el tribunal deberá ordenar al Obispo de Arecibo que notifique en un plazo corto a las personas adultas involucradas que existe un requerimiento del Estado a la información íntima que ellas brindaron confidencialmente a la Iglesia Católica. El Obispo de Arecibo deberá certificar al tribunal, bajo juramento, que notificó a esas personas a la última dirección conocida. **Se entregará la información al Ministerio Público a menos que la persona notificada lo objete luego de ser notificada debidamente.** Debe advertirse a la persona de esta consecuencia y darle un plazo razonable para que conteste. Si una o más de las personas notificadas no acceden a que se revele la información, el Tribunal de Primera Instancia deberá emitir un *injunction* que deje sin efecto los *subpoenas* que emitió la Fiscalía de Arecibo en cuanto a la información

íntima de las personas que objetaron la entrega, por violar el derecho constitucional a la intimidad que tienen esas posibles víctimas de abuso sexual. Art. II, Sec. 8 de la Constitución de Puerto Rico, supra.

En ambas instancias -sean las posibles víctimas mayores o menores de edad- no se entregará al Estado ningún documento o porción de este referente a "cómo la Iglesia Católica y/o las personas que atendieron estos asuntos resolvieron los mismos". Apéndice, pág. 65. Esa parte del subpoena interfiere con los asuntos internos de la Iglesia Católica y no es necesaria para el propósito secular que persigue el requerimiento, por lo que se debe dejar sin efecto.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Obispo de la Iglesia Católica de Puerto Rico – Diócesis de Arecibo, Daniel Fernández Torres, y su Vicario General Luis Colón Rivera<br><br>Peticionarios<br><br>v.<br><br>Secretario de Justicia del Estado Libre Asociado de Puerto Rico, Hon. César Miranda<br><br>Recurridos<br><br>DJMG<br><br>Interventor | CT-2014-4 | Certificación |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se unen la Jueza Presidenta señora Fiol Matta y la Jueza Asociada Oronoz Rodríguez

San Juan, Puerto Rico, a 14 de julio de 2014

> "[C]on la iglesia hemos dado, Sancho".[5]

Disiento enérgicamente de la determinación que hoy emite una mayoría de este Tribunal por entender que procede la entrega de la información requerida por el Departamento de Justicia, tal y como ordenó el Tribunal de Primera Instancia. En cambio, hoy una mayoría de este

---

[5] Miguel de Cervantes Saavedra, *Don Quijote de la Mancha*, Cap. IX, pág. 60 (Ed. IV Centenario, Madrid, Real Academia Española, 2004).

Tribunal devuelve el caso al foro primario para que celebre una vista evidenciaria innecesaria, concediéndoles así a los peticionarios una segunda oportunidad para corregir las deficiencias de la prueba que presentaron. Todo esto a pesar que la Opinión de conformidad concluye que los peticionarios tenían el peso de probar que cumplieron con los requisitos de la Regla 511 de Evidencia y que la prueba que obra en el expediente es insuficiente para llegar a tal conclusión.

Luego, la mayoría trastoca el balance consagrado en nuestra Constitución para otorgarle a los peticionarios poderes que exceden lo contemplado en nuestro ordenamiento, permitiéndoles invocar su derecho a la intimidad y libertad de culto para coartar la responsabilidad del Estado de investigar y encausar la comisión de delitos sexuales contra los más vulnerables: menores de edad alegadamente víctimas de delitos sexuales. Así, a través de fundamentos jurídicos contradictorios y ordenando un proceder desacertado y oneroso — tanto para el Estado, como para las víctimas — la mayoría de este Tribunal evade su responsabilidad de lograr justicia y adjudicar las controversias ante su consideración. Tenemos entonces que plantearnos: ¿quiénes protegen a los menores?

Pasemos entonces a resumir los hechos que sirven de trasfondo a esta controversia.

I

A raíz de una investigación sobre la posible comisión de varios delitos sexuales por parte de sacerdotes adscritos a la Diócesis de Arecibo de la Iglesia Católica ("Diócesis"), el Departamento de Justicia, por conducto del Fiscal de Distrito de la Fiscalía de Arecibo, emitió varios *subpoenas* contra el Obispo de la Diócesis, Monseñor Daniel Fernández Torres ("Obispo"), y su Vicario General, Rev. Luis Colón García ("Vicario").

La información solicitada por medio de los *subpoenas* estaba relacionada a una investigación interna que realizó la Diócesis tras recibir varias querellas denunciando conducta sexual inapropiada por parte de sacerdotes bajo su supervisión. La investigación se realizó conforme al procedimiento uniforme establecido por la Conferencia Episcopal Puertorriqueña, organismo que reúne a todos los obispos de la Iglesia Católica en Puerto Rico, para atender alegaciones de conducta sexual impropia. En este caso, el Obispo encomendó la investigación a su Vicario, quien entrevistó y tomó declaraciones de las víctimas, querellantes y demás testigos en ausencia de terceros y garantizándoles que la Diócesis mantendría lo comunicado en confidencialidad. Además del Vicario, en la investigación también intervinieron el Obispo, **notarios, consultores y profesionales que aportaron pericia, por lo que solamente algunos de los que intervinieron lo hicieron en capacidad de sacerdotes o clérigos de la Iglesia.** La investigación

produjo un expediente que recogió los documentos utilizados y preparados durante ésta. Posteriormente, los hallazgos fueron referidos a la Congregación para la Doctrina de la Fe, organismo de la Iglesia Católica responsable de juzgar las infracciones graves cometidas contra la doctrina católica. La investigación culminó en la expulsión de seis (6) sacerdotes de la Diócesis.

Los primeros dos *subpoenas* en controversia fueron emitidos el 30 de enero de 2014, uno dirigido al Obispo y otro al Vicario. Específicamente, ambos *subpoenas* solicitaban que comparecieran o suministraran los nombres, direcciones y toda información relacionada a los querellantes, tanto menores como adultos, que han alegado ser víctimas de delitos sexuales cometidos por sacerdotes adscritos a la Diócesis durante los últimos diez (10) años, y los querellados. Además, solicitaron información sobre cómo la Diócesis y las personas responsables de atender las querellas resolvieron las mismas. Para cumplir con los requerimientos, el 6 de febrero de 2014 la Diócesis presentó una certificación suscrita por su Canciller, la cual únicamente contenía los nombres de los sacerdotes contra quienes se presentaron las querellas.

Inconformes con la información suministrada, el Fiscal de Distrito emitió dos *subpoenas* adicionales contra el Obispo. El primero, emitido el 6 de febrero de 2014, le requirió suministrar la misma información solicitada mediante el primer *subpoena* en su contra. El segundo, emitido el 7 de febrero de 2014, lo citó a

comparecer para entregar información sobre la investigación relacionada a los alegados delitos sexuales cometidos para el año 2009 por un sacerdote en particular, el ex sacerdote Edwin Mercado Viera. Ambos *subpoenas* citaron al Obispo para que compareciera a la Fiscalía de Arecibo el 12 de febrero de 2014 y entregara la información requerida.

El 12 de febrero, fecha en que el Obispo debía comparecer ante la fiscalía, el Obispo y su Vicario presentaron una demanda ante el Tribunal de Primera Instancia. En la misma solicitaron que el Tribunal dictara sentencia declaratoria decretando la nulidad de los *subpoenas* emitidos en su contra. Además, solicitaron un *injunction* preliminar y permanente al amparo de la Regla 57 de Procedimiento Civil, 32 L.P.R.A. Ap. V R.57, para que se ordenara la paralización de los procedimientos investigativos que realiza el Departamento de Justicia sobre aquellos asuntos internos de la Diócesis de Arecibo que incidan directa o indirectamente sobre los dogmas, creencias y doctrinas de su religión católica. Los peticionarios alegaron que al entregar la certificación suscrita por el Canciller de la Diócesis el 6 de febrero de 2014 cumplieron con los requerimientos del Departamento de Justicia. También alegaron que los *subpoenas* son nulos por violentar la cláusula constitucional que instituye la separación entre iglesia y estado, pues éste garantiza la libertad de culto y prohíbe el establecimiento de religión alguna.

Además, sostuvieron que los *subpoenas* sufren de amplitud excesiva y colocan a la Diócesis en riesgo de sufrir un daño irreparable, pues la información solicitada es confidencial y entregarla laceraría su libertad de culto, la cual incluye la potestad de manejar sus asuntos internos y disciplinarios. Finalmente, alegaron que entregar dicha información violentaría los derechos de intimidad y dignidad de las víctimas de abuso sexual que voluntariamente acudieron a la Iglesia en virtud de las garantías de intimidad y privacidad provistas en el procedimiento canónico. Todo esto, pues sostienen que la mayoría de los veinte (20) casos de abuso sexual ya han prescrito y algunos no constituyen conducta delictiva, sino meros actos consensuales entre mayores de edad que no están tipificados como delitos.

El 19 de febrero de 2014, una de las alegadas víctimas que denunció conducta impropia ante la Diócesis, el interventor D.J.M.G., presentó una moción solicitando intervenir en el pleito y una *Demanda de intervención*. Indicó que actualmente tiene 23 años de edad, que entre las edades de 12 y 15 años fue abusado sexualmente por un sacerdote de la Diócesis y que hace tres años presentó una querella ante la Iglesia por los hechos ocurridos. Alegó que si los peticionarios divulgan la información solicitada por el Departamento de Justicia se verían afectados sus derechos constitucionales a la protección de su intimidad y dignidad, y el libre ejercicio de su religión católica. Amparándose en la Regla 511 de

Evidencia, 32 L.P.R.A. Ap. IV R.511, y la Carta de Derechos de las Víctimas y Testigos de Delito, Ley Núm. 22 de 22 de abril de 1988, 25 L.P.R.A. 973 *et seq*, sostuvo que si la Diócesis cumplía con el requerimiento violaría el privilegio evidenciario que le permite impedir que el sacerdote que realizó la investigación divulgue lo que le comunicó. Esto, pues presentó la querella y participó en la investigación de la Diócesis con la expectativa de que la Iglesia protegería la confidencialidad de la investigación.[6]

En cuanto a la Carta de Derechos de las Víctimas y Testigos, el interventor sostiene que ésta garantiza la confidencialidad de la información en posesión de la Diócesis que lo pueda identificar y prohíbe que se divulguen las comunicaciones confidenciales que realizó. Expone que utilizó el mecanismo confidencial que le proveyó la Diócesis, pues según sus creencias religiosas entiende que es un asunto a dilucidarse internamente, dentro de la Iglesia Católica, y no le interesa que el asunto sea investigado por el Estado. Por ser mayor de edad, razonó que tiene derecho a defender su intimidad y evitar que sus problemas personales se diluciden públicamente en un juicio criminal.

El 20 de febrero de 2014, el Estado compareció al pleito y solicitó la desestimación de la demanda por ésta no exponer una reclamación que justifique la concesión de

---

[6] En su demanda la Diócesis no levantó planteamiento alguno sobre el privilegio religioso-creyente de la Regla 511.

un remedio y no cumplir  con los requisitos para conceder un *injunction* preliminar o permanente. Adicionalmente, alegó que el Secretario de Justicia tiene facultad en ley para investigar y procesar todos los casos de naturaleza penal bajo la jurisdicción del Estado Libre Asociado, por lo que la negativa de los peticionarios de entregar la información requerida constituye una limitación indebida al poder investigativo del Estado. Ante el planteamiento de la naturaleza confidencial de la investigación realizada por la Diócesis, el Estado argumentó que el Departamento de Justicia cuenta con mecanismos adecuados para salvaguardar la confidencialidad de los documentos y proteger la seguridad y privacidad de las víctimas. Adujo que el interés que persigue el Estado con los requerimientos es uno de la más alta jerarquía — investigar y procesar el abuso sexual contra menores, al igual que otros posibles delitos sexuales — por lo que la investigación de hechos constitutivos de delitos no puede considerarse un asunto interno sobre el cual la Iglesia ostente la responsabilidad exclusiva de investigar y sancionar. Finalmente, sostuvo que este tipo de investigación no es el tipo de acción estatal que proscribe la protección constitucional de la libertad de culto y la separación entre iglesia y estado, pues los *subpoenas* se emitieron en virtud de legislación neutral y de aplicación general, por lo que cualquier efecto posible sobre la práctica religiosa es meramente

incidental y el Estado no está investigando las creencias y prácticas internas de la Diócesis.

Luego de varios trámites procesales, el Tribunal de Primera Instancia, mediante sentencia de 7 de abril de 2014, denegó la moción desestimatoria que presentó el Estado y dictó sentencia declaratoria avalando la constitucionalidad de todos los *subpoenas* impugnados. Concluyó que al emitir los *subpoenas* el Departamento de Justicia solicitó información específica relacionada a víctimas de delitos sexuales y los sacerdotes responsables de los alegados delitos, por lo cual los requerimientos inciden directamente sobre la investigación criminal que realiza. Asimismo, sostuvo que los *subpoenas*, al haberse emitido al amparo de una ley neutral de aplicación general y estar limitados a una investigación criminal corriente, no afectan el libre ejercicio de la religión católica o interfieren indebida o sustancialmente en los procesos internos de la Iglesia. Además, no concedió los *injunctions* solicitados, pues los peticionarios no demostraron que sufrirían un daño irreparable. Finalmente, determinó que la información solicitada en los *subpoenas* no estaba protegida por el privilegio de la Regla 511 de Evidencia, pues los practicantes de la religión católica sólo pueden invocarlo sobre comunicaciones realizadas durante el sacramento de la confesión. Por lo tanto, ordenó a la parte demandante a entregar los documentos solicitados en un término de quince (15) días.

En desacuerdo, el 16 de abril de 2014 los demandantes y la parte interventora presentaron ante el Tribunal de Primera Instancia una *Moción para que se formulen determinaciones de hechos y conclusiones de derecho adicionales y en solicitud de reconsideración*, reiterando sus planteamientos constitucionales y solicitando unas determinaciones de hecho adicionales. La misma fue denegada el 22 de abril de 2014.

El 25 de abril de 2014, fecha en que vencía el término concedido por el Tribunal de Primera Instancia para cumplir con los requerimientos de información y entrega de documentos, los demandantes presentaron un recurso de apelación ante el Tribunal de Apelaciones. También presentaron una solicitud en auxilio de jurisdicción ante el foro apelativo intermedio, rogándole que paralizara los efectos de la Sentencia del foro primario hasta que resolviera el recurso en los méritos. No obstante, mientras el Tribunal de Apelaciones tenía ante su consideración ambos recursos, el 2 de mayo de 2014 los demandantes presentaron un recurso de certificación intrajurisdiccional ante el Tribunal Supremo.[7] Acompañaron su escrito con una moción en auxilio de jurisdicción solicitando que ordenáramos la paralización de los efectos de la sentencia.

Mediante resolución emitida el 7 de mayo de 2013, acogimos el recurso de certificación y ordenamos la paralización de los efectos de la sentencia. Le

---

[7] El 2 de mayo el Tribunal de Apelaciones denegó ambas solicitudes.

concedimos a las partes un término simultáneo de quince (15) días para presentar sus alegatos y un segundo término simultáneo de cinco (5) días a partir de la entrega de los alegatos para presentar sus alegatos en réplica.

En sus respectivos escritos, los peticionarios — la Diócesis de Arecibo, su Obispo y Vicario, y el interventor DJMG — alegan la comisión de los siguientes errores por parte del Tribunal de Primera Instancia. En primer lugar, sostienen que erró el Tribunal al resolver que las comunicaciones confidenciales realizadas durante la investigación entre los denunciantes, víctimas y testigos, y el Vicario no son comunicaciones privilegiadas al amparo de la Regla 511 de Evidencia, a pesar de que cumplen con todos los requisitos del privilegio. Sostienen que erró el Tribunal al limitar la aplicación del privilegio exclusivamente al sacramento de la confesión católica, en clara violación a la protección constitucional de la libertad de culto y contra el establecimiento de religión. Además sostienen que erró el foro primario al adjudicar la controversia ante su consideración sin antes examinar en cámara la información y documentos sobre los que reclaman la protección constitucional y el privilegio estatutario.

En segundo lugar, argumentan que al validar la constitucionalidad de los *subpoenas* el Tribunal de Primera Instancia ignoró los reclamos de intimidad que levantaron los demandantes en nombre propio y en

representación de las víctimas y la Diócesis. Finalmente, alegan que el foro de instancia erró al resolver que la confidencialidad de las comunicaciones entre el interventor DJMG y los demás denunciantes no forma parte de sus derechos como católicos, por lo que entienden que exigirle la entrega de la información requerida viola la libertad de culto protegida constitucionalmente.

Por su parte, el Estado argumenta que acoger la tesis de que los derechos constitucionales de los demandantes los eximen de cumplir con los *subpoenas* abriría la puerta a que cualquier persona se escude en las reglas internas de su religión para neutralizar el poder investigativo del Estado e impedir que desempeñe su responsabilidad de  hacer cumplir las leyes e iniciar la acción penal en nombre del Pueblo. También sostiene que la información y documentación requerida en los *subpoenas* no está cobijada por el privilegio religioso-creyente de la Regla 511 de Evidencia, pues lo comunicado durante la investigación fue divulgado a terceros.

Planteada así la controversia, procedemos a analizar el derecho aplicable.

II

Antes de considerar los planteamientos constitucionales que levantan los peticionarios, debemos evaluar la aplicabilidad del privilegio religioso-creyente a la controversia ante nosotros.

A

El propósito principal de nuestras Reglas de Evidencia es el descubrimiento de la verdad en todos los procedimientos judiciales. 32 L.P.R.A. Ap.VI R. 102. No obstante, en virtud de consideraciones de política pública, nuestro ordenamiento admite unas reglas de exclusión de evidencia, como lo son los privilegios, para adelantar ciertos intereses sociales que pueden resultar ajenos o hasta contrarios a la búsqueda de la verdad. Ernesto L. Chiesa, *Tratado de Derecho Probatorio*, T. I., 186. Capitulo IV, §4.1 A y B. Precisamente por ser ajenos a la búsqueda de la verdad, al evaluar la existencia de un privilegio éstos deben interpretarse de forma restrictiva, salvo que ostenten rango constitucional. 32 L.P.R.A. Ap. VI R. 518; *Tratado de Derecho Probatorio*, *supra,* pág. 201; *véase, Pagán v. First Hospital*, 2013 T.S.P.R. 102, 189 D.P.R. ___ (2013); *Noriega v. Hernández Colón*, 130 D.P.R. 919, 940 (1992); *Pueblo en interés del menor L.R.R.*, 125 D.P.R. 81, 88 (1985); *Rodríguez v. Scotiabank*, 113 D.P.R. 210, 214 (1982); *Lugo Ortiz v. Ferrer*, 85 D.P.R. 862, 871 (1962).

Nuestras Reglas de Evidencia proveen un trato privilegiado a cierto tipo de comunicación habida entre un creyente y un religioso, permitiendo que ambos rehúsen revelar o impidan que se divulgue una comunicación confidencial habida entre ellos. A esos fines, nuestra Regla 511 de Evidencia reza como sigue:

**Regla 511. Relación religiosa o religioso y creyente**

(A) Según usadas en esta regla, las siguientes expresiones tendrán el significado que a continuación se indica:

(1) *Religiosa o religioso* — Sacerdote, pastora, pastor, ministra, ministro, rabino, practicante de una religión, funcionaria o funcionario similar de una iglesia, secta o denominación religiosa o de cualquier organización religiosa

(2) *Creyente* — Persona que le hace una comunicación penitencial o confidencial a una religiosa o un religioso.

(3) *Comunicación penitencial o confidencial* — Aquélla hecha por una persona creyente, en confidencia, sin la presencia de una tercera persona, a una que es religiosa y quien, en el curso de la disciplina o la práctica de su iglesia, secta, denominación u organización religiosa, está autorizada o acostumbrada a oír tales comunicaciones y que bajo tal disciplina tiene el deber de mantenerlas en secreto.

(B) Una religiosa o religioso, o una persona creyente, sea o no parte en el pleito, tiene el privilegio de rehusar revelar una comunicación penitencial o confidencial o impedir que otra persona la divulgue.

32 L.P.R.A. Ap. VI R. 511.

Según se desprende del inciso (B) de la Regla 511, los poseedores del privilegio son los dos sujetos que participan en la comunicación confidencial, el creyente y el religioso, y ambos cuentan con legitimación para invocarlo y evitar la divulgación de la comunicación protegida. En cuanto a quién se considera un religioso para propósito del privilegio, el inciso (A)(1) indica que debe ser un funcionario afiliado a una secta religiosa organizada y reconocida, por lo que no incluye a los ministros autodenominados. *Informe de las Reglas de Derecho Probatorio,* pág. 281, *citando a* Notas del Comité Asesor Federal a la Regla propuesta 506. Por otro lado, el inciso (A)(2) indica que *creyente* se refiere al sujeto que realiza la comunicación confidencial al religioso.

Aunque los poseedores del privilegio son fácilmente identificables, resulta complejo delimitar el alcance de las comunicaciones protegidas, pues no toda comunicación que ocurre entre un religioso y un creyente está cobijada por el privilegio. *Informe de las Reglas de Derecho Probatorio*, *supra*, pág. 281; Chiesa, *supra*, pág. 281. Para que se cumplan los requisitos del privilegio, estos dos sujetos deben tener, al momento en que se realiza la comunicación, una relación particular que surge según el tipo de comunicación que se transmite y las expectativas de cada uno al respecto.

El religioso tiene que acostumbrar o estar autorizado a recibir este tipo de comunicación, según sea la costumbre y práctica religiosa. Aunque la Regla 28 de 1979 limitaba el privilegio a la comunicación penitencial, evidentemente influenciado por el sacramento católico de la confesión, la Regla 511 deja a un lado esta limitación para salvaguardar el derecho a la libertad de culto y la protección contra el establecimiento de religión.[8] Del texto de la Regla 511

---

[8] El texto de la actual Regla 511 de Evidencia no alteró sustancialmente el alcance del privilegio religioso-creyente según establecido en la Regla 28 de las Reglas de Evidencia de 1979 y el inciso 3 del artículo 402 del Código de Enjuiciamiento Civil. Secretariado de la Conferencia Judicial y Notarial, *Informe de las Reglas de Derecho Probatorio*, pág. 280. Esta Regla lee de forma casi idéntica al texto de la antigua Regla 28, utilizando los términos **religioso** y **creyente** en vez de **sacerdote** *y* **penitente**. Este cambio intenta ajustar el texto a uno más inclusivo, en armonía con las protecciones constitucionales de la libertad de culto y contra el establecimiento de religión, pues el texto de la Regla 28 sugería que el privilegio sólo aplicaría a comunicaciones habidas en ritos análogos al sacramento de la confesión

(continúa...)

se desprende que no se requiere que la comunicación se realice dentro del ámbito de penitencia o confesión, o en busca de absolución espiritual, pues esa práctica religiosa podría ser ajena a un sinnúmero de religiones y sectas. *Informe de las Reglas de Derecho Probatorio*, *supra*, pág. 281. En vez, el privilegio protege aquella comunicación confidencial realizada entre el creyente y el religioso para recibir algún tipo de consejería espiritual.

Ahora bien, nuestra Regla 511 contiene lenguaje muy particular en cuanto al requisito de confidencialidad que exige. Al definir la **comunicación confidencial**, la regla requiere que la comunicación se realice sin la presencia de terceros y con la creencia de que el religioso la mantendrá en **secreto**; es decir, no la divulgará a ningún tercero, bajo ninguna circunstancia y sin distinción de quién es ese tercero.

Contrario a otros de nuestros privilegios evidenciarios, el texto de la Regla 511 no reconoce la posibilidad de que la comunicación protegida se divulgue a terceros, aún si es con la intención de adelantar el propósito por el cual se realiza la comunicación. *Véase, e.g.,* privilegio abogado-cliente, Regla 503(A)(4); privilegio médico-paciente, Regla 506(A)(3); privilegio consejera-víctima del delito, Regla 507(A)(3), 32 L.P.R.A. Ap. VI. El requisito de que la comunicación se

católica. *Informe de las Reglas de Derecho Probatorio*, *supra*, pág. 280. No obstante, estos cambios no alteraron la doctrina del privilegio. *Id*.

guarde en secreto concuerda con el texto del privilegio según establecido en las secciones 1030 a 1034 del Código de Evidencia de California, el cual sirvió de base para la redacción de la Regla 511 de Evidencia, y era parte del texto de la antigua Regla 28.[9] *Informe de las Reglas de Derecho Probatorio,* pág. 280*; Informe del Proyecto de Reglas de Evidencia de Junio de 1992.*

Al momento de redactar su propuesta para las actuales reglas de evidencia, el Comité Asesor Permanente evaluó otras alternativas para el texto del privilegio religioso-creyente que preservarían la aplicación del privilegio aún luego de cierta divulgación a terceros. Por ejemplo, el privilegio religioso-creyente según plasmado en las Reglas de Evidencia Federales propuestas permite que la comunicación privilegiada sea divulgada a terceros, siempre y cuando sea para adelantar el mismo fin por el cual se realiza la comunicación. En lo pertinente, la Regla 505 dispone que para propósitos de este privilegio

---

[9] El privilegio religioso-creyente del Código de Evidencia de California se encuentra en las secciones 1030-1034. West's Ann.Cal.Evid.Code sec. 1030-1034. Con respecto al requisito de mantener la comunicación en secreto, la sección 1032 del Código de Evidencia lee como sigue:

> As used in this article, 'penitential communication' means a communication made in confidence, in the presence of no third person so far as the penitent is aware, to a member of the clergy who, in the course of the discipline or practice of the clergy member's church, denomination, or organization, is authorized or accustomed to hear those communications and, under the discipline or tenets of his or her church, denomination, or organization, has a duty to keep those communications secret.

West's Ann.Cal.Evid.Code § 1032.

[a] communication is 'confidential' if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication".
Gregory P. Joseph, *et al.*, *Evidence in America*, §27.1 (1994).

Así, la regla modelo federal extiende el privilegio a otras comunicaciones confidenciales entre el religioso y creyente, y no meramente a aquella que el religioso esté obligado a mantener en secreto. *Id*. §27.3.

De hecho, varios comités que evaluaron las Reglas de Evidencia de 1979 habían propuesto redactar el privilegio de forma tal que se pudiera invocar aún luego de cierta divulgación a terceros, tal y como dispone la regla federal propuesta.[10] Al evaluar la regla propuesta por el

---

[10] Por ejemplo, la Regla 508 propuesta en el Proyecto de Reglas de Evidencia en junio de 1992 incluía el siguiente texto:

Comunicación confidencial: comunicación hecha a un sacerdote, en su carácter profesional como consejero espiritual, en la confianza de que la misma **no será divulgada a terceras personas, salvo aquellas que sea necesario para llevar a cabo el propósito de la comunicación.**

*Informe del Proyecto de Reglas de Evidencia de Junio de 1992*, págs. 72-73. (Énfasis suplido).

De igual forma, la redacción del privilegio propuesta por el Comité de Reglas de Evidencia en 1986 dispone que se considerará como comunicación confidencial aquella comunicación realizada a un sacerdote, como consejero espiritual, "en la confianza de que la misma **no será divulgada a terceras personas, salvo aquellas que sea necesario para llevar a efecto el propósito de la comunicación**". Comité de Reglas de Evidencia del Secretariado de la Conferencia Judicial, *Primer Examen de las Reglas de Evidencia de 1979: Comentarios y Recomendaciones* p. 172. (Énfasis suplido). El lenguaje empleado en ambas propuestas del Comité contrasta marcadamente con el requisito de secreto pautado en la actual Regla 511. Su lenguaje se asemeja más a la regla uniforme federal, pues permite la divulgación a terceros en ciertas circunstancias.

Comité Permanente en el 1992, el profesor Rolando Emmanuelli Jiménez indicó que:

> La Regla propuesta adiciona al inciso (A)(3) que la comunicación puede divulgarse a terceras personas cuando sea necesario para llevar a cabo los propósitos de la comunicación. Esta adición desvirtúa la naturaleza y razón de ser del privilegio, pues éste debe estar circunscrito a proteger la estrecha e íntima relación sacerdote-feligrés en el plano espiritual. Permitir la divulgación a terceras personas sin que se entienda renunciado el privilegio parece un contrasentido.

Prontuario de Derecho Probatorio Puertorriqueño, Rolando Emmanuelli Jiménez. P. 369.

No obstante, al redactar el texto de la actual Regla 511, el Comité Asesor Permanente **rechazó alterar el lenguaje de la antigua Regla 28 que requería mantener lo comunicado en secreto.** *Informe de las Reglas de Derecho Probatorio,* pág. 280. Este rechazo reafirma que la intención de la actual Regla 511 es limitar el ámbito del privilegio a las comunicaciones que el religioso está obligado a mantener en secreto, más allá de la mera confidencialidad.

Por todo lo anterior, para invocar el privilegio religioso-creyente de la Regla 511, la comunicación debe (1) realizarse en confidencia y en ausencia de terceros, (2) a un religioso que según la práctica de su organización religiosa acostumbre o esté autorizado a recibir este tipo de comunicación y (3) el religioso tiene que estar obligado según la práctica o creencia de la religión a mantener la comunicación en secreto.

Como se indicó, la Regla 511 es sustancialmente idéntica a las secciones 1030-1034 del Código de

Evidencia de California. Con lo cual, lo resuelto por el Tribunal de Apelaciones de California en *Roman Catholic Archbishop of Los Angeles v. Superior Court*, 131 Cal.App.4th 417 (2005), es particularmente relevante para la controversia que hoy tenemos ante nuestra consideración. En aquella ocasión, un gran jurado que investigaba alegaciones de abuso sexual hacia menores por parte de dos sacerdotes católicos emitió varios *subpoenas* contra la Arquidiócesis para requerir la entrega de varios documentos relacionados a los crímenes que investigaba. Aunque inicialmente entregaron los documentos, varios sacerdotes y la Arquidiócesis misma acudieron al Tribunal Superior de California y solicitaron que anulara los *subpoenas*. Para atender los reclamos de los demandantes, el Tribunal Superior nombró un árbitro para evaluar la evidencia presentada y los reclamos de las partes, y determinar qué documentos debían entregarse al gran jurado. Al resolver, el árbitro denegó la solicitud de los demandantes de anular los *subpoenas* y ordenó la entrega de los documentos solicitados, salvo algunos protegidos por otros privilegios evidenciarios. El árbitro concluyó que el privilegio no aplicaba porque la comunicación entre el religioso y creyente había sido divulgada a un tercero, entendiendo que la arquidiócesis había realizado una investigación similar a la que llevaría a cabo cualquier patrono ante alegaciones contra un empleado abuso sexual contra menores.

Los demandantes acudieron en revisión al Tribunal de Apelaciones, solicitando que el Tribunal impidiera la entrega de quince (15) documentos en específico. En resumidas cuentas, sostuvieron que su religión católica obligaba a los obispos católicos a velar por el bienestar emocional, físico y espiritual de los sacerdotes bajo su supervisión por lo que divulgar las comunicaciones habidas entre el clero de la arquidiócesis y su obispo violentaba la libertad de culto de los demandantes y están amparadas por el privilegio creyente-religioso.

Según demostraron los demandantes en *Roman Catholic Archbishop of Los Angeles*, *supra*, el Arzobispo de Los Angeles había realizado una investigación sobre alegaciones de conducta sexual inapropiada por parte de algunos sacerdotes bajo su supervisión. Durante la investigación, sostuvo conversaciones privadas con algunos de los sacerdotes, sobre las cuales ambos — el sacerdote y el arzobispo — tenían expectativa de que los resultados se mantendrían confidenciales y separados de sus expedientes personales. No obstante, **los resultados de la investigación se comunicaron al Cardenal, varios vicarios y otros empleados de la arquidiócesis, tal y como esperaban los que participaron en la investigación.** Al evaluar si las comunicaciones entre los sacerdotes y el arzobispo estaban protegidas por el privilegio californiano, el Tribunal de Apelaciones hizo hincapié en el requisito de la sección 1032 de que la comunicación se realizara en ausencia de terceros y que el religioso

tuviera la obligación de mantenerla en secreto. *Roman Catholic Archbishop of Los Angeles*, 131 Cal.App.4th en la pág. 226-27. El Tribunal concluyó que al momento de realizar la comunicación, los sacerdotes entendían que el religioso, en este caso el arzobispo, mantendría la confidencialidad de lo comunicado solamente dentro de la jerarquía de la Iglesia, mas no en secreto absoluto, pues el expediente demostraba que los sacerdotes que participaron en la investigación realizada por la Iglesia eran conscientes de que lo comunicado se compartiría con más de una persona. **El hecho de que tanto el religioso como el creyente conocían que la comunicación se divulgaría a terceros impidió, desde el momento mismo de la enunciación, cualquier reclamo bajo el privilegio religioso-creyente de la sección 1032 del Código de Evidencia de California.** *Id*. pág. 445.

B

En este pleito, los peticionarios razonan que al participar en la investigación estaban ejerciendo sus creencias religiosas, pues como creyentes deseaban atender sus reclamos junto a la consejería espiritual que les ofrece el procedimiento interno de sanciones de la Diócesis. Por lo tanto, alegan que las comunicaciones habidas entre las víctimas y los vicarios, las cuales sirvieron de base para los expedientes investigativos que creó la Diócesis, son comunicaciones privilegiadas entre un creyente y un religioso protegidas de divulgación

alguna al amparo de la Regla 511 de Evidencia. No les asiste la razón.

Para invocar exitosamente el privilegio que concede la Regla 511, la parte que reclama su aplicación tiene el peso de demostrar que ha cumplido con todos sus requisitos. De igual forma, reiteramos que las Reglas de Evidencia nos imponen la obligación de interpretar restrictivamente los privilegios evidenciarios estatutarios, como lo es el privilegio creyente-religioso. 32 L.P.R.A. Ap.VI R.518. En la controversia ante nuestra consideración, no albergamos duda que los peticionarios han demostrado que la comunicación sobre la cual reclaman el privilegio ocurrió entre un creyente y un religioso, y éste último estaba autorizado a recibir ese tipo de comunicación según la doctrina católica y la encomienda del Obispo. Sin embargo, **todos los peticionarios — el Obispo, el Vicario y la parte interventora — han reconocido expresamente que, aunque las víctimas confiaban que la Diócesis mantendría la confidencialidad de lo comunicado durante la investigación ante personas extrañas a su organización, al momento de participar en la investigación eran conscientes de que lo expresado al Vicario sería a su vez comunicado a otras personas y no se mantendría en secreto.**

El foro primario determinó que las quejas fueron referidas a la Congregación para la Doctrina de la Fe y que **en la investigación intervino más de una persona,**

**entre ellos sacerdotes, notarios y otros profesionales, determinación de hecho que ninguna parte intentó o ha intentado impugnar.** Apéndice, págs. 62-63. Si bien confiaban en que todos los que participarían en la investigación serían funcionarios de la Iglesia Católica, el privilegio exige que el religioso mantenga la comunicación en secreto y no contempla posibilidad alguna de que sea divulgada a un tercero, independientemente de su estatus como religioso. El que este tercero ostente o no estatus de religioso dentro de la organización religiosa es inmaterial para propósitos de la Regla 511 de Evidencia.

Desde que decidieron participar en la investigación las víctimas y el Vicario entendían plenamente que lo comunicado entre ellos no se mantendría en secreto. Para poder invocar el privilegio religioso-creyente, los creyentes debieron enunciar su declaración no sólo en ausencia de terceros, si no con la intención de que lo comunicado sería mantenido en **secreto**. Es decir, que lo comunicado no sería divulgado a **ninguna** persona, sea ésta o no parte de la jerarquía de la Iglesia. A su vez, el religioso que recibe la comunicación debe estar obligado, según la práctica y doctrina de su religión, a mantener esa comunicación en **secreto**, aun frente a otros religiosos. El privilegio tampoco permite que se divulgue lo comunicado para adelantar el propósito mismo por el cual se recibió, aun si es para brindar mejor consejería espiritual. Si bien las partes tenían la expectativa de

que la Iglesia protegería la confidencialidad de lo comunicado, la intención de las partes no cumple con la expectativa de que lo comunicado permanecería en secreto. Los documentos producidos por la investigación interna de la Diócesis no son comunicaciones privilegiadas al amparo del privilegio religioso-creyente de la Regla 511 de Evidencia. Por ende, no erró el Tribunal de Primera Instancia al declinar aplicar el privilegio.

No obstante, reconocemos que sí erró el Tribunal de Primera Instancia al limitar el alcance del privilegio religioso-invocado por un católico a lo comunicado durante el sacramento de la confesión. A pesar de que el privilegio se concibió originalmente para proteger la comunicación habida dentro de esa práctica católica, el texto moderno de la Regla 511, junto a las protecciones constitucionales de libertad de culto y contra el establecimiento de la religión, extiende el privilegio a toda comunicación que cumpla con los tres requisitos que hemos esbozado. Por lo tanto, bien podría un religioso o creyente católico invocar el privilegio en situaciones adicionales al sacramento de la confesión, siempre y cuando concurran los tres requisitos esbozados.

Finalmente, debido a que los resultados de la investigación no están cobijados por el privilegio religioso-creyente, tampoco erró el Tribunal de Primera Instancia al no celebrar un examen en cámara para determinar qué documentos están cobijados por el privilegio. Los demandantes meramente alegaron de forma

general que toda la información requerida mediante los *subpoenas* está cobijada por el privilegio. No intentaron identificar específicamente qué documentos están protegidos, ni por qué, por lo que el Tribunal de Primera Instancia no se encontraba en posición de realizar dicho examen.

C

Tras concluir correctamente que la Regla 511 de Evidencia exige que la comunicación privilegiada sea mantenida en secreto, una mayoría de este Tribunal devuelve el caso ante el foro de instancia para que celebre un examen en cámara donde evalúe si de hecho el Vicario mantuvo su investigación en secreto. Este examen resulta innecesario y dilatorio pues es evidente que en este caso las comunicaciones no se mantuvieron en secreto y las partes ni han intentado demostrarlo. La confidencialidad que la Diócesis le prometió a las víctimas implicaba que el Vicario comunicaría el resultado de su investigación al Obispo y otros actores, incluyendo el Vaticano, según les exige el procedimiento establecido en la Conferencia Episcopal de Puertorriqueña. Tal y como concluyó el Tribunal de Primera Instancia y relata la Opinión de conformidad:

> [La investigación] produjo varios expedientes que recogieron los documentos preparados durante la investigación. Junto al Vicario general, participaron de la investigación el Obispo, notarios, consultores y profesionales que aportaron pericia, por lo que solamente algunos de los que intervinieron eran sacerdotes o clérigos de la Iglesia Católica.

Opinión de conformidad, en la pág. 4.

Los demandantes no pormenorizaron qué documentos están cobijados por el privilegio de forma tal que el Tribunal se encuentre en posición de evaluar cuáles están protegidos o no por el privilegio, o los derechos constitucionales invocados. Más allá de que se desprende que la condición de confidencialidad que prometió, la Diócesis no cumple con el requisito de mantener en secreto que exige la Regla 511 de Evidencia, los demandantes tenían el peso de probar que la comunicación fue mantenida en secreto. La propia Opinión de conformidad reconoce que los demandantes no lograron probar ello ante el foro de instancia:

> Ahora bien, el expediente de este caso no nos permite concluir si las declaraciones en controversia se mantuvieron en secreto, según requiere la Regla 511 de Evidencia.
> Claramente, la Regla 511(a) de Evidencia requiere que el religioso no divulgue la comunicación a nadie. En este caso no se presentó prueba, más allá de lo ya señalado, de cómo la Iglesia Católica tramitó los expedientes en controversia. Así las cosas, no podemos resolver si los documentos producidos en esas investigaciones son comunicaciones privilegiadas al amparo del privilegio religioso-creyente de la Regla 511 de Evidencia.

Opinión de conformidad, en la pág. 17.

Ante todo lo anterior y considerando que la Regla 518 de Evidencia exige que los privilegios se interpreten restrictivamente, ¿qué exactamente deberá adjudicar el Tribunal de Primera Instancia en cuanto la aplicación del privilegio religioso-creyente? Al devolver el caso al foro de instancia para que celebre un examen en cámara la mayoría concede a los demandantes una segunda oportunidad

para corregir los defectos de sus argumentos y suplementar la insuficiencia de la prueba que desfilaron ante el foro primario. ¿Por qué el trato preferencial? ¿Qué prueba nueva se podrá presentar? Este procedimiento incierto, ¿no afectará los términos prescriptivos de los potenciales delitos que se investigan?

## III

Dado a que el reclamo de materia privilegiada al amparo de la Regla 511 no aplica a los hechos de esta controversia, pasemos entonces a evaluar el reclamo de los peticionarios de que los *subpoenas* emitidos infringen su derecho a la intimidad. Los peticionarios sostienen que la autonomía sobre decisiones personales que protege el derecho a la intimidad cobija, necesariamente, la decisión de las víctimas sobre cómo encausar el agravio que alegadamente sufrieron en manos de los sacerdotes investigados por la Diócesis. De igual forma, señalan que la investigación que realiza el Estado es una intromisión indebida sobre aspectos de su vida sexual. Por su parte, la Diócesis razona que posee una expectativa de intimidad sobre los documentos que produjo su investigación interna, por lo que están protegidos por la cláusula constitucional contra los registros y allanamientos irrazonables.

## A

En nuestro ordenamiento, el derecho a la intimidad y dignidad está protegido por las secciones 1, 8 y 10 del

artículo II de la Constitución del Estado Libre Asociado. *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 401 (1983). Igual protección brinda la Constitución de Estados Unidos en su Decimocuarta Enmienda. Const. EE.UU. XIV Enm. Este derecho tiene como propósito proteger a la persona de ataques abusivos a su honra, reputación y vida privada. Const. P.R. Art. II, Sec. 8. Igualmente, protege la autonomía del individuo al tomar decisiones sobre asuntos de máxima importancia, incluyendo sus pensamientos y el control de la información sobre su persona que posee el Estado como producto de investigaciones policiales o judiciales. *Véase Pueblo v. Torres Albertorio*, 115 D.P.R. 128 (1984); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986); *Arce v. Martínez*, 146 D.P.R. 215 (1998); *véase además*, José Julián Álvarez González, *Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos* 695 (2010). Asimismo, nuestra Constitución protege la intimidad de la persona y sus pertenencias contra registros, incautaciones y allanamientos irrazonables por parte del Estado. Const. P.R. Art. II, Sec. 10; *Pueblo v. Loubriel, Suazo*, 158 D.P.R. 371, 378-379 (2003).

Empero, esta protección no opera automáticamente. Quien la invoque tiene que demostrar que "tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete". *P.R. Tel. Co.,* 114 D.P.R. en la pág. 402. Hemos considerado que existe una expectativa

razonable de intimidad cuando concurren dos elementos: "(1) el subjetivo, mediante el cual el reclamante, según las circunstancias del caso, alberga una expectativa real de que su intimidad se respete, y (2) el criterio objetivo, es decir, si la sociedad considera razonable tener tal expectativa". *Lopez Tristani v. Maldonado*, 168 D.P.R. 838, 852 (2006). En esta ocasión, el segundo elemento es el decisivo. *Weber Carrillo v. E.L.A.*, 2014 T.S.P.R. 46, 15, 190 D.P.R. ____ (2014).

B

Los demandantes, así como el interventor DJMG, alegan que entregar los documentos requeridos tendría el efecto de violar el derecho a la intimidad de las víctimas, pues esto los re-victimizaría. Argumentan que, en el caso de las víctimas mayores de edad, "la decisión de cómo encausar un agravio contra su persona, queda referido [al] juicio discrecional de cada una de las víctimas, sostenido en la autonomía del individuo y su derecho a la intimidad y privacidad". Alegato de la Parte Peticionaria en Petición de Certificación, pág. 31.

No podemos validar la contención de los peticionarios. La autonomía personal protegida por el derecho a la intimidad no incluye la decisión de procesar o no a un individuo que haya cometido un delito en su contra. Más aún cuando consideramos el interés apremiante del Estado de combatir la criminalidad y procesar toda conducta delictiva. Veamos.

En nuestro ordenamiento jurídico el delito se considera una ofensa de carácter público, pues su consecuencia final recae sobre los derechos del cuerpo político y la sociedad en general. *Pueblo v. Castellón Calderón*, 151 D.P.R. 15, 25-26 (2000). Es por esto que el Estado tiene un interés apremiante en procesar a los delincuentes por los delitos que han cometido y "[l]a aplicación de las leyes penales no se deja a la potestad de particulares". *Id*. pág. 25. Es responsabilidad exclusiva del Estado determinar si acusa o encausa al delincuente, independientemente de que la víctima del delito perdone a su victimario o esté renuente a participar, por las razones que fueran, en el proceso penal. *Id*.

Asimismo hemos reiterado que "[l]a facultad y responsabilidad de investigar los hechos delictivos y la decisión de a qué persona acusar y procesar criminalmente y por qué delito, recae en la persona del Secretario de Departamento de Justicia de Puerto Rico y de los fiscales bajo su supervisión". *Pueblo v. Dávila Delgado*, 143 D.P.R. 157, 170 (1997). Aunque reconocemos el papel importante que tienen las víctimas y los testigos en el procesamiento de un caso criminal, éstos no se consideran partes para fines del proceso criminal, por lo cual carecen de los derechos que de ordinario tienen las partes en un procedimiento judicial. *Castellón Calderón*, 151 D.P.R. en la pág. 25; *Pueblo v. Acosta Pérez*, 2014 T.S.P.R. 56, 190 D.P.R. ____ (2014). En síntesis:

> La víctima. . . . de un delito no tiene el poder de vetar la actuación o el curso de acción que el Fiscal entienda procedente seguir en el caso. Esto es así porque los delitos en general son ofensas cometidas contra la sociedad y no contra un individuo en particular. Aunque con la comisión de delitos se lesionan intereses particulares privados, también se afectan fundamentales postulados sociales y comunitarios.

*Castellón Calderón*, 151 D.P.R. en la pág. 25.

A tenor con lo anterior y conforme al interés apremiante del Estado de investigar y procesar toda conducta delictiva, resulta evidente que la víctima no tiene la potestad de decidir si se debe procesar criminalmente al delincuente que le causó el agravio. La autonomía personal que protege el derecho a la intimidad no cobija esa decisión. Por ende, en este caso los *subpoenas* son un ejercicio válido del poder de investigación del Estado. Resolver lo contrario sería proveerles a las víctimas de delitos el poder de vetar el encausamiento criminal e inmiscuirse indebidamente en el poder del Departamento de Justicia de investigar y procesar a los criminales en nombre del cuerpo político.

Los peticionarios también alegan que no procede la entrega de los documentos porque la divulgación de la información al Estado afectaría el derecho a la intimidad de las víctimas sobre aspectos de su vida sexual. No hay duda que toda persona tiene un derecho a la intimidad sobre su vida sexual e íntima. No obstante, entendemos que en este caso las alegadas víctimas no pueden abrigar una expectativa objetiva de intimidad sobre los hechos

constitutivos del delito frente al poder investigativo del Estado.

Nuestra Constitución le delega al Estado, y particularmente al Departamento de Justicia, la responsabilidad de velar por el cumplimiento de la ley e investigar y procesar los delitos, en adición al deber de proteger a los menores de edad de delitos de agresión sexual. No cabe hablar de reconocer una expectativa de intimidad sobre hechos relacionados a la comisión de un crimen cuando a la misma vez la sociedad tiene una expectativa de que el Estado investigue y procese a los individuos por esos mismos hechos delictivos. La víctima es un testigo del delito cometido en su contra, por lo cual ante una investigación del Estado no puede levantar protecciones adicionales a las que podría levantar cualquier otro testigo. 34 L.P.R.A. sec. 1476.

No obstante, aunque no podemos avalar que los hechos constitutivos de un delito estén protegidos por el derecho a la intimidad de las víctimas, éstas no quedan despojadas de la protección de otros derechos constitucionales. Esta determinación tampoco incide sobre la responsabilidad del Estado al manejar la información personal que obtenga a raíz de su investigación. La privacidad de las víctimas no queda desprotegida ante el proceso investigativo o judicial que realizará el Departamento de Justicia. A manera de ilustración, en cuanto a la confidencialidad de la investigación realizada por el Departamento de Justicia, la Ley del

Departamento de Justicia, Ley Núm. 205 de 9 de agosto de 2004, 3 L.P.R.A. sec. 291-296(h) (Ley Núm. 205), dispone lo siguiente:

> La información obtenida como resultado de la investigación realizada es confidencial y debe mantenerse en un expediente investigativo, el cual no puede ser objeto de inspección, examen, ni divulgación mientras se conduce la investigación. La información así recopilada puede ser divulgada una vez concluida la investigación, conforme las normas que adopte el Secretario mediante reglamento, excepto en aquellos casos en que surjan las siguientes situaciones:
> (a) Una ley o reglamento declare la confidencialidad de la información.
> (b) Se revele información que pueda lesionar derechos fundamentales de terceros.
> (c) La comunicación esté protegida por alguno de los privilegios evidenciarios que pueden invocar los ciudadanos.
> (d) Se trate de la identidad de un confidente.
> (e) Sea información oficial conforme a las Reglas de Evidencia, Ap. VI del Título 32.
> (f) Se revelen técnicas o procedimientos de investigativos.

3 L.P.R.A. sec. 292j.

A su vez, es la política pública del Estado Libre Asociado "proveer protección y asistencia a las víctimas y testigos en los procesos judiciales y en las investigaciones", 25 L.P.R.A. sec. 973, razón por la cual la Asamblea Legislativa adoptó la Carta de Derechos de las Víctimas y Testigos de Delito, Ley Núm. 22 de 22 de abril de 1988, 25 L.P.R.A. sec. 973 *et seq.* Contrario a lo que argumentan los peticionarios, la Carta de Derechos de las Víctimas y Testigos no garantiza de forma alguna la confidencialidad de la investigación realizada por la Diócesis, sino que protege la confidencialidad de la información en posesión del Estado durante los procesos investigativos y judiciales. De igual forma, el

Secretario de Justicia tiene el deber de proteger a las víctimas y testigos mientras ejerce sus poderes delegados. 3 L.P.R.A. sec. 292o. En aras de cumplir con esta política pública, el Departamento de Justicia estableció el *Reglamento para establecer las normas de divulgación de información obtenida como resultado de investigaciones realizadas por el Departamento de Justicia*, Reg. Núm. 7450 de 4 de enero de 2008 y el *Reglamento sobre divulgación de información de interés público custodiada por el Departamento de Justicia* de 17 de octubre de 2007. La existencia de estas leyes y reglamentos demuestra que el Estado, de ser necesario, cuenta con múltiples herramientas para proteger la confidencialidad y evitar la divulgación innecesaria de cualquier información que obtenga mediante los *subpoenas*. Cómo el Estado maneje o divulgue esa información — y las responsabilidades y obligaciones que de ello emanan — es un asunto más allá de la controversia que hoy atendemos.

C

Relacionado también al derecho a la intimidad, los peticionarios, como los representantes de más alta jerarquía dentro de la Diócesis de Arecibo, alegan que ésta ostenta un derecho a la intimidad sobre los documentos requeridos por el Departamento de Justicia por éstos estar relacionados a su dogma, fe y gobierno interno, de manera tal que se activa la protección contra registros y allanamientos irrazonables. Argumentan que dicha protección requiere que el Estado justifique la

emisión de los *subpoenas* demostrando la existencia de causa probable, pues se trata de una investigación de índole criminal. A pesar de que reconocemos que la Diócesis tiene un derecho a la intimidad sobre los documentos relacionados a su investigación interna, los peticionarios se equivocan al alegar que el Estado tenía que demostrar causa probable para emitir los *subpoenas*. Veamos. El Departamento de Justicia es el departamento ejecutivo responsable de cumplir una de las responsabilidades esenciales de la Rama Ejecutiva: velar por el cumplimiento de la ley. Exposición de Motivos de la Ley Núm. 205, 3 L.P.R.A. sec. 291-296(h). Esta obligación le fue delegada en virtud de nuestra Constitución y juega un papel fundamental dentro del diseño de nuestra constitución republicana. A su vez, estas responsabilidades recaen sobre el Secretario de Justicia, nombrado por el Gobernador por disposición constitucional para dirigir el Departamento de Justicia. Const. P.R. Art. IV, secs. 5 y 6; 3 L.P.R.A. sec. 292.

Considerando la importancia de las funciones que desempeña el Secretario de Justicia, la Asamblea Legislativa le concedió amplias facultades investigativas para cumplir con la política pública de detectar, combatir y prevenir la delincuencia. Entre estas facultades otorgadas al Secretario de Justicia se encuentra el poder de extender citaciones y requerir la presentación de evidencia documental y aquella que se considere esencial para el conocimiento cabal de los

asuntos que investiga. 3 L.P.R.A. sec. 292h. No obstante, hemos expresado que el "ejercicio [de ese poder] no queda al margen de los postulados constitucionales que informan nuestro ordenamiento". *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 D.P.R. 945, 969 (1993). En lo pertinente, la sección 10 del artículo 2 de nuestra Constitución, al igual que la Cuarta Enmienda de la Constitución de Estados Unidos, protege a los individuos contra citaciones irrazonables de agencias administrativas. *H.M.C.A. (P.R.), Inc., etc.*, 133 D.P.R. en la pág. 969; *véase Oklahoma Press Pub. Co v. Walling*, 327 U.S. 186 (1946). Por tanto, cuando se está ante un requerimiento de documentos por una institución gubernamental, que tiene la facultad de compeler a personas a suministrar información, como lo es el Departamento de Justicia, se debe examinar la razonabilidad del requerimiento a la luz de tres factores: (1) que la investigación que lleve a cabo la agencia esté dentro de la autoridad conferida por ley; (2) que el requerimiento no sea demasiado indefinido; (3) y que la información solicitada sea razonablemente pertinente al asunto específico bajo investigación. *H.M.C.A. (P.R.), Inc., etc.*, 133 D.P.R. en las págs. 968-970. Si hay terceros que puedan abrigar un derecho a la intimidad sobre los documentos requeridos, este Tribunal ha establecido que la institución tiene que notificar al agraviado, o en la alternativa, exigir los documentos a través de una orden judicial. *Loubriel, Suazo*, 158 D.P.R. en la pág. 380.

D

Al emitir los *subpoenas*, el Departamento de Justicia le requirió a la Diócesis que suministrara los nombres, direcciones y demás información relacionada a los querellantes, las alegadas víctimas de delitos sexuales y los individuos alegadamente responsables de cometer los abusos. De igual forma solicitaron información sobre cómo la Diócesis atendió las querellas.[11]

Habiendo expuesto los factores que se deben examinar para determinar si el requerimiento de documentos fue razonable, entendemos que los requerimientos de información que extendió el Departamento de Justicia fueron válidos, pues lo expidió para cumplir con su deber de investigar la comisión de alegados delitos sexuales cometidos por sacerdotes de la Diócesis. No hay duda que esta investigación está autorizada bajo nuestro ordenamiento. En cuanto a los demás criterios a considerar, entendemos que los *subpoenas* no fueron indefinidos, vagos o imprecisos, y lo requerido era razonablemente pertinente al asunto bajo investigación, pues se circunscribió a las investigaciones realizadas por la propia Diócesis sobre alegados delitos sexuales cometidos por sacerdotes. Valga aclarar que el Estado no tenía que notificar la emisión de los *subpoenas* a las víctimas, ya que éstas no tienen un derecho a la

---

[11] Como recogió el Tribunal de Primera Instancia en las determinaciones de hecho de su sentencia de 7 de abril de 2014, la Diócesis ha detallado cómo realizó la investigación interna según el Procedimiento de la Conferencia Episcopal Puertorriqueña. Apéndice, pág. 28.

intimidad sobre los hechos constitutivos de delito, como concluimos previamente.

De igual forma, y aún más preocupante, la Diócesis argumenta que algunas de las querellas que investigó fueron actos consensuales que no están prohibidos por el Código Penal, mientras que otras que sí podrían cumplir con los elementos de algún delito, pero han prescrito. Por ende, sostienen que el Estado no tiene un interés válido en investigar la conducta de los sacerdotes expulsados. Al plantear esos argumentos la Diócesis se adscribe un poder que es de la prerrogativa **exclusiva** del Estado, pues nadie salvo los actores responsables en cada rama gubernamental tienen capacidad para concluir que una conducta no cumple con los elementos delictivos o que el delito ha prescrito. La Diócesis no puede ser juez y parte a la vez.

Cuando la agencia que hace el requerimiento está investigando la comisión de un delito, si bien no se requiere un estándar de causa probable, sí se requiere el cumplimiento estricto de los factores previamente mencionados. *Weber Carrillo*, 2014 T.S.P.R. 46 en la pág. 33. Por lo anterior, los *subpoenas* solicitados a la Diócesis de Arecibo por medio del Obispo Daniel Fernández Torres y el Vicario General, Luis Colón Rivera, son válidos y no infringen sobre el derecho a la intimidad de los peticionarios según protegido por la sección 10 del Artículo 2 de nuestra Constitución.

E

Contrario a lo anterior, hoy una mayoría de este Tribunal concluye que las víctimas mayores de edad tienen una expectativa razonable de intimidad sobre la información que comunicaron al Vicario en el curso de la investigación de la Diócesis. Según razona la Opinión de conformidad, la sociedad reconoce que las alegadas víctimas mayores de edad poseen una expectativa objetiva de intimidad sobre la investigación porque si se llega a divulgar la información que comunicaron a la Diócesis quedarían expuestos al escarnio público de forma tal que recibirían un trato injusto e indigno por parte de la sociedad. Expresan que "[m]uchos podrían culpar a las víctimas por los hechos y levantar sospechas sobre sus vidas íntimas" e imaginan "la humillación que volverá a vivir [el joven interventor] si la Iglesia Católica revela que fue una de las víctimas de abuso sexual. Luego de haber superado el proceso, lo obligaríamos a revivir cada uno de esos momentos dolorosos, con todo lo que ello implica". Opinión de conformidad, en las págs. 41-42.

A pesar de que entendemos que las supuestas víctimas no albergan una expectativa razonable de intimidad sobre los hechos de los delitos que investiga el Estado, coincidimos con la Opinión de conformidad en que las víctimas tienen una expectativa de intimidad sobre cómo el Estado manejará la información que requirió de la Diócesis. Sin embargo, esa no es la controversia ante nuestra consideración. No nos corresponde pasar juicio sobre la posibilidad de que el Estado divulgue los

detalles de un delito, sino sobre la validez de unos *subpoenas* emitidos durante una investigación criminal que el Estado tiene el deber de manejar responsablemente. Por tanto, la Opinión de conformidad se equivoca al sustentar su determinación en que las salvaguardas que proveen las leyes y reglamentos que rigen el Departamento de Justicia "resultan insuficientes" para protegerlos de esta divulgación hipotética y especulativa.

Para concluir que existe una expectativa de intimidad, la mayoría utiliza como fundamento que anteriormente este Tribunal ha otorgado protección a información económica y financiera en manos de terceros. Sin embargo, existe una diferencia con respecto a la naturaleza de la información solicitada en esos casos y la controversia ante nosotros. En aquellas ocasiones reconocimos una expectativa razonable de intimidad porque la información solicitada por el Estado fue suministrada a los terceros para un propósito particular, limitado, y porque podría revelar detalles sobre la persona que serían superfluos al propósito de la investigación. En este caso estamos ante información de una naturaleza muy diferente: hechos alegadamente constitutivos de delitos.

Si bien reconocemos una expectativa de intimidad sobre los estados bancarios y las planillas radicadas, esa expectativa no se extiende a los hechos delictivos en sí, sean la firma de un cheque fraudulento o el hecho de proveer información falsa en una planilla. A modo de ejemplo, en *RDT Const. Corp. v. Contralor*, 141 D.P.R.

424 (1996), el Tribunal determinó que existe una expectativa de intimidad sobre la información que las instituciones bancarias poseen de sus clientes debido a que es necesario recurrir a las instituciones bancarias para participar en la vida económica y éstas requieren información que revela los patrones y estilos de vida de sus clientes. Por ejemplo, mediante esa información se puede determinar:

> la ocupación de la persona investigada, los lugares que frecuenta, los bienes que adquiere, a qué partido o grupo político contribuye, los periódicos y las revistas que lee con frecuencia, la iglesia a la cual hace donativos, las asociaciones a las cuales pertenece, las tiendas y los establecimientos donde compra, los médicos que visita y otra información de naturaleza intima.

*RDT Const. Corp.*, 141 D.P.R. en las págs. 441-442.

Por fundamentos análogos a los expresados en *RDT Const. Corp* — el tipo y gran variedad de la información que contienen los documentos en función del propósito por el cual se solicita — también hemos concluido que existe una expectativa razonable de intimidad sobre las planillas de contribución sobre ingresos y sobre el registro de llamadas telefónicas. *Rullán v. Fas Alzamora*, 166 D.P.R. 742 (2006); *Weber v. E.L.A.*, 2014 T.S.P.R. 46, 190 D.P.R. ___ (2014).

En este caso los peticionarios no han detallado cómo la entrega de documentos específicos violaría su derecho a la intimidad, si existe información no relacionada a la conducta sexual alegadamente constitutiva de delito o qué detalles adicionales a los hechos delictivos revelaría la información solicitada. Los peticionarios no han hecho

más que reclamar a grandes rasgos una expectativa de intimidad sobre la totalidad de la investigación de la Diócesis porque versa sobre su conducta sexual. Nuevamente nos preguntamos, ¿por qué se les debe conceder a los peticionarios un segundo turno para subsanar sus argumentos y la evidencia que presentaron ante el Tribunal de Primera Instancia?

Habiendo determinado erróneamente que existe una expectativa de intimidad sobre la información en controversia, la Opinión de conformidad utiliza dos factores para concluir que en este caso el derecho a la intimidad de las alegadas víctimas va por encima del poder de investigación del Estado: la naturaleza sexual de la información comunicada durante la investigación y la promesa de confidencialidad que realizó la Diócesis. En este caso, la información de naturaleza sexual constituye conducta alegadamente delictiva sobre la cual, como señalamos anteriormente, no existe una expectativa objetiva de intimidad precisamente porque el Estado tiene la obligación de encausar y penalizar esa conducta. Por otro lado, apoyarse en la promesa de confidencialidad de la Diócesis abre la puerta a que en un sinnúmero de situaciones análogas se limite tajantemente el poder del Estado para investigar la comisión de delitos y encausar a los responsables en nombre del Pueblo. La conclusión de la Opinión de conformidad se presta para ser abusada en relaciones donde exista una desventaja de poder entre las partes, y coarta el poder del Estado para investigar y

procesar situaciones de violencia doméstica y otros tipos de abuso sexual.

Siguiendo la confusión doctrinal que enmarca su opinión, la mayoría ordena como remedio que sea la Diócesis quien notifique el requerimiento de información a las víctimas y querellantes de forma tal que puedan oponerse a la entrega. De negarse, la Diócesis sencillamente no podrá entregar la información solicitada. La Opinión de conformidad justifica este curso de acción novedoso tras entender que estamos ante una situación inusitada en nuestro ordenamiento, pues en otras ocasiones donde el Estado ha solicitado información en manos de terceros el Estado conocía los nombres de los afectados y tenía la obligación de notificarles los requerimientos. Sin embargo, debido a que en este caso el Estado no conoce el nombre de esos individuos, la mayoría resuelve que será la Diócesis quien notificará el requerimiento a las víctimas e informará su oposición al Tribunal de Primera Instancia dentro de un término razonable. Este mecanismo suscita graves dudas sobre su adecuación y eficacia. ¿Quién supervisará el cumplimiento? ¿Quién mismo tiene que cumplir?

Además, contrario a lo resuelto por una mayoría de este Tribunal, de existir una expectativa razonable de intimidad lo que procedería sería analizar el requerimiento de información por parte del Estado a la luz de los criterios previamente esbozados en la jurisprudencia citada por la propia mayoría: (1) que la

agencia tenga la autoridad para llevar a cabo la investigación; (2) que el requerimiento no sea demasiado indefinido; y (3) que lo solicitado sea razonablemente pertinente al asunto bajo investigación. En *RDT Const. Corp. v. Contralor*, 141 D.P.R. 424 (1996), *Rullán v. Fas Alzamora*, 166 D.P.R. 742 (2006), y *Weber v. E.L.A.,* 2014 T.S.P.R. 46, 190 D.P.R. ___ (2014), el Tribunal **no** resolvió que como existía un derecho a la intimidad sobre los documentos en controversia lo que procedía era obtener el consentimiento de la persona, sino que ésta debe tener la oportunidad de impugnar el requerimiento para que el Tribunal determinara si el mismo era razonable. El derecho a la intimidad no es absoluto y, contrario a la conclusión de la mayoría, la víctima no tiene que consentir a la entrega de los documentos e información solicitada cuando el requerimiento cumple con los criterios que hemos reafirmado en numerosas ocasiones.

A su vez, la manera en que la Opinión de conformidad caracteriza el impacto que tendrá el proceso criminal sobre las alegadas víctimas socava la legitimidad de este Tribunal frente al Pueblo. Cuando se comete un delito, la víctima no es el único sujeto que sufre un agravio; también sufre el Pueblo de Puerto Rico, pues la conducta delictiva lacera los entendidos básicos de nuestra sociedad. Es precisamente por eso que nuestra Constitución delega en el Estado Libre Asociado de Puerto Rico la responsabilidad colectiva de hacer velar por el

cumplimiento de nuestros entendidos fundamentales al encomendarle definir qué constituye conducta delictiva, investigar su comisión e iniciar la acción penal. Ello es responsabilidad exclusiva del Estado. Lamentablemente, hoy la mayoría avala un intento por parte de unos pocos de investirse de ese poder bajo el manto del derecho a la intimidad y la libertad de culto.

IV

Tras concluir que los *subpoenas* emitidos contra el Obispo y el Vicario no transgreden el derecho a la intimidad de las víctimas y la propia Diócesis, pasemos a evaluar los reclamos de los peticionarios al amparo de la protección constitucional de separación entre iglesia y estado.

A

La sección 3 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico establece que: "[n]o se aprobará ley alguna relativa al establecimiento de cualquier religión ni se prohibirá el libre ejercicio de culto religioso. Habrá completa separación de la iglesia y el estado". Const. P.R. Art. II, sec. 3. La primera oración de la sección 3, al igual que la Primera Enmienda de la Constitución de Estados Unidos, consagra la libertad de culto ("cláusula de libertad de culto") y prohíbe que el Estado establezca una religión oficial ("cláusula de establecimiento"). *Mercado, Quilichini v. U.C.P.R.*, 143 D.P.R. 610 (1997); *Asoc. Academias y Col.*

*Cristianos v. E.L.A.*, 135 D.P.R. 150 (1994); *Agostini Pascual v. Iglesia Católica*, 109 D.P.R. 172 (1979). La segunda oración refuerza la idea subyacente en la protección a la libertad de culto y la prohibición contra el establecimiento de una religión oficial: la separación entre la Iglesia y el Estado. *Agostini Pascual*, 109 D.P.R. en la pág. 175; *véase además* Antonio Fernós Isern, *Original Intent in the Constitution of Puerto Rico* 36 (2da ed. 2002).[12]

Por un lado, la cláusula de establecimiento "es una prohibición amplia en contra de la ayuda o el auspicio estatal a religión alguna, a todas las religiones o a la preferencia de una religión sobre otra". *Mercado, Quilichini,* 143 D.P.R. en las págs. 635-636. Una actuación estatal viola esta cláusula si: (1) no posee un propósito secular, sino religioso; (2) su efecto primordial es promover o inhibir una religión; o (3) conlleva una intromisión (entanglement) excesiva del estado con la religión.[13][14] *Lemon v. Kurtzman*, 403 U.S.

---

[12] Según hemos señalado, al interpretar la sección 3 del Artículo 2, aunque podemos impartirle mayor protección a los ciudadanos que la que está dispuesta a reconocer el Tribunal Supremo de Estados Unidos, debemos ser particularmente cuidadosos en el reconocimiento de garantías adicionales para evitar malograr el equilibrio entre dos mandatos constitucionales inherentemente conflictivos: el deber de no establecer o promover una religión y el de o inhibir el libre ejercicio del culto religioso. *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765, 776 (1989).

[13] Al respecto, en su opinión disidente en el caso *Academia San Jorge v. J.R.T.*, el entonces Juez Presidente señor Trías Monge señaló que para que una legislación resista un ataque al amparo de la cláusula de establecimiento ésta "debe tener un propósito secular, su efecto primario debe ser secular también y ella no debe promover una

(continúa...)

602, 612-613 (1971); *véase además* José Julián Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales* 1194 (2009).

Por otro lado, la cláusula de libertad de culto garantiza la práctica, individual o colectiva, de las creencias religiosas. *Díaz v. Colegio Nuestra Sra. del Pilar*, 123 D.P.R. 765, 778 (1989). En repetidas ocasiones hemos señalado que si bien la libertad de credo es absoluta, **la libertad de actuar conforme a las creencias religiosas tiene sus limitaciones.**[15] *Id. pág. 778; Mercado, Quilichini,* 143 D.P.R. en la pág. 636. Por ejemplo, en *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20, 22 (1974), sostuvimos que la "libertad religiosa no es untura de inmunidad que releve a los profesantes de observar y respetar las leyes bajo las cuales se ha organizado la sociedad, y recogen en sus

---

involucración excesiva con la religión". *Academia San Jorge v. J.R.T.*, 110 D.P.R. 193, 229(1980) (Trías Monge, J., Op. Disidente).

[14] Este estándar ha sido objeto de diversos debates entre los jueces y juezas del Tribunal Supremo de Estados Unidos, particularmente sobre el requisito de intromisión excesiva. *Véase* Stephen M. Feldman, Divided we fall: religion, politics, and the Lemon entanglements prong, 7 First Amend. L. Rev. 253 (2009); José Julián Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales* 1193 (2009). No obstante, al día de hoy sigue siendo el estándar aplicado en la mayoría de los casos que versan sobre la cláusula de establecimiento. Erwin Chemerinsky, Constitutional Law: Principles and Policies 1202 (3 ed. 2006).

[15] En términos similares se expresó el Tribunal Supremo de Estados Unidos en *Reynolds v. United States,* 98 U.S. 145, 164 (1878), al señalar que: "Congress was deprived of all legislative power over mere opinion, but was left to reach actions".

preceptos los principios de paz, de la moral y de orden público". *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20, 22 (1974). De lo contrario, "le estaría vedado al Gobierno hacer respetar las leyes de protección social". *Mercado, Quilichini,* 143 D.P.R. en la pág. 636. De manera similar se ha expresado el Tribunal Supremo de Estados Unidos al señalar que:

> We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. . . 'The mere possession of religious convictions which contradicts the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities'.

*Employment Division v. Smith*, 494 U.S. 872, 878-879 (1990) *citando a Minersville School Dist. Bd. Of Ed. V. Gobitis*, 310 U.S. 586, 594-595 (1940).

Principalmente, la cláusula de libertad de culto se ha invocado: (1) cuando el gobierno prohíbe una conducta que determinada religión exige; (2) cuando el gobierno exige una conducta que determinada religión impide; o (3) cuando una legislación vulnera o dificulta la posibilidad de cumplir con exigencias religiosas. Chemerinsky, *supra*, pág. 1247. En caso de que el Estado promueva algún fin estatal legítimo pero en tal acción afecte adversamente la práctica de una religión, la garantía constitucional requiere que, en algunas situaciones, se hagan concesiones para permitir el libre ejercicio de tales creencias religiosas. *Mercado, Quilichini*, 143 D.P.R. en la pág. 637; *Asoc. Academias y Col. Cristianos*, 135 D.P.R. en la pág. 161.

No obstante, no todas las acciones del Estado que inciden sobre la práctica de una religión requieren que el Estado acomode las creencias religiosas. *Díaz*, 123 D.P.R. en la pág. 778. La cláusula de libertad de culto exige un balance de intereses entre el interés del Estado y el efecto de la acción estatal sobre la práctica religiosa. En particular, para determinar si una actuación del Estado que impone una carga sobre una práctica religiosa es válida y se requiere un acomodo, es necesario evaluar: (1) la acción estatal; (2) el interés o propósito de la acción; y (3) el efecto que tiene sobre determinada práctica religiosa. *Lozada Tirado v. Testigos Jehová*, 177 D.P.R. 893, 914 (2010).

Así, al adoptar el estándar adjudicativo desarrollado por la jurisprudencia del Tribunal Supremo de Estados Unidos, hemos sostenido que si la acción estatal es neutral y de aplicación general, aun cuando tenga el efecto incidental de imponer una carga sobre una práctica religiosa, no tiene que estar justificada por un interés apremiante del Estado. *Lozada Tirado*, 177 D.P.R. en la pág. 914 (2010) *citando a Employment Division v. Smith,* 494 U.S. 872 (1990).[16] En cambio, si la actuación del Estado no cumple con los requisitos de neutralidad y generalidad, el Estado debe demostrar que la acción o medida responde a un interés estatal apremiante y que se

---

[16] La determinación de adoptar el escrutinio establecido en *Employment Division v. Smith,* contrasta, por ejemplo, con la determinación del Tribunal Supremo de Massachusetts en *Attorney Gen. v. Desilets*, 418 Mass. 316 (1994), de negarse a utilizar ese escrutinio al analizar la cláusula de libertad de culto de la Constitución de Massachusetts.

ajusta rigurosamente al interés apremiante que se pretende adelantar, esto es, que no existe un medio menos oneroso para adelantar ese interés. *Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531-532 (1993). De lo contrario, el Estado deberá permitir un acomodo a la práctica religiosa.

Adviértase que la parte que alega que se le ha violado su libertad de culto es quien tiene el peso de la prueba de demostrar cómo la acción estatal viola sustancialmente el libre ejercicio de su religión. *Asoc. Academias y Col. Cristianos*, 135 D.P.R. en la pág. 161. De ordinario, una carga mínima impuesta por el Estado no será suficiente para invocar exitosamente la garantía sobre la libertad de culto. *Id*.

B

Los peticionarios presentan dos cuestionamientos al amparo de las cláusulas religiosas: (1) que el Estado exige una conducta que los dogmas y principios sacramentales de la religión Católica impiden; y (2) que el Estado se entremezcla excesivamente con un asunto interno de la iglesia. La primera es una alegación al amparo de la libertad de culto; la segunda, al amparo de la cláusula de establecimiento. Procedemos a analizar ambas por separado.

Los peticionarios sostienen que la entrega o divulgación de información o documentación al Departamento de Justicia implicaría un quebrantamiento sustancial de las normas, dogmas y principios

sacramentales de la Fe Católica. Señalan que para la religión Católica, los principios y garantías de intimidad, privacidad y dignidad humana son derechos de los Fieles Católicos consustanciales al ejercicio de su fe y proveer la información solicitada, obtenida bajo un procedimiento privado y confidencial, les obligaría a quebrantar sus dogmas religiosos. Por tal razón, en virtud de la cláusula de libertad de culto, exigen que, en el balance de intereses, se le conceda un acomodo de tal suerte que no tengan que proveer la información solicitada mediante los *subpoenas*.

Previo a considerar los méritos de este planteamiento, precisa señalar que al evaluar una reclamación al amparo de la libertad de culto los tribunales estamos impedidos de adentrarnos en determinaciones sobre qué constituye una práctica o creencia religiosa plausible. *Véase U.S. v. Ballard*, 322 U.S. 78 (1944). Así, por ejemplo, el más alto foro de Estados Unidos ha sostenido que:

> '[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.

*Smith,* 494 U.S. *en la pág. 887 citando a Hernandez v. Commissioner,* 490 U.S. 680, 699 (1989).

Por tal razón, consideramos que en efecto la solicitud de la información y documentos solicitados incide de alguna manera con la práctica religiosa alegada

por los peticionarios, a saber: las comunicaciones privadas o confidenciales en el curso de una investigación eclesiástica. No obstante, según advertimos, el mero hecho de que una acción estatal incida sobre una organización o práctica religiosa no implica que tal actuación sea inválida a la luz de la cláusula de libertad de culto. *Mercado, Quilichini v. U.C.P.R.*, 143 D.P.R. 610, 640 (1997).

En este caso, el requerimiento de los *subpoenas* responde a una actuación neutral y general del Estado supeditada al propósito secular de velar por el cumplimiento de las leyes. En específico, el Estado diligenció los *subpoenas* impugnados como parte de una investigación criminal sobre la posible comisión de los delitos de agresión y abuso sexual contra menores. Es decir, hay dos intereses principales tutelados por el Estado: la seguridad de la ciudadanía y el bienestar de los menores. Por tal razón, aunque supusiéramos que la acción del Estado incide sobre la práctica religiosa alegada, ese efecto es incidental al ejercicio de una acción válida y puramente secular del Estado.[17]

---

[17] En su alegato ante este Tribunal, los peticionarios plantean, por primera vez, que debido a que el reclamo de libertad de culto está acompañado de una alegación de que se ha violado también otra disposición constitucional —el derecho a la intimidad – procede que para adjudicar esta controversia se utilice el escrutinio estricto propio de las reclamaciones híbridas, según elaborado por el Tribunal Supremo de Estados Unidos en *Employment Division v. Smith*, *supra*. El alegado escrutinio estricto propio de reclamaciones híbridas que señalan los peticionarios, en efecto surge a raíz de las expresiones del Tribunal Supremo de Estados Unidos en el caso de *Smith*. Allí, el más alto foro de Estados Unidos, al establecer la norma

(continúa...)

Por su parte, los peticionarios sostienen que permitir la entrega de la información y documentación solicitada constituiría una intromisión excesiva con un procedimiento interno de la iglesia. Además, surtiría un efecto disuasivo (*chilling effect*) sobre las víctimas y testigos para que denuncien el tipo de conducta objeto de este pleito, interfiriendo así con los procedimientos eclesiásticos de la Iglesia. Por tanto, implícitamente

---

general de que en caso de que una legislación sea neutral y de aplicación general, el Estado no tiene que establecer un interés apremiante, señaló que:

> [t]he only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press . . . or the right[s] of parents.

*Smith*, 494 U.S. en la pág. 881.

Más adelante el Tribunal se negó a aplicar el escrutinio estricto al caso de *Smith* porque no presentaba la "situación híbrida" antes reseñada. *Id.* pág. 882 (traducción nuestra). Por razón de la ambigüedad de las expresiones del Tribunal Supremo de Estados Unidos, esas expresiones han generado diversas interpretaciones en distintos foros judiciales sobre la aplicación de esa aparente excepción. *Véase* Jonathan B. Hensley, Approaches to the hybrid-rights doctrine in free exercise cases, 68 Tenn. L. Rev. 119 (2000); Steven H. Aden & Lee J. Strang, When a "rule" doesn't rule: the failure of the Oregon Employment Division v. Smith "Hybrid Rights Exception", 108 Penn St. L. Rev. 573 (2004). Algunos foros incluso se han negado a aplicar esa excepción por entender que es *obiter dictum. Véase Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003); Kissinger v. Bd. of Trs. of the Ohio State Univ., 5 F.3d 177 (6th Cir. 1993). No obstante a lo anterior, entendemos que este caso es innecesario que nos pronunciemos sobre la aplicación de las reclamaciones híbridas dado a que, según analizamos, la reclamación al amparo del derecho a la intimidad carece de méritos. Además, este es un planteamiento que se trae ante este Tribunal por primera vez, por lo cual es impropio dilucidarlo.

plantean que el Estado viola la cláusula de establecimiento. Entendemos que no.

Las cláusulas de establecimiento y de separación de iglesia y estado no implican que al Estado le esté vedado interferir absolutamente con asuntos de la iglesia. Lo determinante es si la actuación del Estado responde primordialmente a un interés secular. El propósito de la acción impugnada en esta controversia es el requerimiento de información y documentación para investigar la comisión de delitos. Tal acción es enteramente secular y no busca promover o inhibir la práctica de la religión católica. Tampoco representa una intromisión indebida con asuntos internos de la iglesia. Mediante la expedición de los *subpoenas*, el Estado no interfiere o intenta interferir con la potestad investigativa de la Iglesia, como tampoco con las determinaciones o medidas disciplinarias tomadas internamente en contra de los sacerdotes. Por tanto, el efecto que tiene la acción estatal sobre las investigaciones eclesiásticas, si alguno, es meramente incidental al ejercicio válido del Estado en el cumplimiento de su deber. A tenor con lo anterior, coincidimos con el Tribunal de Primera Instancia en que los *subpoenas* impugnados no violan las cláusulas religiosas.

C

Hoy una mayoría de este Tribunal se convierte en un tribunal de derecho canónico y pasa juicio sobre la validez de una práctica fundamentada en una creencia

religiosa. Esto es, la Opinión de conformidad pasa juicio sobre las normas internas de la Iglesia Católica sobre la entrega de documentación en casos que pudieran constituir maltrato o abuso sexual de menores y concluye que – a base de la interpretación que realiza la mayoría sobre el derecho canónico de la Iglesia Católica – los peticionarios estaban obligados a entregar toda información sobre una víctima si al momento de la denuncia la víctima era menor de edad.[18] Por tanto, concluyen que conforme a su interpretación sobre las reglas internas de la Iglesia y el derecho canónico, no existe conflicto entre la práctica religiosa alegada y la información solicitada por el Estado sobre víctimas menores de edad al momento de la denuncia, por lo que esta información debe ser entregada. Respecto a la información solicitada sobre víctimas que eran mayores de edad al momento de la denuncia, la Opinión de conformidad interpreta que las reglas internas de la Iglesia Católica no exigen que la parte demandante las entregue. Por consiguiente, sobre esa información la parte demandante está cobijada por la protección constitucional sobre la libertad de culto.

Esta determinación es jurídicamente incorrecta. Primero, la Opinión de conformidad sostiene que debido a que no existe conflicto entre la libertad de culto y la

---

[18] Adviértase que esto implica un trato desigual para las víctimas en función de la edad que tenían al momento de presentarse la denuncia ante la Diócesis, independientemente de si era menor de edad al momento de los hechos que denuncia.

información solicitada por el Estado sobre víctimas menores de edad al momento de la denuncia, esa información debe ser entregada. Acto seguido, sostiene que sobre las víctimas que al momento de presentarse las denuncias eran mayores de edad sí existe un conflicto entre la libertad de culto y la información requerida por el Estado. Sobre estas víctimas concluye que les cobija la libertad de culto y el Estado debe probar que no existían medios menos onerosos para obtener la información solicitada.

No obstante a lo anterior, al analizar el derecho a la intimidad la Opinión de conformidad concluye que las víctimas que eran mayores de edad al momento de la denuncia están cobijadas por el derecho a la intimidad, por lo que éstas deben otorgar su consentimiento a la entrega de la información solicitada por el Estado. Nada menciona sobre el derecho a la intimidad de las víctimas menores de edad al momento a la denuncia, manteniendo su determinación de que como no hay conflicto entre la libertad de culto y la información requerida por el Estado sobre éstas, la información debe ser entregada.

¿Acaso la mayoría considera que a las víctimas menores de edad al momento de la denuncia no les cobija el derecho a la intimidad, tal cual le cobija a las que eran mayores de edad al momento de la denuncia? O, por el contrario, ¿que los dogmas y creencias religiosas de una institución tienen primacía sobre el derecho a la intimidad de las víctimas que eran menores de edad al

momento de la denuncia y por ello debe entregarse la información solicitada al no haber conflicto entre el Estado y la Iglesia?

Segundo, al entrar a interpretar veracidad o corrección de los dogmas y creencias religiosas en los que se fundamentan los peticionarios, la Opinión de conformidad se distancia de las normas básicas de limitación judicial al atender cuestiones sobre creencias y prácticas religiosas. Sobre este asunto, en *United States v. Ballard*, 322 U.S. 78, 86 (1944), el Tribunal Supremo de Estados Unidos estableció que los individuos "may not be put to the proof of their religious doctrines or beliefs." Repetimos lo señalado por el más alto foro estadounidense: "[it] is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Smith,* 494 U.S. en la pág. *887 citando a Hernandez v. Commissioner,* 490 U.S. 680, 699 (1989). A su vez, ese mismo foro ha puntualizado que:

> The determination of what is a "religious" belief or practice is more often than not a difficult and delicate task. . . However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.

*Thomas v. Review Bd. of Indiana Employment Sec. Division,* 450 U.S. 707, (1981).

Por ende, no le corresponde a este Tribunal pasar juicio, cual si fuera un tribunal de derecho canónico,

sobre si la creencia o práctica religiosa en que los peticionarios fundamentan su reclamo de libertad de culto se encuentra validada por las reglas internas de la Iglesia Católica; mucho menos, como señalamos, utilizar las creencias religiosas de una religión como fundamento jurídico para adjudicar parte de esta controversia. Dicho sea de paso, tal intervención por parte de este Tribunal constituye una intromisión indebida del Estado con una religión en violación a las cláusulas religiosas, pues pasa juicio sobre la veracidad de la creencia religiosa de los peticionarios.

D

Por su parte, habiendo resuelto que la información solicitada por el Estado sobre víctimas menores de edad al momento de la denuncia debe ser entregada, la Opinión de conformidad pasa a analizar la información solicitada sobre víctimas mayores de edad al momento de la denuncia. Sobre éstas concluye que la actuación estatal sí le impuso una carga sustancial sobre el ejercicio de su religión pues, como mencionamos, según la interpretación del derecho canónico que hace la mayoría, sobre esta información las reglas internas de la Iglesia Católica no compelían a los peticionarios a entregar la información a las autoridades. Al evaluar la carga impuesta por el Estado y determinar el escrutinio aplicable a estos hechos, la Opinión de conformidad escuetamente sostiene que la emisión de un subpoena cumple con el requisito de neutralidad más no con el requisito de aplicabilidad

general y, por ende, procede aplicar el escrutinio estricto a esta controversia.

Según la Opinión de conformidad, debido a que los *subpoenas* emitidos por el Estado pretenden requerir información producto de un procedimiento interno de la Iglesia, la actuación estatal no satisface el criterio de aplicación general. Es decir, como en este caso los *subpoenas* se dirigen exclusivamente a la Iglesia y a requerir información a su haber, no son de aplicación general. Este raciocinio no guarda relación jurídica alguna con el análisis del criterio de aplicación general desarrollado por la jurisprudencia y nos conduce a un absurdo jurídico. Veamos.

El criterio de aplicabilidad general pretende evitar que una ley, a través de su diseño, construcción o aplicación, discrimine contra el ejercicio de una práctica o creencia religiosa. *Lukumi Babalu Aye, Inc.,* 508 U.S. en la pág. 557 (Scalia, J., Opinión Concurrente). En palabras del profesor Richard F. Duncan:

> [T]he 'precise evil' prohibited by the general applicability requirement is the inequality that results when underinclusive legal prohibitions are enforced against religious conduct. When society is unwilling to impose the same legal restrictions on favored secular activities that it imposes on religious practices of the same kind, that "evil" is present and renders the constitutionality of the legal scheme doubtful.

Richard F. Duncan, *Free exercise is dead, long live free exercise: Smith, Lukumi and the general applicability requirement*, 3 U. Pa. J. Const. L. 850, 867 (2001).

Como bien reconoció el Tribunal Supremo de Estados Unidos en *Lukumi Babalu Aye, Inc., supra*:

> All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause 'protect[s] religious observers against **unequal treatment,**' and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued **only** against conduct with a religious motivation.

*Lukumi Babalu Aye, Inc.,* 508 U.S. en las págs. 542-543 citando a Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 148 (1987) (citas omitidas)(énfasis nuestro).

Por tanto, al evaluar un cuestionamiento al amparo de la libertad de culto sobre el criterio de aplicabilidad general, la encomienda de un tribunal no es auscultar si en determinada ocasión una ley se aplicó contra una actividad religiosa, sino evaluar si el diseño, construcción o aplicación de la ley incide únicamente sobre una práctica religiosa **en virtud exclusiva de su naturaleza religiosa.** Si la carga impuesta por el Estado únicamente es a la actividad por su naturaleza religiosa, la actuación estatal no cumplirá con el criterio de aplicabilidad general y procederá aplicar el escrutinio estricto. *Véase* Carol M. Kaplan, *The Devil Is in the Details: Neutral, Generally Applicable Laws and Exceptions from Smith*, 75 N.Y.U. L. Rev. 1045, 1075-1083 (2000). En cambio, si la carga impuesta aplica tanto a prácticas o actividades seculares como a prácticas o actividades religiosas, procederá aplicar el escrutinio racional.

En la controversia ante nuestra consideración, el Secretario de Justicia está facultado por una ley de aplicación general para requerirle a un ciudadano o una

entidad la presentación de evidencia que considere esencial para el curso de una investigación del Departamento de Justicia. En relación a los hechos de este caso, el Secretario está facultado para emitir *subpoenas* requiriendo información en el curso de una investigación sobre la posible comisión de delitos. Los *subpoenas*, por su naturaleza, son dirigidos de manera individualizada. No obstante, el requerimiento de información mediante un *subpoena* no pretende incidir sobre la práctica de una religión de manera distinta a la que incidiría sobre la práctica de una actividad secular. Esto es, la carga impuesta de un *subpoena* a que una entidad religiosa entregue ciertos documentos en el curso de una investigación criminal es la misma carga que se le impondría a una entidad secular en similares circunstancias.

En su consecuencia, si bien en este caso en particular los *subpoenas* fueron dirigidos a la Iglesia para requerirle información producto de una investigación de esta institución, con tal requerimiento el Estado no está imponiéndole una carga a la Iglesia que no le impondría a una entidad secular. De hecho, en nuestro ordenamiento los *subpoenas* son utilizados frecuentemente por las distintas agencias de gobierno para requerirle información a entidades seculares sobre sus asuntos internos. Consecuentemente, si mediante los *subpoenas* se incidió de alguna manera con la práctica religiosa de la Iglesia, tal efecto es meramente incidental a la

aplicación general de una ley y no procede aplicar el escrutinio estricto a la actuación estatal.

La Opinión de conformidad fundamenta su raciocinio principalmente en lo resuelto en *Mercado, Quilichini*, *supra*. Allí sostuvimos que una parte no puede acudir ante los tribunales para solicitar que se invalide una determinación de una entidad religiosa motivada por los dogmas y creencias religiosas de la entidad. *Mercado, Quilichini*, 143 D.P.R. en la pág. 649. Dentro de ese contexto, sostuvimos que la intervención del Tribunal (Estado) en esa disyuntiva requería pasar juicio sobre un asunto interno de la entidad religiosa que sólo afectaría a esta última. Por tal razón, al analizar si un tribunal debía intervenir para pasar juicio sobre la determinación interna de la entidad religiosa motivada por sus dogmas y creencias religiosas, evaluamos nuestra intervención a la luz del escrutinio estricto por entender que nuestra intervención incidiría únicamente sobre la determinación fundamentada en creencias religiosas de la entidad objeto del pleito.

Este caso no se trata de la facultad de un tribunal para intervenir en esta controversia; mucho menos de que mediante nuestra intervención tengamos que pasar juicio sobre la corrección en Derecho de una determinación interna de una entidad religiosa fundamentada en sus dogmas y creencias religiosas.[19] El Estado tampoco

---

[19] Curiosamente, como señalamos, eso es precisamente lo que hizo la mayoría en este caso al pretender adjudicar parte de esta controversia fundamentándose en su
(continúa...)

pretende pasar juicio sobre las determinaciones internas de la Iglesia o imponer su criterio sobre ellas. Los hechos en *Mercado, Quilichini*, *supra*, evidentemente, distan significativamente de los hechos del caso ante nuestra consideración y del alcance que hoy, acomodaticiamente, quiere impartirle la mayoría a la frase "asuntos internos".

Por todo lo anterior, evidentemente los *subpoenas* emitidos son una ley neutral de aplicación general, por lo que ahí debe terminar el análisis de este Tribunal. No obstante, aun si entendiéramos que procede el escrutinio estricto tal y como propone la Opinión de conformidad, en este caso el Estado tiene un interés apremiante en conseguir la información plasmada en los expedientes de la investigación de la Diócesis y el mecanismo de *subpoena* es el método menos oneroso para conseguirla. Como han resuelto otras jurisdicciones, la información producida por la investigación de la Diócesis es de tal naturaleza que sólo puede obtenerse, necesariamente, mediante el estudio de los expedientes de la Diócesis sobre su investigación interna.[20]

---

interpretación y juicio sobre los dogmas y creencias religiosas de la Iglesia Católica. Esto en clara contradicción con el testimonio presentado por el perito en derecho canónico traído al pleito por los peticionarios.

[20] Por ejemplo, en *Society of Jesus of New England v. Com.*, 441 Mass. 662 (2004), la Corte Suprema Judicial de Massachusetts expresó lo siguiente:

> Talbot and the Jesuits argue that the Commonwealth may rely on 'good police work' to secure convictions in criminal cases, and that production of documents from religious organizations is not necessary to pursuit of

(continúa...)

La distinción que la Opinión de conformidad intenta realizar sobre la jurisprudencia de otras jurisdicciones que ha resuelto que los *subpoenas* no infringen sobre la libertad de culto es errada. El que en algunos casos análogos no exista un procedimiento establecido por las autoridades eclesiásticas es inmaterial para adjudicar reclamos bajo el derecho a la libertad de culto. Peor aún, en los casos que la Opinión de conformidad intenta distinguir sí existían tales procedimientos internos y también se solicitó información sobre las víctimas.[21]

---

the Commonwealth's law enforcement goals. Again, however, we turn to the specifics of this case, not to general pronouncements about how law enforcement may be furthered by 'good police work'. **If, as the Commonwealth suspects, the withheld documents contain damaging admissions by Talbot, the utility of such evidence cannot be matched by 'good police work'...** And, again assuming that damaging admissions are contained in the withheld materials, they are not useful solely for purposes of persuading a jury to convict — they can have a strong impact on plea negotiations, with the potential that two young victims of sexual abuse might be spared the ordeal of testifying in trial. **We are satisfied that the Commonwealth has a compelling interest in obtaining these documents, that there are no other avenues by which the Commonwealth could obtain the equivalent of these documents, and that those interests outweigh the claimed interest of keeping these communications confidential.**

*Id.* págs. 672-73 (Citas omitidas)(Énfasis suplido).

Igualmente, en *People v. Campobello* el Estado indicó que interesaba tales expedientes precisamente podían contener admisiones por parte de los sacerdotes investigados que revelaran conducta impropia con un menor de edad, información que no podría conseguir de otra forma. *People v. Campobello*, 348 Ill. App. 3d 619, 624 (2004).

[21] Por ejemplo, en *People v. Campobello*, 348 Ill. App. 3d 619 (2004), los informes producidos por la investigación interna de la Diócesis de Rockford sí contenían

(continúa...)

Resolver lo contrario, como hace la Opinión de

conformidad, implica que para que opere el derecho a la

---

información sobre las víctimas, pues la investigación solicitó información sobre la conducta impropia de los sacerdotes investigados.

Contrario a lo que se alega en la Opinión de conformidad, en *Campobello* la Diócesis de Rockford sí tenía un procedimiento establecido para atender querellas de conducta sexual impropia de sacerdotes, titulado *Sexual Misconduct with Minors: Norms for Educatuon, Prevention, Assistance to Victims and Procedures for Determination of Fitness for Ministry/Employment. Id.* pág. 623.    En *Campobello* el Tribunal también reconoció que en el 2002 la Conferencia de Obispos de los Estados Unidos adoptó el *Charter for the Protection of Children and Young People* (Carta). Este documento ordena que "each diocese have a review board that functions as a confidential consultative body to the diocesan bishop to advise and assist him with respect to allegations of sexual abuse by clergy", con el cual cumplió el comité de la Diócesis que realizó su investigación interna. *Id*. Luego de señalar que los peticionarios no citaron autoridad alguna que indicara que una organización religiosa puede resistir un *subpoena* exclusivamente en virtud de sus creencias religiosas, el Tribunal expresó que:

> [b]oth the substantive and procedural laws under which the State is prosecuting defendant and seeking discovery are unquestionable neutral and generally applicable. Therefore, we see no constitutional requirement that the State show the impossibility of obtaining the information it seeks from sources other than the Diocese.

*Id.* pág. 664.

Dos de los casos que la Opinión de conformidad distingue porque no existían procedimiento interno, *Archbishop of Los Angeles v. Superior Court*, 131 Cal App. 4th 417 (2005), y *Society of Jesus of New England v. Commonwealth,* 808 N.E. 2d 272 (Mass. 2004), ocurrieron luego de que la Conferencia de Obispos de Estados Unidos adoptara la Carta en el 2002. Por otro lado, aunque *Hutchinsos v. Luddy* y *Commonwealth v. Stewart*, se resolvieron antes de la adopción de la Carta, en ambos casos los peticionarios y el Tribunal entendieron que en virtud del Canon 489 de la Iglesia Católica debían mantener un expediente secreto, separado del expediente ordinario de los sacerdotes investigados, y la Diócesis estaba absolutamente prohibida de revelar su contenido. No obstante, en ambos casos los tribunales validaron los *subpoenas* y ordenaron la entrega de los documentos. *Commonwealth v. Stewart*, 690 A.2d. 195, 201-02 (Pa. 1997); *Hutchinsos v. Luddy*, 414 Pa. Super. 138, 144-45 (1992).

libertad de culto se requiere cierta organización jerárquica que establezca procedimientos que formalicen las creencias de la religión. Tal determinación en sí, nuevamente, viola la cláusula de establecimiento, pues impone unos requisitos discriminatorios que no toda religión podrá cumplir. Bajo el criterio que hoy esboza la Opinión de conformidad, ¿qué ocurrirá cuando una religión que no comparte la misma organización formal de la Iglesia Católica levante los mismos reclamos?

Finalmente, la Opinión de conformidad evalúa de manera independiente el requerimiento del Estado en el que solicita información sobre cómo la Iglesia o las personas que intervinieron en la investigación interna de la Iglesia atendieron y resolvieron los asuntos investigados. Sobre ese requerimiento concluye que es excesivamente amplio, interfiere con los asuntos internos de la Iglesia y viola la libertad religiosa. Aunque no queda del todo claro cuál es el análisis constitucional que la mayoría aplica a este asunto, tal parece que la Opinión de conformidad señala que con este requerimiento el Estado viola la cláusula de establecimiento pues representa una intromisión excesiva del estado con la religión.

La Opinión de conformidad sostiene que mediante ese requerimiento el Estado pretende pasar un juicio valorativo sobre los procesos investigativos internos. Sin embargo, no hay un ápice de prueba que señale que tal información se solicita para que el Estado pase un juicio

sobre las decisiones internas de la Iglesia. Tampoco lo hay para sostener que el Estado solicita tal información para intervenir o cambiar el curso de acción tomado por la Iglesia conforme a sus dogmas. En todo caso, una simple lectura del requerimiento del Estado revela que con la información requerida el Estado pretende obtener información para investigar la posible comisión de delitos por parte de los sacerdotes investigados, al igual que en el manejo de los asuntos investigados. Determinar qué delitos debe investigar el Estado es una tarea que le corresponde exclusivamente a éste.

Curiosamente, a pesar de señalar que con este requerimiento el Estado intenta pasar un juicio valorativo sobre las decisiones de la Iglesia o intervenir en las mismas, la Opinión de conformidad analiza con cierto detalle el delito de encubrimiento. En otras palabras, implícitamente reconocen que con la información requerida el Estado posiblemente intenta investigar la comisión del delito de encubrimiento. Lo que es peor, la Opinión de conformidad adelanta su criterio en protección de la Iglesia y los que participaron en la investigación al sostener de antemano que en este caso no estamos ante la posible comisión del delito de encubrimiento por lo que no procedía que el Estado solicitara esta información. Todo esto sin que parte alguna levante o discuta tal argumento.

No le corresponde a este Foro, en esta etapa de los procedimientos, determinar qué delitos se cometieron o a

quiénes procede absolver de la comisión de los mismos. En esta etapa, y conforme a los asuntos planteados ante nuestra consideración, nos corresponde evaluar si el interés del Estado en requerir la información solicitada es intervenir con las determinaciones de la Iglesia. La respuesta es que no.

En fin, según hemos discutido, ausente planteamientos en derecho válidos, nos sostenemos en que procedía la entrega de la información solicitada por el Estado mediante los *subpoenas*. "Tristes tiempos estos en los que hay que luchar por lo que es evidente".[22] A tenor con lo anterior y con mucho pesar sobre la determinación que hoy emite una mayoría, disiento.


                         Anabelle Rodríguez Rodríguez
                              Juez Asociada

---

[22] Friedrich Dürrenmat

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Obispo de la Iglesia Católica de Puerto Rico – Diócesis de Arecibo, Daniel Fernández Torres, y su Vicario General Luis Colón Rivera

Peticionarios

v.

Secretario de Justicia del Estado Libre Asociado de Puerto Rico, Hon. César Miranda

Recurrido

DJMG

Interventor | CT-2014-004 | Certificación |

Opinión disidente emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 14 de julio de 2014.

De forma prematura, a ciegas y en el vacío, una Mayoría de este Tribunal establece mecanismos predirigidos que tendrán el efecto de liberar al Obispo de la Iglesia Católica de Arecibo de entregar una buena parte de la información requerida por el Departamento de Justicia, al peligrosamente conceder un poder de veto a determinados adultos, sin que ningún tribunal haya revisado previamente todos los documentos pertinentes.

Por entender que los fundamentos y el procedimiento contenido en este disenso permitirían lograr, en esta etapa procesal, un justo balance entre los derechos

constitucionales de los individuos y el interés apremiante del Estado en procesar a los depredadores sexuales, DISIENTO.

Indiscutiblemente, esta Curia viene llamada a resolver una controversia en la que se entretejen y enfrentan intereses que revisten gran preeminencia en nuestra sociedad. De un extremo de la balanza se halla el Estado en un intento por soslayar un reclamo de inconstitucionalidad, amparándose en que sus acciones persiguen un interés apremiante y que su quehacer cumple cabalmente con su misión de procesar los casos de naturaleza penal. Mientras, del otro lado de la balanza se encuentran funcionarios del clero y un ciudadano interventor, quienes cuestionan las acciones del Estado e invocan garantías constitucionales para detenerlas, tales como: la libertad de culto, la separación Iglesia y Estado y el derecho a la intimidad.

Hay quienes plantean que las garantías de estirpe constitucional y la seguridad pública son intereses mutuamente excluyentes y que se encuentran en un estado de tensión permanente. Precisamente, en el caso ante nos pudimos haber resuelto esa aparente tensión entre los postulados sociales y comunitarios en que se fundamenta la seguridad pública y las protecciones constitucionales que amparan a los ciudadanos. Para cumplir con esa aspiración, no debemos permitir que en esa lucha por tirar de la soga, el Estado derribe protecciones de rango constitucional sacrificándolas en el altar de la

seguridad pública. A su vez, tampoco podemos dar paso a que el interés del Estado, para investigar a los trasgresores de nuestro precepto penal, sea sacrificado en el altar de la religión.[23]

Ante esa realidad, el rol del Poder Judicial debe consistir en procurar que, de ser posible, queden en pie tanto el interés del Estado en procesar a los infractores de las leyes penales, así como los derechos constitucionales que cobijan a los ciudadanos. En el descargo de esa responsabilidad, no podemos actuar a ciegas, prematuramente ni dirigir por control remoto al foro de instancia para buscar que la soga se arrime a una parte específica. Por entender que ese es el curso de acción en Derecho que impediría que, de forma improcedente, alguna de las partes tire de la soga para su lado, disiento.

Precisada la controversia en esos contornos, pasamos a trazar el contexto fáctico y procesal que dio margen a ésta.

## I

La controversia de epígrafe tuvo su génesis el 12 de febrero de 2014, cuando el Obispo de la Diócesis de Arecibo (Diócesis), Daniel Fernández Torres (Obispo), y el Vicario General, Luis Colón Rivera (Vicario General), incoaron una demanda ante el Tribunal de Primera

---

[23]Para una discusión sobre el particular, *véase* H.A. Meléndez Juarbe, *La Constitución en ceros y unos: un acercamiento digital al derecho a la intimidad y la seguridad pública*, 77 Rev. Jur. UPR 45 (2008).

Instancia con el propósito de impugnar sendos *subpoenas* emitidos por el Departamento de Justicia de Puerto Rico (Departamento).[24] En esencia, solicitaron una sentencia declaratoria y la concesión de un interdicto preliminar y permanente. Ello, a fin de que el foro judicial decretara la inconstitucionalidad de los *subpoenas* y, a su vez, impidiera la entrega de los expedientes y documentos requeridos por el Departamento.

Los demandantes alegaron que la actuación del Estado es el resultado de una serie de investigaciones eclesiásticas internas que la Diócesis efectuó. Estas investigaciones se produjeron con el propósito de atender ciertas quejas de conducta impropia en contra de sacerdotes de la región de Arecibo. Sobre el particular, los demandantes arguyeron que las pesquisas fueron conducidas a tenor con los postulados del Derecho Canónico y que al momento de realizarlas los querellantes eran mayores de edad, para efectos de la ley penal.[25] Argumentaron que como parte del trámite de

---

[24]En síntesis, los *subpoenas* requerían que tanto el Obispo como el Vicario General comparecieran ante la Fiscalía de Arecibo para prestar testimonio y suministrar nombres, direcciones, y toda la información relacionada a los querellantes menores de edad y/o adultos que han alegado ser víctimas de delitos sexuales, en los últimos 10 años, por parte de sacerdotes católicos adscritos al área que comprende la región de Arecibo y/o pueblos limítrofes. Del mismo modo, los *subpoenas* solicitaban a los referidos funcionarios eclesiásticos que informaran la forma en que la institución religiosa y/o las personas que atendieron estos asuntos y los resolvieron.

[25]En relación a las investigaciones, el Tribunal de Primera Instancia determinó que **con posterioridad al momento en que las víctimas emitieron sus respectivas**

(continúa...)

las investigaciones y las normas que las regulan, a los testigos y víctimas se les garantizó entera confidencialidad y privacidad. En respuesta al requerimiento que le hiciera el Estado, informaron que el 6 de febrero de 2014, entregaron toda aquella información que, a su mejor entender, era relevante y pertinente y no quebrantaba la confidencialidad y privacidad que se les garantizó a los denunciantes.

En lo pertinente, el Obispo y el Vicario General enmarcaron su reclamación en varios fundamentos, a saber: (1) la libertad de culto; (2) la separación de Iglesia y Estado; (3) el derecho a la intimidad y expectativa de privacidad de la Diócesis en relación a sus documentos y procesos internos de investigación; (4) el derecho de intimidad de las víctimas denunciantes con respecto a las declaraciones de eventos de naturaleza sexual que expresaron ante la Diócesis y el proceso de sanación emocional y espiritual por el cual atravesaron; y (5) el privilegio religioso-creyente estatuido en la

---

**denuncias o declaraciones**, en el proceso investigativo intervinieron otros **clérigos o sacerdotes**. De la Resolución emitida por el foro de instancia no se desprende que los que intervinieron eran personas ajenas a la institución religiosa. *Véase*, Apéndice de la Petición de Certificación Intrajurisdiccional, págs. 63 y 104. Hacemos hincapié en que de los documentos que obran en autos tampoco surge si en las aludidas investigaciones participaron notarios, consultores, y otros profesionales. Más bien, lo que hace el foro primario es describir, a grandes rasgos, lo establecido en el *Procedimiento de la Conferencia Episcopal*, sin pormenorizarlo a los hechos del presente caso. *Véase*, Apéndice de la Petición de Certificación Intrajurisdiccional, pág. 59.

Regla 511 de las Reglas de Evidencia de 2009 (Regla 511), 32 LPRA Ap. VI, R. 511.

De igual forma, los demandantes arguyeron que dar paso a la investigación y entrega de los documentos solicitados produciría un efecto paralizante (*chilling effect*) tanto en la facultad de la Diócesis para disciplinar a aquellos clérigos que incurran en prácticas impropias, como en la forma de auxiliar a los feligreses que han sido víctimas de este tipo de actuación. Para los demandantes, la divulgación de la información requerida por el Departamento, la cual sostienen fue expresada bajo un entendido de confidencialidad, frustraría la confianza de los feligreses en la institución religiosa.

El 19 de febrero de 2014, DJMG (Interventor) presentó ante el foro de instancia una *Demanda de Intervención*. En ésta, expresó que actualmente tiene 23 años de edad y que entre los 12 y 15 años fue abusado sexualmente por un sacerdote de la jurisdicción de Arecibo. Indicó que hace aproximadamente 3 años denunció ese hecho ante la Diócesis, pues entendió que debía resolverse internamente y conforme a los postulados del Derecho Canónico. El Interventor informó que se le proveyó ayuda psicológica y que quedó satisfecho con los esfuerzos realizados por la Diócesis. En ese sentido, adujo que no le interesó, ni le interesa, que lo denunciado ante la institución religiosa sea investigado y procesado por las autoridades civiles. Con respecto a

la denuncia hecha ante la Diócesis, alegó que lo hizo movido por la estricta confidencialidad que cobija el proceso eclesiástico y el dogma de la Iglesia Católica. Además, sostuvo que todas las comunicaciones sobre su experiencia fueron dirigidas a un miembro del clero religioso, sin la presencia de personas ajenas a la institución.

Ante ello, el Interventor solicitó que se anularan los *subpoenas* emitidos y se prohibiera tanto la divulgación de su identidad y circunstancias personales, como las comunicaciones confidenciales que emitió ante la Diócesis. De forma similar al Obispo y al Vicario General, basó su reclamo en lo siguiente: (1) el derecho a la intimidad; (2) la inviolabilidad de la dignidad humana; (3) la libertad de culto; y (4) el privilegio religioso-creyente.

Por su parte, el 20 de febrero de 2014, el Estado Libre Asociado (ELA) solicitó la desestimación de la demanda original y la reclamación del Interventor. Esencialmente, el ELA alegó que procedía la desestimación de la demanda al amparo de la Regla 10.2 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2, y que los peticionarios no cumplían con los criterios de legitimación activa para invocar derechos de terceros. De igual forma, arguyó que el *injunction* solicitado era improcedente, toda vez que buscaba impedir una actuación de un funcionario público autorizada por ley.

Sobre este último planteamiento, el ELA argumentó que el Secretario de Justicia (Secretario) tiene potestad para investigar y procesar los casos de naturaleza penal en nuestra jurisdicción, por lo que el caso de epígrafe no era una excepción. Por tanto, adujo que la negativa de entregar la información requerida constituía una limitación al poder investigativo del Estado. Ello, pues, su intención no es realizar intromisiones indebidas en los procesos intrínsecos de la iglesia, sino investigar aquella conducta constitutiva de delito para lo cual tiene autoridad y obligación expresa. Para el ELA, la investigación de un delito no puede considerarse un asunto interno de la iglesia.

En relación a los *subpoenas* emitidos, el ELA sostuvo que éstos superan los ataques de inconstitucionalidad, ya que persiguen un interés gubernamental apremiante (detectar y combatir el abuso sexual contra seres humanos) y el efecto sobre la práctica religiosa es meramente incidental. Asimismo, señaló que la acción estatal es de carácter neutral, de estricto contenido secular y de aplicabilidad general, pues constituye un proceso ordinario uniforme. Para el ELA, los *subpoenas* emitidos no imponen cargas impermisibles en las creencias o prácticas religiosas de los demandantes. En lo concerniente al reclamo de confidencialidad, sostuvo que cuenta con un procedimiento dirigido expresamente a salvaguardar la

confidencialidad de los documentos requeridos por el Departamento.

De igual forma, el ELA se opuso a la demanda de intervención. Principalmente, argumentó que ésta no cumplía con los requisitos mínimos establecidos en las Reglas de Administración del Tribunal de Primera Instancia. En relación al fundamento de la aplicabilidad de la Regla 511, adujo, en lo pertinente, que el privilegio no puede tener el alcance de limitar una investigación criminal de abuso sexual. El ELA sostuvo que la aludida regla no goza de rango constitucional, por lo que debe ser interpretada restrictivamente. A base de ello, concluyó que el privilegio estatuido en la Regla 511 solo debe extenderse a la confesión sacramental y no más allá.

Luego de varios trámites procesales, el 7 de abril de 2014, el Tribunal de Primera Instancia emitió una Sentencia mediante la cual declaró la constitucionalidad de los *subpoenas* en cuestión. Concluyó que procedía la entrega de todos los documentos requeridos por el Departamento, con la única excepción de las comunicaciones emitidas durante el sacramento de la confesión, por éstas ser privilegiadas al amparo de la Regla 511. Asimismo, ordenó al Obispo y al Vicario General entregar, en un término de 15 días a partir de la notificación de la Sentencia, los documentos solicitados. En desacuerdo con el dictamen, los demandantes presentaron una moción intitulada *Moción*

*para que se formulen determinaciones de hechos y conclusiones de derecho adicionales y en solicitud de reconsideración*, la cual fue declarada no ha lugar.

Inconformes, el 25 de abril de 2014, los demandantes, conjuntamente con el Interventor, acudieron al Tribunal de Apelaciones mediante recurso de apelación. A su vez, el 28 de abril de 2014, presentaron una moción en auxilio de jurisdicción en la cual solicitaron la paralización de los efectos de la Sentencia emitida hasta que se resolviera el recurso de apelación presentado. El 2 de mayo de 2014, el foro apelativo denegó la paralización solicitada.

Entretanto, ese mismo día, el Obispo y el Vicario General, en conjunto con el Interventor, presentaron ante este Tribunal una *Petición de Certificación Intrajurisdiccional*. En esencia, los demandantes reproducen los argumentos esgrimidos ante los foros apelados. Conjuntamente con su petición, solicitaron la paralización de los efectos del dictamen emitido por el foro primario. En atención a lo anterior, el 7 de mayo de 2014, esta Curia emitió una Resolución en la que declaramos con lugar ambas peticiones y, a la misma vez, le ordenamos a las partes presentar sus alegatos en un término de 15 días.

Ambas partes han cumplido con nuestra orden, por lo que solo nos resta pasar a resolver la controversia suscitada. Procedemos.

**II**

Con el fin de adjudicar el asunto ante nuestra consideración, es imperativo exponer el marco estatutario y jurídico aplicable. Veamos.

Es norma ampliamente conocida que en nuestro ordenamiento jurídico las agencias administrativas gozan de un gran poder de investigación. La adquisición de información se considera imprescindible, pues permite que las agencias puedan asegurar la consecución necesaria para el uso racional de sus poderes sustantivos. Esto, con el fin de atender y resolver los problemas que enfrenta nuestro ordenamiento y asegurar que la política pública vigente se implante de manera adecuada. Weber Carrillo v. ELA, Op. de 24 de marzo de 2014, 2014 TSPR 46, pág. 11, 190 DPR ___ (2014); HMCA (PR), Inc., etc. v. Contralor, 133 DPR 945, 959 (1993).

Aunque lo usual es que las agencias obtengan la información solicitada de forma voluntaria, se les ha delegado, mediante legislación, el poder para obligar a las personas a que entreguen la documentación requerida. Empero, sabido es que el poder de investigación de las agencias no es irrestricto. Ello, pues, resulta incuestionable que el poder inquisitivo de las agencias puede transformarse en un instrumento de hostigamiento y persecución. En consecuencia, esta Curia ha resuelto que para dirimir la razonabilidad de un requerimiento administrativo deben concurrir varias circunstancias, a saber: (1) que la investigación esté dentro de la autoridad conferida por ley a la agencia; (2) que el

requerimiento no sea demasiado indefinido; y (3) que la información solicitada sea razonablemente pertinente al asunto específico bajo investigación. RDT Const. Corp. v. Contralor I, 141 DPR 424, 433 (1996); HMCA (PR), Inc., etc. v. Contralor, *supra*, pág. 970.

Inicialmente, la determinación de pertinencia queda a la discreción del funcionario que realiza la investigación administrativa. Ahora bien, de surgir alguna polémica al respecto, esta determinación le compete a los foros judiciales, pues son éstos los últimos intérpretes de la compatibilidad entre el ejercicio del poder investigativo gubernamental y las garantías constitucionales. HMCA (PR), Inc., etc. v. Contralor, *supra*, pág. 970. Sin duda, esta función de los foros judiciales es trascendental, ya que el poder investigativo de las agencias no puede quedar al margen de los postulados y garantías constitucionales que amparan a las personas frente a las actuaciones del Estado.

**III**

Cónsono con el marco jurídico expuesto, a una agencia como el Departamento de Justicia se le reconoce un amplio poder para llevar a cabo investigaciones. Conviene recordar que el Secretario de Justicia es el principal funcionario de ley y orden del Estado Libre Asociado y es el llamado a dirigir esta agencia administrativa, creada en virtud del Art. IV, sec. 6, de la Constitución de Puerto Rico. En síntesis, entre las

funciones principales de este funcionario está el promover el cumplimiento y ejecución de las leyes, así como el investigar y encausar cualquier violación a las leyes penales. *Véase*, Pueblo v. Castellón, 151 DPR 15, 24-25 (2000).

La potestad de investigar del Secretario está formalmente establecida en el Art. 11 de la Ley Orgánica del Departamento de Justicia, Ley Núm. 205-2004 (Ley Núm. 205), 3 LPRA secs. 291 *et seq*. En lo pertinente, el referido artículo dispone que el Secretario o sus funcionarios tienen autoridad para realizar "las investigaciones que sean necesarias y adecuadas para el ejercicio de sus facultades . . . y quedan autorizados para entrevistar testigos y tomar juramentos y declaraciones". 3 LPRA sec. 292h. Asimismo, el Art. 11 faculta al Secretario y a sus funcionarios a emitir citaciones y requerir la comparecencia de testigos y la presentación de evidencia documental y de aquella otra que consideren esencial para el conocimiento cabal del asunto bajo investigación. Íd. Se advierte que la persona que sea citada como testigo en una investigación o procedimiento realizado por el Departamento tiene la obligación de comparecer y testificar, o de presentar la evidencia que se le requiera. 3 LPRA sec. 292i. Todo ello, claro está, salvaguardando las garantías constitucionales y los derechos de los individuos.

En la consecución de su facultad para investigar, el Secretario puede extender *subpoenas* cuando lo

entienda razonablemente necesario. El diligenciamiento de estos mecanismos en el contexto de una investigación penal tiene el propósito de adelantar el interés del Estado en la investigación y procesamiento criminal de los acusados, con el fin de velar por la seguridad de los ciudadanos. Así las cosas, el Secretario puede emitir citaciones dirigidas a obtener testimonios (*subpoena ad testificandum*), así como citaciones para la producción de documentos (*subpoena duces tecum*). Ambos instrumentos se consideran de vital importancia para que las agencias, y en particular el Departamento, puedan dar fiel cumplimiento a las funciones que le han sido delegadas. Weber Carrillo v. ELA, *supra*, págs. 11-12.

En cuanto a las citaciones para obtener documentos (*subpoena duces tecum*), recientemente reiteramos que cuando la información está en manos de un tercero y la persona afectada tiene una expectativa de intimidad sobre la misma, la agencia tiene la obligación de notificarle a la persona afectada que se ha hecho el requerimiento al tercero como garantía constitucional. En cambio, cuando la persona agraviada es la que tiene la información en su poder, el requerimiento que se le extienda a ésta constituye suficiente notificación. Íd., pág. 18.

**IV**

En lo que atañe a las garantías y salvaguardas que amparan a las personas que suministren la información solicitada, ya sea mediante el uso de *subpoena ad*

*testificandum* o el *subpoena duces tecum*, recordemos que en el Art. 13 de la citada Ley Núm. 205 se dispone, en lo pertinente, que "la información obtenida como resultado de una investigación realizada es confidencial y debe mantenerse en un expediente investigativo, el cual no puede ser objeto de inspección, examen ni divulgación mientras se conduce la investigación". 3 LPRA sec. 292j.

Por su parte, el Reglamento Núm. 7450 del Departamento[26] precisa la normativa con respecto a la divulgación de la información obtenida como resultado de investigaciones llevadas a cabo por el Departamento. Cabe resaltar que el citado Reglamento es de aplicación a "toda solicitud, requerimiento, petición, citación, subpoena u orden de cualquier persona que implique la potencial divulgación de información recopilada para fines investigativos por el Departamento de Justicia". Art. 5 del Reglamento Núm. 7450. Es mediante el Art. 7 del Reglamento que se desglosan las normas que rigen la divulgación de la información recopilada para fines de investigación y se dispone de manera detallada las garantías para mantener la confidencialidad de la misma. Este artículo reconoce que el derecho de acceso y a recopilar información de interés público no es irrestricto, toda vez que el Estado puede reclamar la confidencialidad de la información recopilada

---

[26]Reglamento para establecer las normas de divulgación de información obtenida como resultado de investigaciones realizadas por el Departamento de Justicia, Reglamento Núm. 7450 de 4 de enero de 2008.

amparándose en varios supuestos, a saber: (1) cuando la Constitución lo requiere o una ley lo declara; (2) cuando la comunicación está protegida por privilegios evidenciarios; (3) cuando revelar la información puede lesionar derechos fundamentales de terceros; (4) cuando se trate de la identidad de un confidente; y (5) cuando se trate de información oficial. *Véase*, Art. 7 del Reglamento Núm. 7450.

De igual forma, el Art. 7 obliga a que en el momento de determinar si se debe divulgar alguna información que se encuentre en custodia del Departamento, se tomen en consideración todas las fuentes de derecho sustantivo pertinentes que crean privilegios, deberes de confidencialidad u otras limitaciones al derecho de acceso a la información de interés público. Debemos resaltar, además, que el aludido artículo reproduce íntegramente lo dispuesto en el Art. 13 de la Ley Núm. 205, a saber: que la información obtenida mientras se conduce la investigación del Departamento deberá mantenerse confidencial y no será susceptible de inspección, examen ni divulgación.[27]

Por otro lado, la Carta de Derechos de las Víctimas y Testigos de Delito también cuenta con disposiciones dirigidas a proteger la confidencialidad de la información entregada o comunicada por éstos. De hecho,

---

[27]En casos en los que, por excepción, se permita la divulgación de información, el Secretario retiene discreción y autoridad para determinar las condiciones en que se hará. *Véase*, Art. 7 del Reglamento Núm. 7450.

de la mencionada Carta surge que las víctimas y testigos tienen derecho a "[e]xigir que se mantenga la confidencialidad de la información sobre su dirección y números telefónicos cuando así lo estime necesario para su seguridad personal y de sus familiares". *Véase*, Ley Núm. 22 de 22 de abril de 1988, según enmendada, 25 LPRA sec. 973a(c).

No cabe duda de que lo dispuesto en la Ley Núm. 205, el Reglamento Núm. 7450 y en la Carta de Derechos, en cuanto a la confidencialidad de la información recopilada, constituye una diáfana garantía que el Departamento viene llamado a cumplir y a ejecutar.[28]

V

Como expusimos, los amplios poderes investigativos que se le han conferido a las agencias administrativas, incluido el Departamento, tienen límites pues de otra forma quebrantarían las protecciones constitucionales y los derechos que amparan a los individuos. Así, es norma reiterada que en nuestro ordenamiento jurídico se excluye evidencia pertinente, en aras de proteger importantes consideraciones de política pública y adelantar valores o intereses sociales ajenos a la búsqueda de la verdad. Pagán v. First Hospital, Op. de 19 de septiembre de 2013, 2013 TSPR 102, págs. 6-7, 189 DPR ___ (2013), citando a E.L. Chiesa, *Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y*

---

[28]Es mi criterio que las víctimas de delito, independientemente de su edad, gozan de protecciones adicionales que emanan de la Constitución, como veremos en el restante análisis de esta Opinión.

*Federales*, República Dominicana, Pub. JTS, Tomo I, págs. 185-186 (2009). Como es sabido, los privilegios evidenciarios constituyen una de esas instancias probatorias, a la vez que imponen límites al poder de investigación de las agencias administrativas. Ello, pues, debido a su naturaleza y función, los privilegios evidenciarios impiden el descubrimiento de ciertos actos, hechos o comunicaciones por existir intereses  en

conflicto que intervienen con esa búsqueda exhaustiva de la verdad. Pagán v. First Hospital, *supra*, pág. 7; Pueblo v. Fernández Rodríguez, 183 DPR 770, 784 (2011); Pueblo v. De Jesús Delgado, 155 DPR 930, 939 (2001).

Ante la realidad de que los privilegios inciden con el propósito cardinal de las Reglas de Evidencia, que es la búsqueda de la verdad, la Regla 518 exige que éstos se interpreten restrictivamente. 32 LPRA Ap. VI, R. 518. De ese mandato de interpretación restrictiva, se excluyen privilegios que gozan de rango constitucional. Se intima que el propósito de esta regla evidenciaria es evitar la ampliación indebida de los privilegios con el fin de no entorpecer la consecución de los procesos judiciales. Rodríguez v. Scotiabank de PR, 113 DPR 210, 214 (1982). Así, la disposición expresa de la Regla 518 exige que los foros judiciales rechacen cualquier invocación de un privilegio evidenciario cuando surjan dudas en cuanto a la presencia de los requisitos estatutarios exigidos para su existencia. Esto es, en caso de duda, los foros judiciales deben permitir la evidencia.

Recientemente en Pagán v. First Hospital, *supra*, tuvimos la oportunidad de pronunciarnos con respecto a los privilegios evidenciarios. Resolvimos que los privilegios no son automáticos, por lo que el peso de demostrar que se es acreedor de alguno de ellos reside en quien lo invoca, no en la parte contraria. *Véase*, 1 *McCormick on Evidence*, ed. Kenneth S. Brown, Ed.

Thompson-West, St. Paul, sec. 73.1, pág. 342 (2006). La parte que invoca el privilegio tiene el deber de sostenerlo, de forma fundamentada, en el momento en que se intente divulgar la comunicación. Es decir, tiene el peso de demostrarle al juzgador, prontamente, las razones que convierten la comunicación en privilegiada. Pagán v. First Hospital, *supra*, pág. 9. En ese proceso, debe establecer la existencia de los requisitos del privilegio que invoca mediante preponderancia de prueba.[29] Íd., citando a 1 *McCormick on Evidence*, *op. cit.*, sec. 6.3.1, pág. 591 y escolio 3.

**VI**

Establecida la función cardinal que emana de los privilegios evidenciarios y discutida la manera en que éstos deben interpretarse, es menester examinar el privilegio instituido en la Regla 511, el cual protege el vínculo entre la persona religiosa y persona creyente. 32 LPRA Ap. VI, R. 511. Veamos.

El llamado privilegio religioso-creyente surge como parte del derecho constitucional a la libertad de culto y su objetivo primordial es proteger la confianza que una persona creyente deposita en la persona religiosa.

---

[29]Este Tribunal ha precisado que preponderancia de la prueba equivale a que se establezcan "como hechos probados aquéllos que con mayores probabilidades ocurrieron". Zambrana v. Hospital Santo Asilo de Damas, 109 DPR 517, 521 (1980).

El profesor Chiesa Aponte destaca la importancia del privilegio, pues de lo contrario se menoscabaría el sacramento de la confesión y otro tipo de comunicaciones confidenciales entre el creyente y el religioso. E.L. Chiesa, *Reglas de Evidencia de Puerto Rico de 2009: Análisis por el Prof. Ernesto L. Chiesa*, Publicaciones JTS, pág. 168 (2009). Por tanto, para el referido profesor este privilegio está fundado, en gran parte, en el derecho a la intimidad. Íd.

Como mencionamos, en nuestra jurisdicción este privilegio se encuentra estatuido en la Regla 511 de las Reglas de Evidencia de 2009. Conviene recordar que esta regla corresponde a la derogada Regla 28 de las Reglas de Evidencia de 1979, pero su sucesora contiene cambios sustanciales en su redacción para abarcar la multiplicidad de denominaciones religiosas que no utilizan los términos que establecía la derogada regla. Resaltamos que la nueva redacción de la Regla 511 no restringe la definición de la persona religiosa a ningún individuo o religión en particular. Más bien, se concibe su aplicación en términos abarcadores, pues se incluye a una variedad de denominaciones, a saber: sacerdote, pastora, pastor, ministra, ministro, rabino, practicante de una religión, funcionario o funcionaria similar de una iglesia, secta o denominación religiosa o de cualquier organización religiosa. 32 LPRA Ap. VI, R. 511(a)(1).

En cuanto a la diversidad de denominaciones, el profesor Emmanuelli Jiménez señala que ésta obedece a la necesidad de atender un sinnúmero de religiones o sectas que no necesariamente utilizan los términos creyente y religioso, de manera que se incluye a otras denominaciones de fe que no se refieren a estos conceptos. R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño, Nuevas Reglas de Evidencia 2010*, Ediciones Situm, pág. 310 (2010). Por su parte, el profesor Chiesa Aponte subraya que la ampliación del concepto *religioso* se hace por imperativo constitucional. E.L. Chiesa, *Reglas de Evidencia de Puerto Rico de 2009: Análisis por el Prof. Ernesto L. Chiesa*, Publicaciones JTS, pág. 168 (2009).

Por otro lado, la persona *creyente* es definida en la regla como aquella que le hace una comunicación penitencial o confidencial a un *religioso* o *religiosa*. 32 LPRA Ap. VI, R. 511(a)(2). A su vez, la *comunicación penitencial o confidencial*, es precisada en la regla como aquella que, en confidencia, emite una *persona creyente*, sin la presencia de una tercera persona, a una que es *religiosa* y quien en el curso de la disciplina o la práctica de su iglesia, secta, denominación u organización religiosa, está autorizada o acostumbrada a oír tales comunicaciones y que bajo tal disciplina tiene el deber de mantenerlas en secreto. 32 LPRA Ap. VI, R. 511(a)(3).

En lo referente a quién puede invocar el referido privilegio, la Regla 511 dispone que tanto la *persona religiosa* como la *creyente* son poseedoras del privilegio. Es decir, ambas pueden rehusar revelar una comunicación penitencial o confidencial o impedir que otra persona la divulgue. 32 LPRA Ap. VI, R. 511(b). El motivo por el cual se extiende el privilegio a la *persona religiosa* es porque la ley no puede compeler a que en determinadas circunstancias ésta transgreda, ni castigarlo por rehusarse a quebrantar, las normas de su organización religiosa que le obligan a mantener ciertas comunicaciones en secreto. *Véase*, Secretariado de la Conferencia Judicial y Notarial, *Informe de las Reglas de Derecho Probatorio*, págs. 280-281 (2007).

Al examinar la Regla 511, nos percatamos de que la misma eleva a rango estatutario la protección de las comunicaciones habidas entre una *persona religiosa* y otra *creyente*. Basta una mera lectura del texto de la regla para percatarse de que no cabe hablar de protección cuando en la comunicación entre las partes mencionadas intervienen o están presentes terceras personas.

**A**

A pesar del análisis restrictivo que exige la Regla 518 a la hora de examinar la mayoría de los privilegios evidenciarios, debemos reconocer que el legislador ha ampliado el alcance del privilegio dispuesto en la Regla 511. Como discutimos, la inclinación ha sido extender la

protección del privilegio para que ampare a toda denominación religiosa y, más que todo, no restringirlo al sacramento de la confesión. No se puede pretender que la comunicación protegida se circunscriba estrictamente al sacramento de la confesión de la religión católica. Sabido es que este tipo de práctica religiosa no se concibe en otras denominaciones. En consecuencia, revestir de protección solo a este sacramento menoscabaría el derecho a la igual protección de las leyes, constituiría una intromisión impermisible con la libertad de culto, a la vez que amenazaría otras salvaguardas constitucionales. *Véase*, E.J. Imwinkelried, *The New Wigmore: A Treatise on Evidence: Evidenciary Privileges*, Aspen Publishers, 2d. Ed., sec. 6.9.1 (2010). Sin duda, delimitar el privilegio a las prácticas de la religión católica constituiría un proceder patentemente inconstitucional. Sobre el particular, el *Secretariado de la Conferencia Judicial y Notarial*, al presentar sus recomendaciones sobre las Reglas de Evidencia, señaló que:

> La comunicación privilegiada no puede circunscribirse a la confesión estrictamente por interferir con los derechos de igual protección de las leyes y libertad religiosa. Sin embargo, **no puede ser tan amplia que extienda el privilegio a todo tipo de comunicación con el funcionario religioso**. *Véase*, Secretariado de la Conferencia Judicial y Notarial, *Informe de las Reglas de Derecho Probatorio*, pág. 281 (2007). (Énfasis suplido).

Cónsono con lo anterior, los recientes desarrollos y formulaciones en materia de derecho probatorio tienden

a no ceñir el privilegio religioso-creyente a las comunicaciones ligadas al sacramento de la confesión. Más bien, lo han ampliado a otro tipo de situaciones en donde la *persona creyente* de cualquier denominación religiosa busca en la *persona religiosa* **consejería o guía espiritual** (consejería espiritual). De hecho, en el tratado de *The New Wigmore* se reseña ampliamente que:

> The clergy-penitent privilege was originally restricted to sacramental, doctrinally required confessions, and there is still support for that view. This view strictly confines the privilege to confessional communications required by the tenets of a religion. **However, the tendency has been to broaden the privilege to apply to non-penitential communications in which the layperson confers with the clergy in clergyperson's capacity as a spiritual advisor. Under this broader standard, the privilege applies not only when the layperson seeks forgiveness for a past sin but also when the layperson seeks guidance as to a future ethical choice.**
>
> ...
>
> Moreover, the liberal tendency would be consistent with a shift toward a humanistic theory. As previously stated, under that theory the point of a privilege is to create a private enclave to enable persons to seek expert advice enabling them to make more intelligent, independent life preference choices. **Under that theory it makes eminently good sense to expand the privilege to apply whenever a fideist seeks spiritual advice from a religious counselor.** Indeed, it would be ironic if the privilege protected members of the faith who had violated tenets of the faith and had to confess such violations but not fideits who had observed the tenets and sought spiritual counseling to deepen their faith. *Véase*, E.J. Imwinkelried, *op. cit.*, sec. 6.11.1. (Énfasis suplido) (Citas omitidas).

A tenor con estos desarrollos jurídicos, **además del sacramento de la confesión, la comunicación estatuida en**

**la Regla 511 incluye también la consejería espiritual, brindada por una *persona religiosa*, desempeñándose en tal capacidad.** Esta práctica adquiere carácter privilegiado bajo el palio de la regla evidenciaria en cuestión. Dictaminar lo contrario sería dar al traste con las tendencias expansivas e inclusivas del privilegio. Además, otro aspecto que requiere examinarse, en aras de resolver si aplica el privilegio, es si la *persona religiosa* en cuestión **está autorizada a proporcionar la llamada consejería espiritual y, para fines de la comunicación, actúa en ese rol de consejera.** Íd., sec. 6.9.1. *Véase*, además, <u>In re</u> Grand Jury <u>Investigation</u>, 918 F.2d 374 (1990).

Ahora bien, aunque reconocemos que la protección incluye la llamada consejería espiritual, concluimos que la protección no puede ser tan amplia que extienda el privilegio a todo tipo de comunicación con la *persona religiosa*. Empero, la determinación de lo que constituye comunicación privilegiada o una comunicación no protegida tendrá que realizarse analizando las circunstancias particulares de cada caso, a la luz de la normativa expuesta. *Véase*, E.J. Imwinkelried, *op. cit.*, sec. 6.11.1.

**VII**

Más allá de los límites que los privilegios evidenciarios le imponen al poder de investigación de las agencias, la controversia ante nos requiere que no perdamos de perspectiva la garantía constitucional de

expectativa de intimidad que ampara a los individuos. Como sabemos, nuestro andamiaje constitucional consagra el principio cardinal de la inviolabilidad de la dignidad del ser humano, a la vez que reconoce como derechos fundamentales la intimidad y la protección contra ataques abusivos a la honra, la reputación y la vida privada o familiar. *Véase*, Art. II, secs. 1 y 8, Const. ELA, 1 LPRA. A estos derechos fundamentales, le hemos reconocido particular preeminencia en nuestro esquema constitucional. Por tanto, nuestros pronunciamientos jurisprudenciales dejan meridianamente claro que el Estado tiene una función dual para proteger lo contenido en nuestra ley suprema, esto es: (1) abstenerse de actuar de forma tal que se infrinja el ámbito de autonomía e intimidad individual; y (2) actuar afirmativamente en beneficio de los ciudadanos. Soc. de Gananciales v. Royal Bank de PR, 145 DPR 178, 201 (1998).

En lo referente al derecho fundamental a la intimidad, reiteradamente hemos expresado que este derecho goza de la más alta protección bajo el palio de nuestra Constitución. Por su carácter privilegiado, el derecho a la intimidad opera *ex propio vigore* e incluso puede invocarse frente a personas particulares, sin la necesidad de que concurra el requisito de acción estatal. López Tristani v. Maldonado, 168 DPR 838, 850 (2006); López v. ELA, 165 DPR 280, 295 (2005); Arroyo v. Rattan Specialties, Inc., 117 DPR 35, 64 (1986).

Nuestros pronunciamientos jurisprudenciales sobre el particular revelan que este derecho se lesiona cuando se limita la facultad del individuo para tomar decisiones personales, familiares o de carácter íntimo. Soc. de Gananciales v. Royal Bank de PR, *supra*, pág. 202.

El criterio de umbral para reconocer si se ha infringido el derecho a la intimidad es si la persona afectada alberga una expectativa de intimidad y si tal expectativa es razonable a la luz de los criterios prevalecientes en la sociedad.[30] Weber Carrillo v. ELA,

---

[30]Aunque esta Curia adoptó este método del Tribunal Supremo de los Estados Unidos y lo ha reiterado hasta el presente, es preciso señalar que la aplicación del segundo criterio expuesto, es decir, la llamada "expectativa objetiva", ha sido objeto de diversos debates. A modo de ejemplo, el profesor Ramos González resalta ampliamente las dificultades de aplicar el requisito de la "expectativa objetiva", pues concluye que ésta provoca que sean otros, no presentes en el tribunal como reclamantes, quienes en última instancia determinen la valorización del reclamo de intimidad y dignidad instado por un ciudadano. De esta forma, el referido profesor sostiene que:

> [E]n la medida que el derecho de intimidad es complementario o consustancial a la dignidad humana, en esa misma extensión la metodología sobre "búsqueda de expectativas razonables de intimidad" es insuficiente para valorar una violación al derecho de intimidad de la Sección 8 del Artículo II de la Carta de Derechos. En la etapa de la evaluación inicial de lo alegado, la metodología no puede aumentar el peso de la prueba del demandante y disminuir la del demandado dado la dimensión que tiene el derecho de intimidad sobre la dignidad humana. Si así se hace, se corre el riesgo de entender el derecho de intimidad puertorriqueño *como uno que garantiza u honra meras expectativas cuando más bien debe interpretarse que este derecho garantiza la intimidad y obliga a promover su desarrollo.* Es decir, la metodología de "expectativas razonables" evita que aflore la función dual de nuestra Carta de Derechos y nuestra

(continúa...)

*supra*, pág. 14. Debemos acentuar que el mencionado derecho constitucional constituye un ámbito capaz de impedir o limitar la intervención de terceros, ya sean particulares o poderes públicos, contra la voluntad del titular. López Tristani v. Maldonado, *supra*, pág. 849. Por tanto, hemos afirmado que en nuestra jurisdicción se le impone a toda persona, incluido el Estado, el deber de no inmiscuirse en la vida privada o familiar de los demás. Colón v. Romero Barceló, 112 DPR 573, 576 (1982). Además, recientemente resolvimos que:

> La intromisión del Estado en la vida privada de un individuo, cuando ésta es necesaria para llevar a cabo una investigación criminal, no está prohibida, pero está limitada, pues el interés gubernamental de poner en vigor las leyes penales y combatir el crimen **no permite violar los derechos de los ciudadanos y las ciudadanas a su intimidad.** Weber Carrillo v. ELA, *supra*, pág. 10. (Énfasis suplido).

Ahora bien, un reclamo de violación al derecho a la intimidad no puede coartar de plano la facultad del Estado de investigar y procesar a los infractores de las leyes penales. La autoridad para determinar si se procesa o no a los infractores de nuestro precepto penal es exclusiva del Estado, por lo que las víctimas no tienen el poder de vetar el curso de acción estatal.

---

vocación inconclusa de estado social y democrático: vindicar la dignidad humana y, como *parte* de este norte, limitar los poderes del gobierno e imponerle obligaciones a ese estado. *Véase*, C.E. Ramos González, *La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el Derecho Constitucional puertorriqueño*, 45 Rev. Jur. U. Inter. P.R. 185, 201 (2010-2011).

Pueblo v. Castellón, *supra*, pág. 25. Resolver que las víctimas tienen la facultad para decidir si se procesa o no a un perpetrador de conducta delictiva, al amparo de un derecho constitucional o de otro reclamo, atentaría con el interés legítimo y apremiante del Estado de investigar y procesar a los que quebrantan las normas penales.

En lo concerniente al asunto ante nos, aunque no albergamos duda de que el derecho a la intimidad protege a las víctimas de abuso sexual en ciertas circunstancias, reconocemos que ese derecho no es absoluto. Ello, toda vez que éste se enfrenta al interés del Estado de investigar y procesar a los que incurren en conducta criminal.

Sabido es que en nuestro ordenamiento jurídico existen modalidades de delitos en los cuales no importa ni es pertinente la edad o capacidad mental de la víctima, sino el abuso de la relación de autoridad para tener acceso a ésta. *Véase*, 33 LPRA sec. 5191; D. Nevares-Muñiz, *Código Penal de Puerto Rico: Comentado por Dora Nevares-Muñiz*, Instituto para el Desarrollo del Derecho, Inc., pág. 195 (2012).

A tales efectos, el examen en cuanto a la aplicación del derecho a la intimidad no puede circunscribirse a un mero análisis de si se es mayor de edad o no. Por tanto, el solo hecho de ser mayor de edad no implica que pueda invocarse válidamente un derecho de intimidad, y de esa forma obstaculizar otros intereses

que muy bien pudiesen ser legítimos y apremiantes. Mucho menos, podemos disponer de un reclamo de intimidad a base de especulaciones o imaginaciones, sustituyendo el mecanismo objetivo de la inspección en cámara de la totalidad de los documentos por estos criterios subjetivos. Nos preguntamos, entonces: ¿Qué garantías tenemos de que las alegadas víctimas de delitos sexuales en este caso no se encuentran amenazadas para no declarar? ¿Acaso concluir que existe un derecho a la intimidad en esta etapa, sin aún contar con el beneficio de un cuadro más amplio, no tiene el efecto colateral de inmunizar posibles conductas punibles? Ante ese cuadro e interrogantes de umbral, me parece prematuro adjudicar en el vacío un reclamo de intimidad en esta etapa de los procedimientos, tal como lo ha hecho una Mayoría de este Tribunal al concederle un poder de veto al adulto interventor y otras posibles víctimas.

## VIII

En esta coyuntura, vale preguntarse, entonces, qué herramientas tienen los foros judiciales ante un reclamo de que los documentos o información solicitada por una agencia pueden ser de naturaleza privilegiada o si existe una expectativa de intimidad sobre éstos. En relación a ello, avalamos el razonamiento de que la confidencialidad de la información se determine a base de un análisis de la totalidad de las circunstancias que rodean la comunicación, así como su propia naturaleza. Adviértase que en este quehacer, el mecanismo altamente

favorecido, apropiado y útil es el **examen en cámara**. Colón Cabrera v. Caribbean Petroleum, 170 DPR 582 (2007); ELA v. Casta, 162 DPR 1 (2004); Pres. del Senado, 148 DPR 737 (1999); Santiago v. Bobb y El Mundo, Inc., 117 DPR 153 (1986); Soto v. Srio. de Justicia, 112 DPR 477 (1982). Este mecanismo forma parte primordial en el ordenamiento jurídico federal y no es la excepción en nuestra jurisdicción.

En esencia, el examen en cámara permite al juzgador dirimir los reclamos de confidencialidad en cuanto a documentos o información que estén en controversia. Particularmente, hemos expresado que cuando una parte alega que la información es privilegiada, el examen en cámara constituye, de ordinario, una condición previa al reconocimiento del privilegio. ELA v. Casta, *supra*; Santiago v. Bobb y El Mundo, Inc., *supra*; Peña Clos v. Cartagena Ortiz, 114 DPR 576 (1983).

Este examen le brinda la oportunidad al juzgador de analizar cada uno de los documentos en cuestión y, de esa forma, ejercer su tarea constitucional de determinar cuáles gozan de protección, por lo que deben ser catalogados como confidenciales, o cuáles no están cobijados por algún privilegio o derecho. Por tanto, refrendamos la visión judicial que avala que los foros judiciales realicen, de ordinario, un examen en cámara de los documentos reclamados como privilegiados, antes de hacer una determinación a tales efectos.

**IX**

La polémica suscitada y traída ante la consideración de esta Curia amerita que nos pronunciemos con respecto a la manera en que el Estado se interrelaciona con las prácticas religiosas y la forma en que los tribunales deben examinar este vínculo. Es una realidad irrefutable que la zona de acción del Estado suele entremezclarse, de una forma u otra, con la religión. Ante este escenario, los tribunales estamos llamados a intervenir para alcanzar un balance armonioso entre la obligación estatal de salvaguardar los intereses de los ciudadanos y su deber de no quebrantar las garantías constitucionales vinculadas con asuntos religiosos.

Es norma firmemente establecida que al amparo de la Constitución, tanto de los Estados Unidos como de Puerto Rico, se garantiza la práctica de las creencias religiosas individuales o colectivas. De esta forma, hemos sido concluyentes en afirmar que la libertad de culto es absoluta y no proceden intromisiones indebidas contra ésta. No obstante, señalamos que la autonomía para actuar conforme a las creencias religiosas podría tener sus limitaciones.

Respecto a lo anterior, esta Curia ha reconocido que aquellas actuaciones estatales que no afecten adversamente la religión o lo hacen de modo incidental y, a su vez, persiguen un interés apremiante, de ordinario, prevalecerán sobre los reclamos incoados al

amparo del Art. II, sec. 3, de nuestra Constitución.[31] Es decir, cuando exista un interés legítimo y apremiante y la intervención estatal con la práctica religiosa sea incidental, la acción gubernamental, de ordinario, será constitucionalmente permisible. Asoc. Academias y Col. Cristianos v. ELA, 135 DPR 150, 160 (1994). En cambio, si la intervención gubernamental es neutral, de aplicabilidad general, y está relacionada con asuntos seculares que recaen uniformemente en todo un género de actividades, el Estado no tendrá que justificar un interés apremiante, siempre y cuando el efecto sobre la práctica religiosa sea de tipo incidental. Íd., págs. 160-161. En armonía con lo anterior, en Church of Lukumi v. Hialeah, 508 US 520, 531 (1993), el Tribunal Supremo Federal concluyó que:

> [A] law that is neutral and of general applicability need **not to be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice**. . . A law failing to satisfy these requirements must be justified by a compelling government interest and must narrowly tailored to advance that interest. (Énfasis suplido).

A la luz de lo expuesto, reiteramos que actos estatales pueden repercutir en la zona de la iglesia,

---

[31]En cuanto a lo que puede constituir un interés apremiante, esta Curia ha expresado que:

> [D]ifícilmente existe un interés estatal más apremiante que el de proteger la seguridad de los ciudadanos de este País mediante el procesamiento, correcto y adecuado, de las personas acusadas de cometer delitos en detrimento de la tranquilidad y sosiego de nuestra sociedad. Rodríguez Del Valle v. Corcelles Ortiz, 135 DPR 834, 845 (1994). (Énfasis suplido).

pero ello no conlleva su invalidez automática. Es constitucionalmente válido que el Estado, en su función de velar porque se cumplan las leyes y proteger la paz, la moral y el orden público, interfiera incidentalmente con la práctica de una religión. Asoc. Academias y Col. Cristianos v. ELA, *supra*, págs. 160-161. Empero, no es permisible que la acción estatal afecte indebida e innecesariamente el libre ejercicio de las creencias religiosas.

Hacemos hincapié en que si en la consecución de un fin apremiante el Estado afecta adversamente la práctica de una religión, las garantías constitucionales requieren que se hagan concesiones para permitir el libre ejercicio de las creencias religiosas. Íd. En estas circunstancias, el Estado deberá probar: (1) la existencia de un interés legítimo y apremiante que justifique su acción y (2) que la misma no puede ser sustituida por medios menos onerosos.

Con respecto al peso de la prueba, esta Curia ha resuelto que la persona que cuestiona una intervención estatal, al amparo de la garantía de libertad de culto, viene llamada a establecer que el Estado no tiene el correspondiente interés público que justifique su actuación o que se ha impuesto un gravamen o carga sustancial al ejercicio de su religión. Íd., pág. 161. Esto es, la parte que alegue que su libertad de culto ha sido infringida, tiene el peso de probar la forma en que la actuación gubernamental lo hace. Como mencionamos, es

norma reiterada que una carga mínima o incidental impuesta por el Estado a una parte, de ordinario, no es suficiente para invocar exitosamente el derecho a la libertad de culto. Íd.

**A**

Al amparo de la normativa expuesta en el acápite que antecede, los foros judiciales han validado acciones gubernamentales que, de una forma u otra, repercuten en asuntos de alguna religión. En ese sentido, existen circunstancias en que el interés apremiante y secular tiene suficiente peso y ha sido determinante para permitir la intervención estatal. En cuanto a ello, en el libro *Religious Organizations and the Law* se señala que:

> The general rule is that the courts are prohibited by the First Amendment from getting involved in intra-church disputes when doing so would require them to become entangled in religious affairs. **However, when a dispute can be analyzed and resolved by application of neutral principles of law, the court will often take jurisdiction.** Thus, if a court determines that adjudication would require the court to choose between competing religious visions or cause interference with a church's administrative prerogatives, the disputes is truly of a religious nature, rather than theoretically and tangentially touching on religion, and the claim is barred from secular court review; **if, however, the dispute can be resolved by the application of purely neutral principles of law and without impermissible government intrusion, e.g., where the church offers no religious based justification for its actions and points to no internal governance rights that would actually be affected, there is no First Amendment shield to litigation, even when the dispute arises from**

> **activity that occurred in a religious setting.** *Véase*, W.W. Bassett, W. Cole Durham & R.T. Smith, *Religious Organizations and the Law*, Thomson Reuters/West, p. 145-146, sec. 10:44 (2012). (Énfasis suplido). (Citas omitidas).

A tono con este proceder, tribunales han rechazado extender el privilegio del religioso-creyente para cobijar de inmunidad investigaciones internas de la iglesia. Esto, cuando las acciones del Estado cumplen a cabalidad con la normativa discutida. Basta con examinar dictámenes de tribunales federales para percatarse de que éstos **no han extendido el privilegio de la comunicación penitencial a las comunicaciones emitidas en el contexto de una investigación eclesiástica de conducta impropia por parte de miembros del clero.** *Véanse*, Roman Catholic Archbishop of Los Angeles v. Superior Court, 131 Cal. App. 4th 417 (2005); People v. Campobello, 348 Ill. App. 3d 619 (2004); Society of Jesus of New England v. Com, 441 Mass. 662 (2004).

Sostenemos tal contención y razonamiento. **Consideramos que no todas las comunicaciones emitidas en el contexto de una investigación eclesiástica, están automáticamente revestidas de protección al amparo del privilegio estatuido en la Regla 511.** Del mismo modo, concluimos que la protección tampoco se extiende, de forma automática, a todos los documentos que se generan en el contexto de una investigación eclesiástica. **De lo que hoy determinamos, exceptuamos, claro está, las comunicaciones que se hacen durante el sacramento de la**

**confesión y, tal como interpretamos, aquellas que se enmarcan dentro de la llamada consejería espiritual, cuando son realizadas por una *persona religiosa* en su rol de consejero.** *Véase*, *In re* Grand Jury Investigation, *supra*.

Sin duda, no es nuestro rol inmunizar todo lo que acontece en un entorno religioso, máxime cuando se trata de un potencial abuso sexual contra seres humanos. Asimismo, la interpretación que realizamos permitirá que la Regla 511 de nuestro ordenamiento evidenciario esté en armonía con el mandato legislativo, el cual recogió los recientes desarrollos en materia de derecho probatorio.

## X

Examinado el marco jurídico y estatutario correspondiente, y resueltas las cuestiones de umbral, pasamos a disponer de la controversia ante nos.

Tal y como reseñamos, este caso tuvo su origen cuando el Obispo y el Vicario General impugnaron sendos *subpoenas* emitidos por el Departamento. En síntesis, alegaron que éstos infringían garantías constitucionales y quebrantaban el privilegio evidenciario estatuido en la Regla 511. Por su parte, el ELA sostuvo que su actuación perseguía un interés apremiante, que no representaba una intromisión indebida con la religión y que tenía las salvaguardas necesarias para proteger la confidencialidad de la información requerida. Ante ello, el foro de instancia decretó la constitucionalidad de

los *subpoenas* en cuestión, exceptuando lo obtenido en el sacramento de la confesión, y ordenó la entrega de la información solicitada por el Departamento.

No podemos avalar el dictamen emitido por el aludido foro. Entendemos que éste incidió al ordenar, a ciegas, la entrega de todos los documentos en controversia. Asimismo, concluimos que actuó de forma improcedente al circunscribir el privilegio de la Regla 511 al sacramento de la confesión.

Ante el reclamo de los demandantes y el Interventor de que los documentos requeridos estaban cobijados por privilegios y que tenían una expectativa de intimidad sobre los mismos, el tribunal de instancia debió celebrar una inspección en cámara. Como expusimos, ese es el mecanismo más apropiado y útil que tiene el juzgador para dirimir este tipo de reclamo, y es cónsono con el remedio que los demandantes han expuesto y solicitado. Erró el foro al descartar, sin más, realizar este procedimiento.

Por otra parte, el foro primario solo le otorgó la protección que emana de la Regla 511 a las comunicaciones emitidas durante el sacramento de la confesión. Somos de la opinión de que con este proceder, el referido foro se alejó de todo el desarrollo jurídico vigente en materia de derecho probatorio. A su vez, revestir de protección solo al mencionado sacramento, constituye una intromisión indebida con los asuntos de otras denominaciones religiosas, a la vez que, como

discutimos, atenta contra garantías constitucionales firmemente establecidas. En conformidad con lo interpretado en esta Opinión, no podemos sostener ni imprimirle un sello de corrección al razonamiento del tribunal de instancia.

Si bien reconocemos la amplia facultad del Departamento para investigar aquellos actos que podrían constituir violaciones a las leyes penales y que los *subpoenas* en cuestión podrían adelantar un interés estatal apremiante, ante la ausencia de una inspección en cámara previa, su concesión automática constituiría una acción excesiva del Estado. Esto, ya que dentro de lo requerido por el Departamento podría haber comunicaciones emitidas tanto en el sacramento de la confesión como en consejería espiritual. De igual forma, sin la intervención de un juzgador por medio de un examen en cámara, y en vista de la etapa en que se encuentra el presente caso, no podemos concluir que el requerimiento estatal es contrario a un interés apremiante y que éste constituye una intervención indebida en relación a la manera en que la institución religiosa maneja sus asuntos internos. Ante la coyuntura particular, tampoco cabe afirmar que el Estado pretende pasar juicio valorativo sobre esos asuntos, ni mucho menos determinar que la información requerida no es necesaria para la investigación criminal.

Respetuosamente considero que la Mayoría de este Tribunal debió enmarcar el procedimiento ordenado en los parámetros objetivos de este disenso.

Precisamente, a la luz del derecho expuesto, ordenaría que el foro de instancia realice un examen en cámara, con el fin de determinar cuáles documentos y comunicaciones están protegidas y cuáles no. En consecuencia, devolvería el caso al foro primario para que, en un término perentorio, ejecute la correspondiente inspección de todos los documentos.

En armonía con lo que hemos ordenado ante situaciones análogas, para la realización del examen en cámara hubiese establecido el siguiente procedimiento, a saber: (1) los demandantes someterán al tribunal una relación, bajo juramento, de todos los documentos en su poder, concernientes a lo requerido por el Departamento; (2) en la referida relación se deben identificar adecuadamente todos los documentos en cuestión y se tomarán previsiones para proteger la identidad de las posibles víctimas de delito; (3) no será necesario que se incluya una descripción del contenido de los documentos; (4) debe especificarse cuál o cuáles de los documentos no deben ser revelados, expresando todas las razones y fundamentos para ello; y (5) el tribunal de instancia ordenará que los demandantes produzcan los documentos para ser inspeccionados, con exclusión de las partes y sus abogados. En todo caso, el foro de instancia tendrá discreción para regular y dirigir estos

procedimientos, siempre y cuando su proceder sea compatible con lo aquí resuelto.

Realizado el correspondiente examen, el foro judicial ordenará la entrega de copia de aquellos documentos que determine que no están protegidos, en conformidad con lo interpretado en esta Opinión. Del mismo modo, denegará el acceso a los demás documentos que concluya están protegidos.

Sostenemos que una vez inspeccionados los documentos mediante el referido procedimiento, el Tribunal de Primera Instancia estará en posición de adjudicar el reclamo de violación al derecho de intimidad instado por el Interventor. La razón de ello es que desconocemos el grado de expectativa, la posible divulgación a otras personas y el *contexto* en que se emitieron las comunicaciones del Interventor. Sin la debida inspección de los documentos, lo que tenemos ante nos son meras alegaciones. Además, no podemos obviar que una Mayoría de este Tribunal le ha otorgado al Interventor un poder de veto.

En fin, como hemos expresado, el Estado tiene un rol constitucional de garantizar el orden público y procesar a los infractores de las leyes penales. Sin embargo, no puede llevar a cabo tal trascendental función en detrimento de los derechos de los ciudadanos. En vista de ello, es función inherente de los tribunales intervenir para lograr la armonía necesaria que debe existir entre las prerrogativas del Estado y los

derechos que cobijan a los ciudadanos. Habida cuenta de que este balance se ve tronchado por el curso de acción delineado por una Mayoría de este Tribunal, DISIENTO.


                                Luis F. Estrella Martínez
                                    *Juez Asociado*